1  LATHAM & WATKINS LLP
   Kenneth M. Fitzgerald (SBN 142505)
2     kenneth.fitzgerald@lw.com
   Hassan Elrakabawy (SBN 248146)
3     hassan.elrakabawy@lw.com
600 West Broadway, Suite 1800
4  San Diego, California 92101-3375
Telephone: +1.619.236.1234
5  Facsimile: +1.619.696.7419

6  Attorneys for Defendant Reed Elsevier Inc.

7

8               UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  JERRY CZAJKOWSKI, Ph.D., an
individual,
           CASE NO. 07 CV 2383 JM (LSP)

12              DECLARATION OF KENNETH M.
Plaintiff,       FITZGERALD IN SUPPORT OF
13              DEFENDANT'S MOTION FOR
            SANCTIONS AND FOR PRE-FILING
   v.          ORDER AGAINST VEXATIOUS
14  REED ELSEVIER INC., a    LITIGANT
Massachusetts Corporation, and DOES
15  1-20, inclusive,       DATE: March 7, 2008
            TIME: 1:30 p.m.
16            COURTROOM: 16, 5th Floor
      Defendant.
17              Honorable Jeffrey T. Miller

18

19

20

21         I, Kenneth M. Fitzgerald, declare:

22         1.    I am a partner at Latham & Watkins LLP, counsel for defendant

23  Reed Elsevier Inc. ("Reed") in this action. I am licensed to practice law in the

24  State of California and admitted before this Court. All of the facts set forth herein

25  are within my personal knowledge, to which I could and would testify if called

26  upon to do so.

27  / / /

28  / / /

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN DIEGO

SD\615194.1

1

CASE NO. 07 CV 2383 JM (LSP)
DECLARATION OF KENNETH M. FITZGERALD
ISO DEFENDANT'S MOTION FOR SANCTIONS

1        2.      Attached hereto as Exhibit A is a true and correct copy of a

2  letter from plaintiff Jerry Czajkowski to Reed corporate counsel H. Z.

3  Horbaczewski dated January 6, 2004.

4        3.      Attached hereto as Exhibit B is a true and correct copy of a

5  letter from plaintiff Jerry Czajkowski to Reed corporate counsel H. Z.

6  Horbaczewski dated March 24, 2004.

7        4.      Attached hereto as Exhibit C is a true and correct copy of an e-

8  mail from plaintiff Jerry Czajkowski to me dated June 26, 2004.

9        5.      Attached hereto as Exhibit D is a true and correct copy of an e-

10  mail from plaintiff Jerry Czajkowski to me dated June 27, 2004.

11        6.      Attached hereto as Exhibit E is a true and correct copy of a

12  letter from me to plaintiff's attorney C. L. Davidson dated July 20, 2005.

13        7.      Attached hereto as Exhibit F is a true and correct copy of a

14  letter from me to plaintiff's attorney P. Lewis dated April 11, 2007.

15        8.      Attached hereto as Exhibit G is a true and correct copy of an e-

16  mail from plaintiff J. Czajkowski to C. J. Faruki dated September 24, 2007.

17        9.     On January 4, 2008, I served the instant Motion For Sanctions

18  on plaintiff and, pursuant to Fed. R. Civ. P. 11, requested that he voluntarily

19  withdraw his complaint.  He did not do so.

20        I declare under penalty of perjury under the laws of the United States

21  that the foregoing is true and correct and that this declaration was executed at

22  San Diego, California on January 29, 2008.

23

24                              s/Kenneth M. Fitzgerald

25

26

27

28

LATHAM&WATKINS<sup>LLP</sup>  SD\615194.1
ATTORNEYS AT LAW
SAN DIEGO

2

CASE NO. 07 CV 2383 JM (LSP)
DECLARATION OF KENNETH M. FITZGERALD
ISO DEFENDANT'S MOTION FOR SANCTIONS

# EXHIBIT A

January 6, 2004

Henry Z. Horbaczewski
Reed Elsevier Inc.
125 Park Avenue, 23rd Floor
New York, NY 10017

Dear Mr.Horbaczewski:

On January 1st, 1991, in anticipation of a merger with General Cinema, San Diego based
Harcourt Brace Jovanovich, Inc. (HBJ) stopped paying dividends on its 12% Preferred Stock, a bond-
like security, in which I and my mother Lonia have had vested interest (a vested property right). The
HBJ 12% Preferred Stock had a maturity date of June 30, 2003 through June 30, 2007 (please see the
attached HBJ stock certificate and p.133 from HBJ Joint Proxy Statement).

Although HBJ had designated the HBJ 12% Preferred Stock as "outside of shareholders' equity"
("The 12% Preferred Stock is mandatorily redeemable and as such is classified outside of shareholders'
equity", see page F-22), on two occasions (1994 and 1999) we failed to get specific performance of the
contract as equitable relief and have this debenture redeemed before its maturity at $13.50/share, unlike
the Nivram Corporation did in 1995 (see encl.5), though once on June 8, 1994 we came close. This
happened mainly because we represented ourselves in the 4th District Court in San Diego and twice on
appeal in the 9th U.S. Court of Appeals (please see the two Appellate Memoranda of June 8, 1994 and
April 15, 1999, and the Opening Brief of Sept 02, 1998 summarizing all our six year efforts).

The facts: (1) that in order not to follow the 6/8/1994 Appellate Court's main directive favoring
the plaintiffs, on 5/20/96 Judge J.S. Rhodes who knew the specifics of our case, transferred the case to
an unfamiliar Judge R. Brewster (see p.8 of the Civil Docket), and (2) on 4/21/94, 12 days before the
oral argument at the Appeals Court in Pasadena on 5/03/94, defendants' attorneys R.Clark and
W.Bowen quit the case and defendants hired an unacquainted young attorney - a San Diego District
Court insider - a former Law Clerk, K.M. Fitzgerald, did not help our case either.

Under such circumstances in 1996 we had no chance to come across with the Law Clerks of
Judge Brewster (former friends or coworkers of K.M. Fitzgerald), nor in 1999 with the Law Clerks of
the Appellate Court's Judges. Simply put the Law Clerks didn't want to heed the Appellate Court's
6/8/1994 main directive instructing that plaintiffs' vested property rights ("various allegations of fraud
and breach of fiduciary duty") could be taken into consideration at an appraisal proceeding ("Appellants
also make various allegations of fraud and breach of fiduciary duty which can be considered in
conducting an appraisal under NY law", p.6 of June 8, 1994 Memoranda), and in 1999 a new Appeals
Court's panel of Judges ignored it as well.

Unlike us, the Nivram Corporation had a better luck in the U.S. District Court of New York where on
May 30, 1995, it was awarded $13.50/share or $1,417,500 for its 105,000 shares of HBJ 12% Preferred
Stock, $493,000 in attorney fees, and $57,093.93 in expert fees (please see the attached Final Judgment
of May 30, 1995 with its Opt-Out list).

Until this date we possess our vested property right, for we dissented from the merger between HBJ and
General Cinema, which had lead to creation of Harcourt General, and we still have the HBJ Stock
Certificate and 5,083 shares (copy attached).

In July 2001 Harcourt General was acquired by Reed Elsevier, which paid $59 a share for Harcourt's
stock and also assumed about $1.2 billion of the company's debt as part of the overall purchase price.

1

With this letter We, Lonia and Jerry Czajkowski, make a call for redemption by Reed Elsevier of our 5,083 HBJ 12% Preferred shares accordingly with the terms of the HBJ Contract –

"HBJ may, at its option, redeem shares of HBJ Preferred Stock in whole at any time, or from time to time in part, at a redemption price equal to the $13.50 per share liquidation preference plus accrued and unpaid dividends, if any, to the date fixed for redemption. HBJ is required to redeem, on June 30, 2003, and on each June 30 thereafter through June 30, 2006, 20% of all shares of HBJ Preferred Stock then outstanding and on June 30, 2007 all remaining shares of outstanding HBJ Preferred Stock, in each case at the redemption price of $13.50 per share, plus accrued and unpaid dividends, if any, to the date of redemption". (Joint Proxy Statement of 10-25-91, p.133).

Since January 1st, 1991, 13 years have passed or 52 quarters. The quarterly dividend rate is 12%/4 = 3%. On Dec 30, 2003 this amounted to 5083*(1+0.03)^52 = 23,640.45 shares valued at $13.50 per share, or a total of 23,640.45 * $13.50 = $319,146.11.

1. If you choose to redeem in the year 2003 only 20% of the 23,640.45 shares or 4,728.09 shares at $13.50/share, please remit $63,829.22.

2. Next year on Dec 30, 2004 if only 20% similarly, please remit (23,640.45 - 4,728.09 = 18,912.36 shares left, 18,912.36*(1+0.03)^4 = 21,286.03 shares, 21,286.03*0.20 = 4,257.21 shares * $13.50/share = $57,472.28.

3. Following year on Dec 30, 2005 if only 20% similarly, please remit (21,286.03 - 4,257.21 = 17,028.82 shares left, 17,028.82*(1+0.03)^4 = 19,166.09 shares, 19,166.09* 0.20 = 3,833.22 shares * $13.50/share = $51,748.45.

4. On Dec 30, 2006 if only 20% similarly, please remit (19,166.09 - 3,833.22 = 15,332.87 shares left, 15,332.87* (1+0.03)^4 = 17,257.28 shares, 17,257.28*0.20 = 3,451.46 shares * $13.50/share = $46,594.67.

5. And finally on Dec 30, 2007 please remit all the remaining shares (17,257.28 - 3,451.46 = 13,805.83*(1+0.03)^4 = 15,538.58 shares, 15,538.58 shares * $13.50/share = $209,770.83. (Total of 1-5 = $429,415.45)

Alternatively, please remit as of December 30, 2003 (after 52 quarters) 5083 shares * (1+0.03)^52 = 22,283.39 shares valued $13.50 per share, for a total of 22,283.39 * $13.50 = $319,146.12.

Sincerely,

    Jerry Czajkowski and Lonia Czajkowski
    7944 La Jolla Shores Dr
    La Jolla, CA 92037

PS: Please respond to this Call for Redemption within 60 days.

Enclosures:
1. p.133, p.F-22 of HBJ 1991 Joint Proxy Statement
2. Appellate Memoranda of June 8, 1994 and April 15, 1999
3. Opening Brief of Sept 02, 1998 sent via USPS Priority Mail with delivery confirmation
4. Civil Docket as of 5/18/1998
5. Final Judgment of May 30, 1995 in the case Nivram Corporation vs HBJ.
6. Copy of the HBJ Stock Certificate PF 68731, 5083 shares.

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

**FILED**

FOR THE NINTH CIRCUIT

APR 1 5 1999

CATHY A. CATTERSON
CLERK, U.S. COURT OF APPEALS

|  |  |
|---|---|
| JERRY CZAJOWSKI; LONIA CZAJKOWSKI, | No. 98-55904 |
| Plaintiffs-Appellants, | D.C. No. CV-92-00431-RMB |
| v. |  |
| PETER JOVANOVICH; HARCOURT BRACE JOVANOVICH, INC., | MEMORANDUM[1] |
| Defendants-Appellees. |  |

Appeal from the United States District Court
for the Southern District of California
Rudi M. Brewster, District Judge, Presiding

Submitted April 12, 1999[2]

Before:   BRUNETTI, LEAVY, and THOMAS, Circuit Judges.

Jerry Czajkowski and Lonia Czajkowski ("plaintiffs"), former preferred

shareholders of Harcourt Brace Jovanovich, Inc. ("HBJ"), appeal pro se the district

court's grant of summary judgment for defendants in plaintiffs' diversity action

---

[1]    This disposition is not appropriate for publication and may not be cited to or by the courts
of this circuit except as may be provided by 9th Cir. R. 36-3.

[2]    The panel unanimously finds this case suitable for decision without oral argument. See
Fed. R. App. P. 34(a)(2). Accordingly, we deny appellants' request for oral argument.

alleging that HBJ breached a liquidation preference clause by failing to redeem

plaintiffs' shares of HBJ preferred stock at the purported guaranteed redemption

price of $13.50 per share when HBJ merged with General Cinema Corporation in

1991. Plaintiffs also appeal the district court's April 24, 1998 order denying their

motion for reconsideration. We dismiss in part, and affirm in part.

We lack jurisdiction to review the district court's February 9, 1998 order

granting summary judgment to defendants because plaintiffs did not file their

notice of appeal until May 4, 1998, nearly three months after judgment was

entered on February 10, 1998. *See* Fed. R. App. P. 4(a)(1)(A); *Atchison, Topeka &*

*Santa Fe Ry. Co. v. California State Bd. of Equalization*, 102 F.3d 425, 427 (9th

Cir. 1996). Although plaintiffs sought reconsideration of the district court's

summary judgment order, they did not file the motion until March 12, 1998, well

beyond the ten-day period that would have tolled the time to file their notice of

appeal from the summary judgment order. *See* Fed. R. App. P. 4(a)(1)(A).

Accordingly, we dismiss this portion of plaintiffs' appeal for lack of appellate

jurisdiction. *See California State Bd. of Equalization*, 102 F.3d at 427.

We do, however, have jurisdiction to review the district court's denial of

plaintiffs' motion for reconsideration. We conclude that the district court did not

abuse its discretion because plaintiffs essentially only sought to relitigate issues

that were previously rejected by this court in *Czajkowski v. Jovanovich*, No.

-2-

92-55787, 1992 WL 247089, at *1-4 (9th Cir. June 8, 1994), and plaintiffs have

failed to demonstrate a sufficient basis for relief under either Fed. R. Civ. P. 59(e)

or 60(b). *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1441-42 (9th Cir. 1991).

We reject plaintiffs' remaining contentions as being without merit.

**We deny Appellees' request for judicial notice.**

**Appellees are entitled to recover their costs on appeal.**

**DISMISSED in part, and AFFIRMED in part.**

-3-

# EXHIBIT B

March 24, 2004

Henry Z. Horbaczewski
Reed Elsevier Inc.
125 Park Avenue, 23rd Floor
New York, NY 10017

Dear Mr. Horbaczewski:

Two months have passed since the January 6, 2004 Request to Redeem our 5083 HBJ 12% Preferred shares (attached), but we still have not received any response from you or your office.

Please be kind enough to inform us, at least, of your intent.

In addition we would like to acquaint you with some of our biography as per letter to the President George W. Bush of Nov 24th, 2003, with selected attachments.

Sincerely,

Jerry Czajkowski and Lonia Czajkowski
7944 La Jolla Shores Dr
La Jolla, CA 92037

Enclosures:

1.  Copy of Nov 24th, 2003 letter to the President George W. Bush with selected attachments:
    a.  1966 photo page of us and our parents Wieslaw and Longina taken with the U.S. Ambassador to Poland John A. Gronouski and. attorney Chester A. Kozdroj, President of the Polish Business and Professional Men of Detroit.
    b.  1969 photo of our father Wieslaw taken with Edward J. Piszek and Leopold Dende, editor-publisher of NEW LIFE and Janusz Wieczorek, Chief of the Prime Minister's Office. 1970 foto page of our parents Wieslaw and Longina with the U.S. Ambassador to Poland Walter J. Stoessel taken at the Warka Kazimierz Pulaski Memorial.
    c.  November 23,1971 best wishes letter from Edward J. Piszek.
    d.  Title page of Edward J. Piszek's 2001 book "Some Good in the World – a Life of Purpose".
    e.  October 8, 2003 letter to the former U.S. Ambassador to Poland Thomas W. Simons, Jr.
2.  Excerpts from "The Ends of Power" written by President Nixon's Chief of Staff, H.R. Haldeman.
3.  Henry Kissinger's "White House Years", first page of Chapter XVIII "An Invitation to Peking – The End of the Warsaw Channel" and page 188.
4.  Copy of January 6, 2004 Request to Redeem letter.

1





May-06-2004  03:49pm    From-REED ELSEVIER              +2123095487           T-431   P.005/014   F-160



LONGINA CZAJKOWSKI

MRS. and MR. WALTER STOESSEL, U.S. AMBASSADOR TO POLAND

PULASKI MEMORIAL WARKA 10.1070



PULASKI MEMORIAL WARKA 10.1070
MRS. and MR. WALTER STOESSEL



E.J.PISZEK(EP) I.DENDE (LD) W.CZAJKOWSKI (WC)

WARSAW 1960
MINISTER TWEEZOREK



WARKA 10.10.70
L.D, W.C. and E.P, JR.



PULASKI MEMORIAL WARKA 10.1070
WIESLAW CZAJKOWSKI (WC)

May-06-2004  03:50pm  From-REED ELSEVIER                    +2123095487           T-431  P.006/014  F-160

# MRS. PAUL'S

5830 HENRY AVENUE, PHILADELPHIA, PA. 19128

November 23, 1971

OFFICE OF THE PRESIDENT
EDWARD J. PISZEK

Mr. Wieslaw Czajkowski
% Mr. William C. Rainford
29 Huntleigh Woods,
St. Louis, Missouri  63131

Dear Wieslaw:

Thank you for your letter.  I'm glad to hear that
you have yourself situated.  Your letter didn't say
where you are employed or whether your wife is
working or what your immediate needs were.

I'm sure that Mrs. Rainford has seen Mrs. Paul's
products in her local market since they are sold
in all fifty states.

With my best wishes for you and your family I remain,

Sincerely,

EJP/ll

"The Ends of Power", written by Nixon's Chief of Staff, H.R. Haldeman.

In my first months at the White House [1969], sensing that I would play a small role in historical events as the man closest to Nixon, I kept a log of some special events.
Entry No. 26, entitled "Chinese in Warsaw", hints at what may have been the most dangerous of all the confrontations this nation has ever faced. The confrontation was between China and the Soviet Union. The real story, never revealed so far [1978] by Kissinger or Nixon, is chilling. It involves not only brilliant last-minute diplomatic moves by Kissinger, but an unofficial ploy by an Air Force intelligence officer that combined to stave off an incredible disaster: a Soviet nuclear 'surgical' strike on China's atomic plants, which alone would have caused hundreds of thousands, if not millions, of deaths form fallout to Chinese, Japanese and American troops and civilians in Korea and Japan. If China had reciprocated, a full-scale nuclear holocaust would have begun, with fallout extending around the world. Insane. And yet the Soviets were ready to go. In fact, they insisted we join them. This is my log entry, which begins with a note of the first breakthrough in U.S.-Chinese relations:

"Log 26 - Chinese in Warsaw  On December 10th Kissinger burst into my office in a great state of excitement to report that we had just received word that the Chinese in Warsaw had come to our embassy indicating that they wanted to meet with us, and, more significantly, that they wanted to use the _front door_. The latter point is significant because any meetings with the Chinese before had been with utmost secrecy, whereas the use of the front door would indicate that the Chinese were prepared to have it _known_ that they were meeting with us. Kissinger at the same time volunteered the personal opinion that the Russian/Chinese situation was very serious and that he expected that there was a very strong probability that the Russians would attack China by April 15th." Kissinger's concern about a Russian attack on China was expressed many times. I used to tease him about his use of percentages. He would say there was a 60 per cent chance of a Soviet strike on China, for example, and I would say, "Why 60, Henry? Couldn't it be 65 per cent or 58 per cent?" But most of the details about the Soviet-Chinese crisis were kept so secret even I wasn't advised of some of the day to day developments. It wasn't until later that I heard many of the details. The world has heard of the border skirmishes in 1969 along the Ussuri River, between the northeastern province of Heilung Kiang in Manchuria and the Soviet Far East maritime province. What it doesn't know is that the Soviets (called by our intelligence experts in the area 'paranoiac about China') had moved nuclear-armed divisions within two miles of the border, according to intelligence sources. I am told that U.S. aerial photos revealed this grim story: hundreds of Soviet nuclear warheads stacked in piles. Eighteen thousand tents for their armored forces erected overnight in nine feet of snow. For years, the Soviets had been buttonholing U.S. diplomatic and military leaders. The message was always China, China, China. The Chinese must not be allowed to build a nuclear capability. As far back as 1962, Secretary of Defense Robert McNamara had thought seriously enough of the proposition to ask the Air Force to make a feasibility study of a surgical strike on Chinese nuclear plants. The study was completed in great secrecy. What the U.S. commanders found was that at the time, they didn't have a nuclear weapon in the entire stockpile 'clean' enough for a surgical strike. Our smallest weapon would have ended up causing millions of fatalities from fallout. In effect, we had no surgical capability then. What had made U.S. leaders supremely nervous was, as far as we knew, the Soviets had no 'surgical' capability either - but that fact apparently would not stop them. None of their warheads had been miniaturized as ours; instead, they were massive blockbusters whose fallout would be fantastic. In 1969 there were several overtures by the Soviets to the U.S. for a joint venture in the surgical strike. Nixon turned the Soviets down, but was then informed, to his horror, that the Soviets intended to go ahead on their own. A short review of Nixon's - and Kissinger's - background in Chinese relations will set the stage for the drama to come. Nixon for

1

years had been this nation's foremost enemy of Communist China. In a 1950 Senate campaign, Nixon said, 'Look at the map and we can see that if Formosa falls, the next frontier is the coast of California.' As late as 1960, in a television debate with John F. Kennedy, Nixon said, 'Now what do the Chinese Communists want? They don't want just Quemoy and Matsu. They don't want just Formosa. They want the world.' But Nixon was always shrewd. By 1967 he had decided that Communist China was a fact of life. In an article in the influential _Foreign Affairs_, in 1967, Nixon said, 'Any American policy towards Asia must come urgently to grips with the reality of China ... we simply cannot afford to leave China forever outside the family of nations, there to nurture its fantasies, cherish its hates and threaten its neighbors ...' When Nixon took office, one of his first priorities was a reopening of relations with China. His foreign affairs adviser, Kissinger, was rather a reluctant passenger those first six months. Kissinger had no background in Chinese affairs; his interests lay in European and Soviet relations. On Air Force One in the midst of Nixon's round-the-world trip in the late summer of 1969, I was meeting with the President in his private cabin. We had a long talk about a lot of things, but one comment he made really amazed me. When I returned to the staff section, the seat next to Henry Kissinger at his table was empty. I slipped in, leaned over to Henry, and said, 'You know, he actually seriously intends to visit China before the end of the second term.' Henry took his glasses off and polished them, a small smile on his face, then he turned to me and said, 'Fat chance.' Then came the Soviet-Chinese border clashes, surprising the rest of the world, which had seen the two countries as one great Communist monolith. And finally word from the Soviets that they could wait no longer for U.S. participation in the attack. If no signal was received from us, they would go ahead on their own. Kissinger, at first inclined to dismiss a Soviet nuclear attack on China as a fantasy, now realized as the border clashes escalated that was a serious possibility and told me so. He and Nixon huddled. They decided they would send a signal to the Soviets that the U.S. was determined to be a friend of that Eastern nation. How to send that signal? The U.S. and China had once held a series of meetings in Warsaw, but those talks had broken off. Kissinger contacted Walter J. Stoessel Jr., U.S. ambassador to Poland. His orders to Stoessel: find the highest ranking Chinese envoy to Poland at a social function and tell him the U.S. wants to resume the Warsaw talks. In the atmosphere of the time, when China was a bitter enemy of the U.S., and their diplomats never uttered a word to each other, this approach at a party would be a seismic event. It ended up as high comedy: the Charge d'Affaires at the Chinese embassy, Lei Yang, attending a Yugoslavian reception, was so startled by Stoessel's approach, he turned and walked out of the door. Stoessel ran down the stairs after him. Later, Chou En-lai told Kissinger in China: 'If you want our diplomats to have heart attacks, approach them at parties and propose serious talks.' On December 10, Kissinger's unorthodox approach worked, as my log entry showed. The request to resume the Warsaw talks carried two messages. One to Peking, that we were ready to reverse our policy of enmity to China and reopen relations. The second to Moscow, that the U.S. and China had common interest and a Soviet nuclear strike might bring the Russians into confrontation with the U.S. Meanwhile, Air Force intelligence studied the photos of Russian missiles and nuclear warheads along the border. No one could tell whether the Soviets would launch the attack, no matter what the U.S. attitude. And their fallout studies showed the immensity of the catastrophe in store for the world. For example, it was possible that without advance warning and precautionary measures every man, woman and child in Japan would have died. In addition to Japan, the fallout would spread across Korea and Pacific islands where more than 250,000 American troops were stationed. Major General George Keegan, Air Force Chief of Intelligence, was in Honolulu assaying the situation. He remembered that during the Cuban missile crisis in 1962, his Air Force Commander-in-Chief, Thomas Power, had said, 'Make a little mistake. Send a message in the clear.' Keegan went to the code room and told the clerks on duty he had a message so sensitive that they had to leave the room while he transmitted it. He then sent a message to the Secretary of Defense 'in the clear' (uncoded)

2

05/11/2004 TUE 11:04 FAX

May-06-2004 03:50pm    From-REED ELSEVIER                    +2123095487              T-431  P.008/014  F-160

# XVIII

# An Invitation to Peking

## *The End of the Warsaw Channel*

THERE was, on the surface, nothing dramatic about the first official meeting in the Nixon Administration between the United States and the People's Republic of China. It took place in Warsaw at the Chinese Embassy, on January 20, 1970, with our Ambassador to Poland, Walter Stoessel, sitting across the table from Lei Yang, chargé d'affaires of the People's Republic. It was the first meeting in two years, but ambassadorial sessions of this kind had been going on sporadically for fifteen years and their major significance seemed to be that they represented the longest continual talks that could not point to a single important achievement. There had been 134 meetings and all of them had been sterile. The agenda for the 135th meeting was heavy with the same air of futility. The difference was that after bureaucratic bloodletting in Washington, Stoessel had been instructed to say something different — and so, it transpired, had Lei Yang.

The main point of the previous 134 meetings had been our relationship to Taiwan, a classic Catch-22 topic: no solution was conceivable so long as US–Chinese hostility persisted, and the hostility would not end so long as the Taiwan issue was unsettled. Other questions raised from time to time were the hoary standbys of bilateral perplexity: American claims to compensation for nationalized property and defaulted debts; Chinese efforts to recover assets in the United States, frozen after 1949 under the Trading with the Enemy Act; our efforts to secure the release of Americans imprisoned in China; and fitful attempts to gain access to China for American newsmen, or to explore the prospects for trade.

All the familiar themes were due for tedious rehearsal again at the 135th meeting. The instructions for our side were being prepared by the State Department's Bureau of East Asian and Pacific Affairs, which, unaware of the messages that had been passed to the Chinese during the previous year, saw no reason to change an approach that had seen it through 134 previous Warsaw meetings — without result, true, but also

# EXHIBIT C

**Beebe, Patricia (SD)**

| | |
|---|---|
| **From:** | Fitzgerald, Kenneth (SD) |
| **Sent:** | Thursday, January 03, 2008 11:27 AM |
| **To:** | Elrakabawy, Hassan (SD) |
| **Subject:** | FW: Special Request |

**From:** Fitzgerald, Kenneth (SD)
**Sent:** Monday, June 28, 2004 8:01 AM
**To:** 'JERRY CZAJKOWSKI'
**Subject:** RE: Special Request

Mr. Czajkowski:

I am not in a position to refer you to a lawyer. However, any competent lawyer you do talk to will tell you that you have no claims, and no basis to file suit. The court's dismissal of your your prior case extinguised any claims you could have brought concerning any right of redemption of your HBJ shares.

**Kenneth M. Fitzgerald**

**LATHAM & WATKINS** LLP
600 West Broadway, Suite 1800
San Diego, CA 92101-3375
Direct Tel: (619) 238-2982
Fax: (619) 696-7419
E-mail: kenneth.fitzgerald@lw.com
www.lw.com

-----Original Message-----
**From:** JERRY CZAJKOWSKI [mailto:jerry_czajkowski@yahoo.com]
**Sent:** Saturday, June 26, 2004 12:03 AM
**To:** Fitzgerald, Kenneth (SD)
**Subject:** Special Request

Dear Mr.Fitzgerald:

I have made a redemption request of my 5000 HBJ 12% Preferred shares (maturing effective June 30, 2003 -2007) in November 2003 of the new owners of HBJ, who have turned me down two weeks ago using a "res judicata" argument.

Since I will have to open a case under the diversity jurisdiction in the Federal Court in San Diego, I would like to ask you for a small favor in recommending to me a lawyer who specializes in securities litigation and can practice in the District Court.

Your help in this matter will be greatly appreciated by me and my 77 year old mother Lonia Czajkowski,

Thank you very much - Jerry Czajkowski

Do you Yahoo!?
Yahoo! Mail - Helps protect you from nasty viruses.

# EXHIBIT D

**Beebe, Patricia (SD)**

| | |
|---|---|
| **From:** | Fitzgerald, Kenneth (SD) |
| **Sent:** | Thursday, January 03, 2008 11:26 AM |
| **To:** | Elrakabawy, Hassan (SD) |
| **Subject:** | FW: Biography |
| **Attachments:** | GBUSH.pdf; JGronouski.jpg; STOESSEL.jpg; Piszek_bk.pdf; haldeman.pdf |

**From:** JERRY CZAJKOWSKI [mailto:jerry_czajkowski@yahoo.com]
**Sent:** Sunday, June 27, 2004 11:22 PM
**To:** Fitzgerald, Kenneth (SD)
**Subject:** Biography

June 27, 2004

Dear Mr.K.Fitzgerald:

　　　　At the request of my mother Longina, I would like to acquaint you with some of our biography as per letter to the President George W. Bush of Nov 24th, 2003, with selected attachments.

　　　　Sincerely,

　　　　　　　　Jerry Czajkowski and Lonia Czajkowski
　　　　　　　　7944 La Jolla Shores Dr
　　　　　　　　La Jolla, CA 92037

Enclosures:

1.  Copy of Nov 24th, 2003 letter to the President George W. Bush with selected attachments:

    a.  1966 photo page of us and our parents Wieslaw and Longina taken with the U.S. Ambassador to Poland John A. Gronouski and. attorney Chester A. Kozdroj, President of the Polish Business and Professional Men of Detroit.

    b.  1969 photo of our father Wieslaw taken with Edward J. Piszek and Leopold Dende, editor-publisher of NEW LIFE and Janusz Wieczorek, Chief of the Prime Minister's Office. 1970 foto page of our parents Wieslaw and Longina with the U.S. Ambassador to Poland Walter J. Stoessel taken at the Warka Kazimierz Pulaski Memorial.

    c.  November 23,1971 best wishes letter from Edward J. Piszek

    d.  Title page of Edward J. Piszek's 2001 book "Some Good in the World – a Life of Purpose".

    e.  October 8, 2003 letter to the former U.S. Ambassador to Poland Thomas W. Simons, Jr.

2.   Excerpts from "The Ends of Power" written by President Nixon's Chief of Staff, H.R. Haldeman.

3.   Henry Kissinger's "White House Years", first page of Chapter XVIII "An Invitation to Peking – The End of the Warsaw Channel" and page 188.

Do you Yahoo!?
New and Improved Yahoo! Mail - 100MB free storage!

Exh. D
2

November 24ᵗʰ , 2003.

President George W.Bush
The White House

Dear Mr.President:

On June 28, 1969 I and my brother (then 12 and 14 years old), delivered to the Chinese Embassy in Warsaw at the asking of our father Wieslaw Czajkowski a suitcase filled with certain papers and gifts. Our father who at the time was working for Edward J.Piszek of Philadelphia, at Piszek's request was to deliver the suitcase to the Embassy, however, due to the risk of being charged by the Polish government with illegal contacts with the Embassy, Edward J.Piszek delegated this assignment to us.

Thanks to our courage, and efforts of our father and Edward J.Piszek, as Henry Kissinger wrote in his book (White House Years, Chapter - End of the Warsaw Channel), three months later U.S. Ambassador Walter J. Stoessel Jr. was able to meet with the Chinese in their Embassy, so it appears, that our mission also contributed to President Nixon's efforts of preventing a nuclear attack on China by the U.S.S.R, and other consequences stemming there from.

In light of our contribution to the global peace and stability, we undersigned ask the United States Government to formally acknowledge our role in opening diplomatic relations with China.


With highest regards –

Jaroslaw Czajkowski , Ph.D and Miroslaw Czajkowski, M.S.


Enclosures:

1. 1966 photo page of us and our parents Wieslaw and Longina taken with the U.S. Ambassador to Poland John A. Gronouski and. attorney Chester A. Kozdroj, President of the Polish Business and Professional Men of Detroit.
2. 1969 photo of our father Wieslaw taken with Edward J. Piszek and Leopold Dende, editor-publisher of NEW LIFE and Janusz Wieczorek, Chief of the Prime Minister's Office.
3. 1970 foto page of our parents Wieslaw and Longina with the U.S. Ambassador to Poland Walter J. Stoessel taken at the Warka Kazimierz Pulaski Memorial.
4. 2003 e-mail correspondence to and a letter from the former U.S. Ambassador to Poland Thomas W. Simons, Jr.
5. November 23,1971 best wishes letter from Edward J. Piszek
6. June 28, 1969 letter of Edward J. Piszek to the Chinese Government

_____

October 19, 2003.

Dear Mr.Thomas W. Simons, Jr.:

I turn to you seeking a letter of support that I could attach to the following request of the U.S. President G.W. Bush. You as an Assistant to the Ambassador Walter J. Stoessel Jr. (WSJ) were an eye witness to the events that took place in 1969 Warsaw, all in an effort to open diplomatic relations with the U.S.- phobic People's Republic of China (to such an extent that the Chinese Ambassador to Warsaw was recalled apparently for his contacts with the U.S., causing the charge d'affaires Lei Yang to take over his responsibilities, see Henry Kissinger's White House Years, page 188). The summary of the pertinent 1969 events is as follows:

1. On June 23 on a secret mission Edward J. Piszek (EJP) appears in Poland with a task of opening a diplomatic channel between the U.S. and China.

2. EJP as a businessman (owner of the food industrial complex Mrs.Paul's Kitchens) is unable to accomplish the task by himself.

3. So, Mr. EJP seeks help of Wieslaw Czajkowski (WC) (see the attached photos, taken at the Office of Prime Minister with its chief Janusz Wieczorek and EJP).

4. WC's few attempts to secure a meeting of EJP with the Chinese fail.

5. WC via EJP's assistant, Mr.Leopold Dende, is warned by the Polish Security Office (UB) not to contact the Chinese.

6. Irrespective of the warning EJP asks WC to deliver a message inside the GIFT suitcase to the Chinese.

7. On June 28, Jaroslaw and Miroslaw Czajkowski deliver the suitcase to the front door of the Chinese Embassy, which after a short interrogation is taken inside the Embassy by a Chinese security guard.

8. On Dec.3, 1969 U.S. Ambassador WSJ and Thomas W.Simons meet the Chinese charge d'affaires at the footsteps of the Warsaw Palace of Culture.

9. In Jan 1970 the U.S. Ambassador WSJ is officially invited to the Chinese Embassy in Warsaw.

10. On February 21, 1972 President Richard Nixon meets personally with the Communist Chinese leader Mao Tse-tung.

11. On March 19, 1972 (after accomplishing the EJP Chinese mission), President Nixon invites EJP and his children Helen and William to attend a Sunday church service at the White House (ask Nixon Archives at www.archives.gov).

12. On April 26, 1972 President Nixon assigns to EJP a task of preparing President's visit to Poland.

13. On August 28, 1973 in full appreciation of EJP's achievements, President Nixon nominates him to the Board of Governors of the United Service Organizations (USO) where EJP serves until 1975.

On October 11, 1971 WC with his wife Longina and sons appear in the U.S.A. on immigration visa, and on November 23, 1971 receive a best wishes letter from EJP.

With regards - W.Czajkowski, with respective enclosures and expectation of your response, soon.

DRAFT: November 2003. Dear Mr.President G.W.Bush: On June 28, 1969 I and my brother (then 12 and 14 years old), delivered to the Chinese Embassy in Warsaw at the asking of our father Wieslaw Czajkowski a suitcase filled with certain papers and gifts. Our father who at the time was working for Edward J.Piszek of Philadelphia, at Piszek's request was to deliver the suitcase to the Embassy, however, due to the risk of being charged by the Polish government with illegal contacts with the Embassy, Edward J.Piszek delegated this assignment to us. Thanks to our courage, and efforts of our father and Edward J.Piszek, as Henry Kissinger wrote in his book (White House Years, Chapter - End of the Warsaw Channel), three months later U.S. Ambassador Walter J. Stoessel Jr. was able to meet with the Chinese in their Embassy, so it appears, that also our mission contributed to the efforts of avoiding a nuclear attack by

U.S.S.R against China, and other consequences stemming therefrom. In light of our contribution to the global peace and stability, we undersigned ask the U.S. Government to formally acknowledge our role in opening diplomatic relations with China.

With highest regards - Jaroslaw and Miroslaw Czajkowski.

**From:** POSimons@aol.com

**Date:** Wed. 22 Oct 2003 20:17:42 EDT

**Subject:** Re: Edward J. Piszek

**To:** w czaikowski@yahoo.com, tsimons@stanford.edu

Dear Mr. Czajkowski:

Thank you for your letters. Unfortunately, although I was in Warsaw between mid-1968 and mid-1971, i.e. during much of the period covered by your list, I have personal knowledge of only two of the items on it, Nos. 8 and 9. I of course knew and admired Mr. Piszek, but was unaware of the activities to which the rest of the list refers. I am therefore not in a position to provide the letter of support you request.

Sincerely yours,

Thomas W. Simons, Jr.


**Date:** Fri. 24 Oct 2003 08:33:55 -0700 (PDT)

**From:** "Wieslaw Czaikowski" <w czaikowski@yahoo.com>

**Subject:** Mr.E.J.Piszek

**To:** nosimons@aol.com

**CC:** tsimons@stanford.edu

Dear Thomas W. Simons, Jr:

Thank you very much for your quick answer to my e-mail. The most recent postal letter should reach you soon. Please return to me the Mr.Piszek's letter of November 23, 1971 which I had enclosed. It is the only copy I had in my files.

I am sorry to hear that Mr.Piszek's Chinese mission was so secret that only a few of President Nixon's staff knew about it. Of those, Henry Kissinger was the first to get a directive to proceed with the mission in January 1969. Ambassador Stoessel should had been informed, but unfortunately he has passed away. I thought that you as Ambassador's Assistant were too, but apparently you were not.

If I may ask of your advice, would the proposed letter to the President G.W. Bush after 30 years harm Mr.Piszek in some way, for in his autobiography he omitted all his contacts with President Nixon. Is it a good idea in itself to revive the past and disclose it to the public? Please respond shortly.

With regards - Wieslaw Czajkowski, 75.

P.S.:Please be assured, that all the events as listed did occur and the supporting data is well preserved in Nixon archives. Some of it is also accessible on the Internet.



CK= CHESTER KOZDROJ    JG= U S A. AMBASSADOR JOHN A. GRONOUSKI

GDANSK 10-25-66

JG= LONGINA CZAJKOWSKI    HK= HELEN KOZDROJ    MC= MIROSLAW CZAJKOWSKI

FOR WIESLAW CZAJKOWSKI WITH MY BEST WISHES, JOHN GRONOUSKI

1964    CK    CK

LC    HK    CK    JG    MC    WC

GDANSK 10-25-66    JG= JAROSLAW CZAJKOWSKI    WC= WIESLAW CZAJKOWSKI    JG    HK

U S A EMBASSY WARSAW POLAND 9-01-1966    WC    HK    JG    CK    LC

Exh. D
6



WIESLAW CZAJKOWSKI (WC)

WARSAW 195...

J.WIECZOREK

E.J.PISZEK(EJP) L.DENDE (LD) W.CZAJKOWSKI (WC)

L.D.  WC and E.JP JR



PULASKI MEMORIAL WARKA 10-10-70

MRS. and MR WALTER STOESSEL



...ASKI...

MRS. and MR WALTER STOESSEL U.S AMBASSADOR TO POLAND

LONGINA CZAJKOWSKI

Exh. D



SOME GOOD IN THE WORLD

A LIFE OF PURPOSE

Edward J. Piszek

with

Jake Morgan

Foreword by James A. Michener

**"The Ends of Power", written by Nixon's Chief of Staff, H.R. Haldeman.**

In my first months at the White House [1969], sensing that I would play a small role in historical events as the man closest to Nixon, I kept a log of some special events.

Entry No. 26, entitled "Chinese in Warsaw", hints at what may have been the most dangerous of all the confrontations this nation has ever faced. The confrontation was between China and the Soviet Union. The real story, never revealed so far [1978] by Kissinger or Nixon, is chilling. It involves not only brilliant last-minute diplomatic moves by Kissinger, but an unofficial ploy by an Air Force intelligence officer that combined to stave off an incredible disaster: a Soviet nuclear 'surgical' strike on China's atomic plants, which alone would have caused hundreds of thousands, if not millions, of deaths frm fallout to Chinese, Japanese and American troops and civilians in Korea and Japan. If China had reciprocated, a full-scale nuclear holocaust would have begun, with fallout extending around the world.

Insane. And yet the Soviets were ready to go. In fact, they insisted we join them.

This is my log entry, which begins with a note of the first breakthrough in U.S.-Chinese relations:

"Log 26 - Chinese in Warsaw

On December 10th Kissinger burst into my office in a great state of excitement to report that we had just received word that the Chinese in Warsaw had come to our embassy indicating that they wanted to meet with us, and, more significantly, that they wanted to use the _front door_. The latter point is significant because any meetings with the Chinese before had been with utmost secrecy, whereas the use of the front door would indicate that the Chinese were prepared to have it _known_ that they were meeting with us.

Kissinger at the same time volunteered the personal opinion that the Russian/Chinese situation was very serious and that he expected that there was a very strong probability that the Russians would attack China by April 15th. Kissinger's concern about a Russian attack on China was expressed many times. I used to tease him about his use of percentages. He would say there was a 60 per cent chance of a Soviet strike on China, for example, and I would say, 'Why 60, Henry? Couldn't it be 65 per cent or 58 percent?'

But most of the details about the Soviet-Chinese crisis were kept so secret even I wasn't advised of some of the day to day developments. It wasn't until later that I heard many of the details. The world has heard of the border skirmishes in 1969 along the Ussuri River, between the northeastern province of Heilung Kiang in Manchuria and the Soviet Far East maritime province. What it doesn't know is that the Soviets (called by our intelligence experts in the area 'paranoiac about China') had moved nuclear-armed divisions within two miles of the border, according to intelligence sources.

I am told that U.S. aerial photos revealed this grim story: hundreds of Soviet nuclear warheads stacked in piles. Eighteen thousand tents for their armored forces erected overnight in nine feet of snow. For years, the Soviets had been buttonholing U.S. diplomatic and military leaders. The message was always China, China, China. The Chinese must not be allowed to build a nuclear capability.

As far back as 1962, Secretary of Defense Robert McNamara had thought seriously enough of the proposition to ask the Air Force to make a feasibility study of a surgical strike on Chinese nuclear plants. The study was completed in great secrecy. What the U.S. commanders found was that at the time, they didn't have a nuclear weapon in the entire stockpile 'clean' enough for a surgical strike. Our smallest weapon would have ended up causing millions of fatalities from fallout. In effect, we had no surgical capability then.

What had made U.S. leaders supremely nervous was, as far as we knew, the Soviets had no 'surgical' capability either - but that fact apparently would not stop them. None of their warheads had been miniaturised as ours; instead, they were massive blockbusters whose fallout would be fantastic. In 1969 there were several overtures by the Soviets to the U.S. for a joint venture in the surgical strike. Nixon turned the Soviets down, but was then informed, to his horror, that the Soviets intended to go ahead on their own.

A short review of Nixon's - and Kissinger's - background in Chinese relations will set the stage for the drama to come. Nixon for years had been this nation's foremost enemy of Communist China. In a 1950 Senate campaign, Nixon said, 'Look at the map and we can see that if Formosa falls, the next frontier is the coast of California.' As late as 1960, in a television debate with John F. Kennedy, Nixon said, 'Now what do the Chinese Communists want? They don't want just Quemoy and Matsu. They don't want just Formosa. They want the world.'

But Nixon was always shrewd. By 1967 he had decided that Communist China was a fact of life. In an article in the influential _Foreign Affairs_, in 1967, Nixon said, 'Any American policy towards Asia must come urgently to grips with the reality of China ... we simply cannot afford to leave China forever outside the family of nations, there to nurture its fantasies, cherish its hates and threaten its neighbours ...'

When Nixon took office, one of his first priorities was a reopening of relations with China. His foreign affairs adviser, Kissinger, was rather a reluctant passenger those first six months. Kissinger had no background in Chinese affairs; his interests lay in European and Soviet relations. On Air Force One in the midst of Nixon's round-the-world trip in the late summer of 1969, I was meeting with the President in his private cabin. We had a long talk about a lot of things, but one comment he made really amazed me.

When I returned to the staff section, the seat next to Henry Kissinger at his table was empty. I slipped in, leaned over to Henry, and said, 'You know, he actually seriously intends to visit China before the end of the second term.' Henry took his glasses off and polished them, a small smile on his face, then he turned to me and said, 'Fat chance.'

Then came the Soviet-Chinese border clashes, surprising the rest of the world, which had seen the two countries as one great Communist monolith. And finally word from the Soviets that they could wait no longer for U.S. participation in the attack. If no signal was received from us, they would go ahead on their own. Kissinger, at first inclined to dismiss a Soviet nuclear attack on China as a fantasy, now realised as the border clashes escalated that was was a serious possibility and told me so.

He and Nixon huddled. They decided they would send a signal to the Soviets that the U.S. was determined to be a friend of that Eastern nation. How to send that signal? The U.S. and China had once held a series of meetings in Warsaw, but those talks had broken off. Kissinger contacted Walter J. Stoessel Jr., U.S. ambassador to Poland. His orders to Stoessel: find the highest ranking Chinese envoy to Poland at a social function and tell him the U.S. wants to resume the Warsaw talks.

In the atmosphere of the time, when China was a bitter enemy of the U.S., and their diplomats never uttered a word to each other, this approach at a party would be a seismic event. It ended up as high comedy: the Charge d'Affaires at the Chinese embassy, Lei Yang, attending a Yugoslavian reception, was so startled by Stoessel's approach, he turned and walked out of the door. Stoessel ran down the stairs after him. Later, Chou En-lai told Kissinger in China: 'If you want our diplomats to have heart attacks, approach them at parties and propose serious talks.'

On December 10, Kissinger's unorthodox approach worked, as my log entry showed. The request to resume the Warsaw talks carried two messages. One to Peking, that we were ready to reverse our policy of enmity to China and reopen relations. The second to Moscow, that the U.S. and China had common interest and a Soviet nuclear strike might bring the Russians into confrontation with the U.S.

Meanwhile, Air Force intelligence studied the photos of Russian missiles and nuclear warheads along the border. No one could tell whether the Soviets would launch the attack, no matter what the U.S. attitude. And their fallout studies showed the immensity of the catastrophe in store for the world. For example, it was possible that without advance warning and precautionary measures every man, woman and child in Japan would have died.

In addition to Japan, the fallout would spread across Korea and Pacific islands where more than 250,000 American troops were stationed. Major General George Keegan, Air Force Chief of Intelligence, was in Honolulu assaying the situation. He remembered that during the Cuban missile crisis in 1962, his Air Force Commander-in-Chief, Thomas Power, had said, 'Make a little mistake. Send a message in the clear.'

Keegan went to the code room and told the clerks on duty he had a message so sensitive that they had to leave the room while he transmitted it. He then sent a message to the Secretary of Defense 'in the clear' (uncoded) as if by accident. The message said the U.S. had 1300 nuclear weapons airborne - and named Soviet cities which were targeted for the bombs.

Keegan states there was a Middle Eastern army officer visiting Nikita Khrushchev got that message a few hours after its transmission. The officer said Khrushchev turned pale. He had four telephones on his desk and tried to pick them all up at once, calling Moscow. And that day the Russian ships turned back. Whether that uncoded message was as significant as the officer indicated, Keegan remembered it now - and decided to try another message 'in the clear' that the Soviets would intercept.

This time the objective was to ensure that the Soviets clearly understood that many thousands of Russian citizens in Siberia would also die as a consequence of nuclear fallout generated by a Soviet strike against China. Meanwhile, U.S. intelligence sources, reading all the Soviet and Chinese messages from all the embassies around the world, saw at the same time that the Nixon-Kissinger rapproachment with China, begun in Warsaw, was having an electric effect on the Kremlin.

And just in time. The Soviets were on the brink of war. They believed that if the Chinese nuclear plants were destroyed, China would not be a military threat to them for decades. They teetered on the edge for days watching the Chinese moving more and more under the U.S. security umbrella. Finally, the Soviets realised they no longer could take the chance. Intelligence photos showed their nuclear armed divisions were withdrawing from the Chinese border.

Because of the timely diplomatic initiative of Kissinger and Nixon – and perhaps also the good memory of an air force general - a Soviet-Chinese nuclear war that had been called 'probable' by Kissinger in 1969 did not erupt into a worldwide catastrophe. And Chinese leaders invited their old enemy to visit their country and resume relations at a time just before Nixon's re-election campaign in 1972, when it would have the greatest political effect in his favor.

# EXHIBIT E

Kenneth M. Fitzgerald
Direct Dial. (619) 236-1234
kenneth.fitzgerald@lw.com

600 West Broadway, Suite 1800
San Diego, California 92101-3375
Tel. (619) 236-1234  Fax: (619) 696-7419
www.lw.com

# LATHAM & WATKINS LLP

| FIRM / AFFILIATE OFFICES | |
| --- | --- |
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| | Washington, D.C. |

July 20, 2005

File No. 013384-0006

Clark L. Davidson
Atkins & Davidson
450 B Street, Suite 1430
San Diego, CA  92101

      Re:    <u>Reed Elsevier, Inc.</u>

Dear Mr. Davidson:

      Enclosed are the relevant orders of the District Court and Ninth Circuit, which were entered after the June, 1994 remand referred to in your July 18, 2005 letter.  Apparently, Mr. Czajkowski did not share these orders with you, which should give you considerable pause about acting on his behalf.

      Irrespective of whether your client has been candid with you, the enclosed decisions extinguished your client's claims concerning his HBJ preferred stock, as a matter of law.  In addition, any such claims are now barred by the statute of limitations, in any event.  In sum, neither you nor your client has any probable cause to bring suit over Mr. Czajkowski's HBJ preferred stock, and any effort to do so will be dealt with appropriately.  In pursuing his groundless claims, Mr. Czajkowski has already inflicted significant expense on HBJ and its successors.  Should he renew his vexatious efforts, my client will hold him, and all those assisting him, fully responsible.

                   Very truly yours,

                   Kenneth M. Fitzgerald
                   of LATHAM & WATKINS LLP

Enclosures

Exh. E
1

Clark L. Davidson
July 20, 2005
Page 2

LATHAM&WATKINS LLP

bcc:   Bill Bayers, Esq. (w/o encls.)

# EXHIBIT F

Kenneth M. Fitzgerald
Direct Dial: (619) 238-3027
kenneth.fitzgerald@lw.com

600 West Broadway, Suite 1800
San Diego, California 92101-3375
Tel: (619) 236-1234  Fax: (619) 696-7419
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 013384-0006

April 11, 2007

**VIA FACSIMILE**

Patricia Lewis, Esq.
LEWIS LAW FIRM
1202 Kettner Blvd., Suite 6100
San Diego, CA 92101

Re:    <u>Czajkowski v. Harcourt Brace Jovanovich, Inc.</u>

Dear Ms. Lewis:

   I received your letter dated April 2, 2007.  At the outset, I fail to see why it is designated as a settlement communication, since it contains no settlement offer or other settlement content.  Instead, it articulates a claim and demand, which are wholly invalid.  All claims of Mr. Czajkowski, arising from his ownership of HBJ preferred stock, are barred by the New York Business Corporations Law, the statute of limitations, and the doctrine of res judicata.

   Mr. Czajkowski bought HBJ preferred stock.  He did not loan HBJ money.  Your analysis mischaracterizes his stock as a promissory note, and is therefore fundamentally flawed.

   Moreover, the Ninth Circuit determined that Mr. Czajkowski's exclusive remedy in connection with his stock ownership was an appraisal.  His claim for an appraisal was dismissed on summary judgment, and his subsequent attempt to obtain monetary compensation based on the $13.50 per share maturity value was rejected by the district court, in orders that became final years ago.  The district court's orders and judgment of dismissal fully and finally extinguished any claims to compensation Mr. Czajkowski may have had as an owner of HBJ stock.  Your analysis completely ignores the res judicata effect of the judgment and orders in the prior litigation against Mr. Czajkowski.

   Your analysis also fails to recognize that any claim for breach of contract, even if it were theoretically viable, accrued in 1991, when HBJ made it clear that no further dividends would be paid, and that no redemption of the preferred shares would take place.  If, as you contend, Mr. Czajkowski had a contract with HBJ, that contract was repudiated in 1991.  The statute of limitations on any breach of contract claim therefore ran over ten years ago.  Events subsequent to the 1991 merger, including the position taken by HBJ in the litigation, reaffirmed to Mr. Czajkowski that he would not receive any dividends, or any redemption of his stock.  Thus, again, any claim for breach of contract accrued many years ago, and is now clearly barred by the statute of limitations.

Patricia Lewis, Esq.
April 11, 2007
Page 2

LATHAM&WATKINS LLP

In sum, there is no probable cause for any claim by Mr. Czajkowski. And while he has demonstrated that he is nothing if not tenacious, his tenacity is not matched by any discernible degree of sense. So while Mr. Czajkowski may feel unconstrained from continuing to harass our client, I would hope that you would exercise greater restraint. Because of Mr. Czajkowski's vexatiousness, and his seemingly incessant demands and frivolous arguments, our client has determined to hold his attorneys responsible for any additional costs inflicted on his behalf. Therefore, be advised that if you proceed to assert any such claim on behalf of Mr. or Mrs. Czajkowski, our client will seek sanctions against you personally, and/or sue you personally for malicious prosecution, in addition to pursuing any and all remedies against Mr. Czajkowski.

Very truly yours,

Kenneth M. Fitzgerald
of LATHAM & WATKINS LLP

cc: William Bayers, Esq.

# EXHIBIT G

## Beebe, Patricia (SD)

| | |
|---|---|
| **From:** | Fitzgerald, Kenneth (SD) |
| **Sent:** | Thursday, January 03, 2008 11:34 AM |
| **To:** | Elrakabawy, Hassan (SD) |
| **Subject:** | FW: representation |
| **Attachments:** | pat696934093; pat1344265238; pat193988508; pat1852357178; pat818924228 |

**From:** Kaplan, Evan (Reed Elsevier inc) [mailto:evan.kaplan@reedelsevier.com]
**Sent:** Tuesday, September 25, 2007 11:45 AM
**To:** Fitzgerald, Kenneth (SD)
**Subject:** FW: representation

Note e-mail from Jerry Cz below trying to find a (new) lawyer…

E

**From:** Horbaczewski, Henry (REI-NYC)
**Sent:** Tuesday, September 25, 2007 11:46 AM
**To:** Kaplan, Evan (Reed Elsevier inc)
**Subject:** FW: representation

**Charles Joseph Faruki**
Faruki Ireland & Cox PLL - 3
500 Courthouse Plaza, SW
10 N Ludlow Street
Dayton, OH 45402-1818
937-227-3705
937-227-3705 (fax)
cfaruki@ficlaw.com

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

FYI

**From:** Faruki, Charles J. [mailto:cfaruki@ficlaw.com]
**Sent:** Tuesday, September 25, 2007 11:44 AM
**To:** Nash, Nancy A. (LNG-DAY); Horbaczewski, Henry (REI-NYC)
**Cc:** Monroe, Kimberly L.

Exh. G
1

**Subject:** FW: representation

Nancy, as you requested. I emailed a reply to him that we represent Reed, that I may well end up on the other side of the matter, & that he is not to contact me again.

Charlie.

-----Original Message-----
**From:** JERRY CZAJKOWSKI [mailto:jerry_czajkowski@yahoo.com]
**Sent:** Monday, September 24, 2007 2:24 AM
**To:** Faruki, Charles J.
**Subject:** representation

Dear Mr. Faruki :

I am looking for representation in the Breach of Contract case as an individual or in a Class Action.

I am the owner of HBJ Preferred Stock Certificate (attached) which was the original 1987 Debt and a Liability of Harcourt Brace Jovanovich Inc, possessing mandatory redemption provision on June 30, 2007 at $13.50/share plus accumulated 12%/yr dividends.

The detailed contractual description of the HBJ's 12% Preferred Stock found in the 1991 HBJ-GCC Merger Prospectus informed:

> *"HBJ may, at its option, redeem shares of HBJ Preferred Stock in whole at any time, or from time to time in part, at a redemption price equal to the $13.50 per share liquidation preference plus accrued and unpaid dividends, if any, to the date fixed for redemption. HBJ is required to redeem, on June 30, 2003, and on each June 30 thereafter through June 30, 2006, 20% of all shares of HBJ Preferred Stock then outstanding and on June 30, 2007 all remaining shares of outstanding HBJ Preferred Stock, in each case at the redemption price of $13.50 per share, plus accrued and unpaid dividends, if any, to the date of redemption."* (10/25/91 Merger Prospectus, p.133).

The new owner of HBJ, Reed Elsevier has rejected my first redemption attempt in May 2004.

Reed Elsevier in 2001 per New York Business Corporation Law § 906 (b)(2)(3) inherited Harcourt General's debts and liabilities, and Harcourt General in turn inherited HBJ's debts and liabilities when HBJ merged with General Cinema in 1991.

As of June 30, 2007 my total redemption claim is $480,000.

In 1992 there was a Class Action Rule 10b-5 Complaint of preferred stockholders in New York by Nivram Corp., and it ended in a $1,417,500 settlement with HBJ (please see the attached order). I have an opt out list from this 1995 settlement. The most pertinent is the one reported by Boston Co. (attached), where are listed Robert Kraft (16,000 HBJ Pref. shares) and International Forest Products (6,000 shares). Total 22,000 shares, today worth about $2,110,000.With my 5,083 shares ($480,000), the grand total would be $2,590,000.

In addition there are two smaller opt out investors, Stanley and Marjorie Allen (100 shares) and Gordon & Thelma Comly (200 shares). In all 27,383 Preferred shares worth $2,600,588.43 on June 30, 2007.

On 12/09/91 HBJ in the "Offer to Pay for Shares of Dissenting Shareholders", informed that, there were 48 dissenting 12% Preferred stockholders, representing 820,675 preferred shares, who voted against the

merger and most likely after the merger did not surrender or exchange their certificates for 69 cents a share (the merger offer).

According to the Stipulation Order of 1/27/95 in the Nivram Case, HBJ attorney Sheldon Raab of Fried Frank Harris Shriver & Jacobson "*within 10 days of the date of this Order, HBJ shall provide plaintiff's counsel (Zachary Alan Starr), …, all information … identifying by name and address the persons and entities who became holders of HBJ 12% preferred stock during the period from 3/30/89 – 3/30/90.*"

Therefore all the information about the 48 dissenting 12% Preferred stockholders from the 1991 HBJ-GCC merger, if not from HBJ, might be obtained directly from Sheldon Raab who can be reached in New York at 212-859-8090.

These 48 dissenters if they never surrendered their certificates, together hold 820,675 shares, worth today $77,940,251.50.

Would you be willing to take this case and represent me as an individual on a 33% contingency or in a Class Action, or based on any other arrangement?

If not would you be kind to recommend someone who would be interested in this case?

Please advise shortly.

Sincerely,

Jerry Czajkowski, PhD
La Jolla, CA

Catch up on fall's hot new shows on Yahoo! TV. Watch previews, get listings, and more!

The information contained in this e-mail is intended only for the use of the individual or entity to which it is addres

message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of th

from your system. Although this e-mail and any attachments are believed to be free of any virus or other defect t

accepted by Faruki Ireland & Cox P.L.L. for any loss or damage arising in any way from its use.