Jerry Czajkowski, Ph.D., in Pro Se
6370 Streamview Dr
San Diego, CA 92115
619-287-2944

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| JERRY CZAJKOWSKI, Ph.D., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>REED ELSEVIER, INC., a Massachusetts Corporation,<br><br>Defendant | Case No.: 07 CV 2383 JM (LSP)<br><br>**Additional Points and Authorities in Opposition to the Motion to Dismiss**<br><br>Date: February 8, 2008<br>Time: 13:30<br>Courtroom: 16<br><br>Honorable Jeffrey T. Miller |

## INTRODUCTION

The following are the additional Points and Authorities in Opposition to the Motion to Dismiss and in Response to Defendant's 2/01/08 Reply. In order to save on time and space these Points and Authorities are a general response without referencing to particular allegations by number.

## POINTS AND AUTHORITIES

### Two Separate Hernandez's Common Law and Civil Law Claims - No Res Judicata, No Collateral Estoppel (*Hernandez v. City of Pomona*, 138 Cal.App.4th, 506

1.     "*Following a verdict and judgment in favor of the defendants in federal court, the plaintiffs filed a common law negligence action against the defendants in state court.*
*The trial court sustained the defendants demurrer to the complaint, holding that plaintiffs' cause of action was barred by the previous federal court judgment against the plaintiffs. However, the court of appeal reversed, finding that based upon the procedural circumstances of the case neither res judicata nor collateral estoppel precluded the plaintiffs' negligence action going forward:*

> *... We hold the doctrine of res judicata does not apply to the case before us. The primary right at issue in section 198 action was Hernandez's right under the Fourth Amendment to be free from unreasonable seizure of his person. The primary right in the negligence action is Hernandez's right to be free from injury to his person. That some of the same facts are involved in both actions is not determinative; the significant factor is the nature of the harm. The nature of the harm in the former action was the violation of a constitu-*

*tionally protected right. The nature of the harm in the latter action is the violation of a common law right.* " (Exh.16)

By analogy to the Plaintiff's case, the nature of his former action (1992-1999), assuming it was not barred by the 80 day Statute of Limitations (NY BCL 623(h)(1)(2)), was the unsuccessful enforcement of the statutory right to Appraisal, whereas the nature of the harm in the latter action is the violation of a common law right to Mandatory Redemption in 2003 (Breach of Contract).

**Present Breach of Contract Claim is Based on Common Law, and Defendant's Bullying Did Not Distress Plaintiff's Attorneys, but the Plaintiff Who Chose to File 12/13/07 Complaint on the Neutral Ground in the Illinois US District Court**

2.    *Mr.Czajkowski is making a common law claim for contractual rights of payment due him which were specifically set forth and identified as mandatory redemption provisions which were the reasons for his purchase of the 12% Preferred. His common law right to recovery is not a defeasible interest but, rather, is an entitlement to payment according to the terms and provisions of the offering.* (4/23/07 letter of Patricia Lewis to Mr.K. Fitzgerald, Exh.17)

**Atkins & Davidson's 6/23/2006 Engagement Offer**

3.    Despite Mr.K.Fitzgerald's 7/20/05 warning letter *("Should he renew his vexatious efforts, my client will hold him, and all those assisting him, fully responsible"*, Exh.18), Plaintiff's Counsel Mr. Clark Davidson did not waver and wanted to continue Plaintiff's representation on a full contingency basis, as is evidenced by his Letter of Engagement dated 6/23/06 (Exh.19)

**Atkins & Davidson's 6/12/2007 Engagement Offer**

4.    Despite Mr.K.Fitzgerald's 7/20/05 and 4/11/07 two warning letters *("Should he renew his vexatious efforts, my client will hold him, and all those assisting him, fully responsible"*, and *"Because of Mr.Czajkowski's vexatiousness, and his seemingly incessant demands and frivolous arguments, our client has determined to hold his attorneys responsible for any additional costs inflicted on his behalf. Therefore, be advised that if you proceed to assert any such claim on behalf of Mr. or Mrs. Czajkowski, our client will seek sanctions against you personally, and/or sue you personally for malicious prosecution, in addition to pursuing any and all remedies against Mr.Czajkowski.",* Exhs.18, 20), addressed to Plaintiff's Counsel Patricia Lewis, Mr. Davidson did not waver and wanted to continue Plaintiff's representation on a full contingency basis, as is

evidenced by his Letter of Engagement dated 6/12/07 (Exh.21).

5.    Despite Mr.K. Fitzgerald's 4/11/07 *"vicious commentary"*, Patricia Lewis also did not waver, and wrote the 4/23/07 response and a Settlement Demand. The following are the excerpts from this letter to Mr.K. Fitzgerald in response to his various allegations, Exhs.20,17).

*Dear Mr. Fitzgerald:*                                                                                    *4/23/07*

*I am troubled with your response in that it fails to provide any specific reference or documentation for the basis of your opposition. To that end, I make this reply, addressing your opposition in order of its presentation.*

### New York Businesses Corporation Law

*You state that Mr.Czajkowski's claims are barred by the NY BCL, without further comment and without identifying the specific statutes to support your opposition. My commentary is, therefore, speculative, without your clarification.*

<u>*Mr.Czajkowski is making a common law claim for contractual rights of payment due him which were specifically set forth and identified as mandatory redemption provisions which were the reasons for his purchase of the 12% Preferred.*</u> *His common law right to recovery is not a defeasible interest but, rather, is an entitlement to payment according to the terms and provisions of the offering.*

*I urge you to please identify the specific statutes upon which you rely, so that I may more fully consider your position.*

### Statute of Limitations

*Secondly, you identify the statute of limitations as a preclusion to my client's claim for recovery. You support your position by the statement that, in 1991, HBJ repudiated its obligation to either pay dividends or redeem the 12% Preferred.*

*You say, "Events subsequent to the 1991 merger... reaffirmed to Mr.Czajkowski that he would not receive any dividends, or any redemption of his stock". Other than the federal litigation, you make no reference to subsequent events.*

*As you know, the four year statute of limitations period for breach of a written contract accrues at the time of breach... Although Mr.Czajkowski wishes to proceed with litigation immediately, the limitations period will not run until 6/29/2011.*

### Anticipatory Repudiation

*To address your opposition that HBJ has allegedly repudiated its contractual obligation, I find no reference in any of the merger prospectus documents, including the restated merger of 8/24/91, and the amended merger of 10/18/91, or in Andersen and Company notes to financial statements of 6/30/91, that HBJ has made a stated repudiation of its contractual obligation to pay dividends and redeem the 12% Preferred.*

*Even assuming there was such a repudiation by HBJ in 1991, as you assert, HBJ's repudiation of its contractual obligations would be anticipatory to the 6/30/03 redemption. Because the anticipatory breach has not yet occurred, the injured party may wait until the time for performance to file his suit... The limitations period, then, does not accrue until the time when there*

*is an actual breach, which is now, not in 1991.*

### Res Judicata

*The 9th Circuit and the US District Court cases were decided in 1994 on the basis of an appraisal remedy for stock, and could not have been decided on the basis of breach of contract which would not accrue until 2007.*

### Debt Security

*You further oppose Mr.Czajkowski's claim by asserting that he purchased preferred stock, rather than loan money to HBJ. I beg to differ. Mr.Czajkowski paid for a "debt security", meaning,... Had my client not purchased a debt security, clearly there would be no liquidation preference, there would be no stated redemption payment period, and there would be no stated amount of redemption. His purchase is that of a debt security. His investment is secured by the liquidation preference of the contractual agreement. Indeed, the debt security is a contractual obligation which cannot be impaired without the breach thereof. Mr.Czajkowski's right to redemption at the time and in the amount stated by HBJ is a Contract. For HBJ to refuse to honor its contractual obligation is an impairment of Mr.Czajkowski's contract rights and a deprivation of his vested property interest.*

*My analysis of Mr.Czajkowski's claim is not "fundamentally flawed" in identification of HBJ's contractual obligations as you allege.*

### Sanctions and Malicious Prosecution

*I am truly surprised that you have made threats to me personally, to wit, that if I pursue an action on my client's behalf, your client will sue me personally for malicious prosecution and seek sanctions personally against me.*

*My analysis of this case is supported by the same facts and basis which Mr. Clark Davidson used to attempt a settlement in his earlier negotiations with you. I reiterate here some of his analysis, to which I have also referred you.*

*1. "the 12% Preferred Stock is mandatorily redeemable and as such is classified outside of shareholders' equity." p.F-22*

*2. Dividends will accrue, even if not paid, just as interest is paid on a loan. p.133*

*3. The 6/30/03 and subsequent installment redemptions are mandatory payments, just as a note would be callable by the holder.*

*The tenor of your 4/11/07 correspondence to me is not present in your similar correspondence with Mr. Davidson, and I am, therefore, surprised at your **vicious commentary** directed to me only.*

### Settlement Demand

*Although you have failed to make any offer of settlement in your 4/11/07 response, I reiterate, on behalf of Mr.Czajkowski, his demand for $480,000 to settle his claims for breach of contract. This offer will remain open for a limited period.*

### Documentation

*Mr. Davidson and I both have asked that you provide documentation for analysis, which has not been forthcoming. Please provide, at a minimum, the following:*

*1. Prospectus for the 12% Preferred;*

*2. Annual 10K from 1990;*
*3. HBJ Articles of Incorporation and Amendments;*
*4. All documents to support any assertion that Mr.Czajkowski was paid for his loan to*
*HBJ or that his ownership of the 12% Preferred was fully redeemed by HBJ;*
*5. All documents to support HBJ's opposition to Mr.Czajkowski's demand.*
*Without documentation, references and citations to support your client's positions, I remain firm*
*in my belief that Mr.Czajkowski has a valid claim for breach of contract remedies, supported by*
*the facts and law a I have cited previously, as well as is stated herein.*

*I look forward to your considered response, within ten days.*
*Sincerely, Lewis Law Firm, Patricia Lewis*

6.      In the 12/02/91 **NOTICE OF AUTHORIZATION** (Exh.22), *"As a result of the Merger,*

*HBJ became a <u>wholly owned subsidiary of GCC"</u>.* This contradicts Defendant's claim that HBJ

ceased to exist, when in fact it lives on under a different name of Reed Elsevier, Inc.

### Plaintiffs Had No Intention to Ever Request an Appraisal Proceeding

7.      On p.91 of the Merger Prospectus, in bold capital letters, HBJ warned all dissenting

shareholders (see Exhs.23, 24),

> **THIS DISCUSSION AND EXHIBIT D SHOULD BE REVIEWED CAREFULLY BY ANY SHARE-HOLDER OF HBJ WHO WISHES TO EXERCISE STATUTORY APPRAISAL RIGHTS OR WHO WISHES TO PRESERVE THE RIGHT TO DO SO BECAUSE FAILURE TO STRICTLY COMPLY WITH ANY OF THE PROCEDURAL REQUIREMENTS OF SECTION 623 MAY RESULT IN A TERMINATION OR WAIVER OF APPRAISAL RIGHTS UNDER SECTION 623.**

Plaintiffs fully aware of this warning, had no intention to ever invoke the Appraisal Right, in-

stead they filed a common law Breach of Liquidation Preference Contract and Fraud Complaint

on 2/25/92 in the CA Superior Court, and on 4/27/92 filed an Amended Breach of Liquidation

Preference Contract and Fraud Complaint in the District Court, also without demanding any ap-

praisal rights. The statute of limitations on the appraisal right started to run on 12/09/91 and ex-

pired 80 days later on 2/27/1992 (see Plaintiff's 2/01/08 Reply Memorandum in Support of the

Opposition to the Motion to Dismiss). Therefore, the 9th Circuit's 6/08/94 leave to amend the

4/27/92 Amended Complaint with an appraisal request, was in error, as it was barred by the 80

day Statute of Limitations.

*"Amendment Would Likely be Futile If, for Example, the Claims the Plaintiff Sought to Add*

*Would be Barred by the Applicable Statute of Limitations."(Infra)*

8.   **FRCP Rule 15. Amended and Supplemental Pleadings**
     *(c) RELATION BACK OF AMENDMENTS. An amendment of a pleading relates back to the date of the original pleading when: (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, ...*

9.   In the **_U.S. 2nd Circuit Court of Appeals, Docket No. 98-9618_**, it was concluded,

     *"the court noted that the new claims that plaintiffs moved to add were subject to a six-year statute of limitations. Because plaintiffs' motion was made in 1996 and the new claims focused on conduct alleged to have occurred principally in 1986-1989, the court concluded that filing of the Supplemental Complaint would likely be futile <u>because most of the new claims appeared to be time-barred</u>. Plaintiffs argued that the statute of limitations was no bar because the filing of their new claims should be deemed to "relate [] back" to the time of filing of their amended complaint, Fed. R. Civ. P. 15(c). The court rejected that contention, observing that <u>the proposed pleading was not based on the events challenged in the amended complaint</u> ...The court likewise rejected plaintiffs' contention that relation back was appropriate on the theory that plaintiffs were challenging a "continuing course of conduct"; the court pointed out that the amended "complaint alleged, in essence, a specific act of wrongdoing, <u>i.e.</u>, a freeze-out merger, <u>which is a distinct transaction from the</u> subsequent note and mortgage <u>transactions plaintiffs now seek to add</u>."*

Similarly here, the Plaintiffs in the 4/27/92 Amended Complaint alleged Breach of Liquidation Preference Contract and Fraud, a common law claim, and two years later on appeal, in error, the Plaintiffs were given leave to amend with a statutory appraisal demand, a completely different transaction not challenged or asserted in the original 2/25/92 nor in the 4/27/92 Amended Complaint. Therefore, Plaintiffs' appraisal request in the 12/26/95 5th Amended Complaint was a *futile amendment,* for it was long barred by the 80 day statute of limitations.

     *... in determining whether leave to amend should be granted, the district court has discretion to consider, inter alia, the apparent "**futility of amendment**," Foman v. Davis, 371 U.S. at 182; see also Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993) (per curiam). **Amendment would likely be futile if, for example, the claims the plaintiff sought to add would be barred by the applicable statute of limitations.** See, e.g., McGill v. Goff, 17 F.3d 729, 734 (5th Cir. 1994).*

          **There Was No Appraisal Proceeding Ever Held in the District Court.**

10.  Even as far back as 5/03/96 Defendant's Counsel, Mr. K. Hoffman, had informed the Plaintiffs that such an appraisal proceeding may never be held (Opp. p.54, Exh.15), and he was

correct, for this appraisal proceeding, at which, the directive of the 9th Circuit were to be taken into consideration- *"Appellants also make various allegations of fraud and breach of fiduciary duty which can be considered in conducting an appraisal under New York law"*, was never conducted, and so Plaintiffs' allegations were not considered –

> *"First the 9th Circuit has held, you are entitled to one remedy only as a dissenting shareholder from a duly approved merger – an appraisal proceeding to fix the fair value of you shares at the time of the merger. Such an appraisal proceeding, <u>if conducted</u>, will inevitably result in the conclusion..."*

### Final Order of Dismissal Was Entered in Violation of NY BCL §623(h)(5), Against the Dissenting Shareholder and Not the Corporation, Confirming that There Was No Appraisal Proceeding Ever Held

11.     *NY BCL §623(h)(5). The final order in the proceeding shall be entered against the corporation in favor of each dissenting shareholder who is a party to the proceeding and is entitled thereto for the value of his shares so determined.* (Exh.24)

### There Was No Appraisal Proceeding and the Plaintiffs Never Surrendered Their Certificate as Required by the §623(h)(8), and Therefore HBJ Never Bought Plaintiffs Shares

12.     *NY BCL §623(h)(8). Within sixty days after final determination of the proceeding, the corporation shall pay to each dissenting shareholder the amount found to be due him, <u>upon surrender of the certificates</u> for any such shares represented by certificates.* (Exh.24)

### The similarities between the Instant Case and the <u>*Weckler v. Valley City,*</u> are Apparent, as Well as the Similarities Between NY BCL and the Michigan General Corporation Act.

13.     On p. 454 of <u>*Weckler v. Valley City 93 F.Supp.444. Affirmed, 188 F.2d 36,*</u> Exh.25

> *"The right of a preferred stockholder to have his stock redeemed on the certain date specified in the stock certificate was a vested property right of a contractual nature, and that a corporation could not, through action by a majority of its stockholders, deprive a minority preferred stockholder of this redemption right without his consent."*

14.     On p. 457 of <u>*Weckler v. Valley City,*</u> Exh.25

> *Plaintiff's stock by its terms, did not mature until 10/01/49. She brought suit on 10/04/49, 4 days after her redemption rights matured. When she was requested to exchange her cumulative preferred stock in 1936 for new noncumulative preferred, she refused to make the exchange.... When after the purported sale and reorganization, she was asked to exchange her stock for stock of the new company, she did not send in her stock certificate and did not make the exchange. In*

*short, she consented to none of the corporate actions in question but, on the contrary, indicated by her every action that she had no intention of waiving or sacrificing her redemption rights.*

15.    On p. 452 of <u>Weckler v. Valley City,</u> Exh.25

*But reading the whole act together and giving effect to each section makes it clear that the legislature had no intention of attempting to give to... corporations the power through action of a majority of its stockholders to take from the minority stockholders vested or accruing property rights. By virtue of the quoted provision contained in the certificate of stock held by plaintiff, he certainly had, immediately upon receiving it from the defendant, a vested or accruing right to have it redeemed at par on 1/25/1932. This was a liability that the corporation assumed incident to issuing this stock. Section 59 of the act expressly provides that 'The liability of any corporation *** shall not in any way be lessened or impaired by *** any change or amendment in the articles of any such corporation.' It is not possible to give effect to this provision of the statue and at the same time deny plaintiff the right to recover... So that there might be no doubt of the purpose of the Legislature to preserve vested and accruing rights, practically at the close of the act..., in section 192 it is again provided: "This act shall not impair or affect any *** right accruing, accrued, or liability ***... but the same may be *** enforced *** as fully and to the same extent as if this act had not passed'.*

*"The inescapable conclusion is that... the Legislature clearly and conclusively intended to preserve vested rights of the character here asserted by plaintiff..."*

16.    On p. 452 of <u>Weckler v. Valley City,</u> Exh.25

*"the Supreme Court further stated,... 'It seems clear that the redemption right of plaintiff as a preferred stockholder is something more and different in character than an ordinary incidental right of a stockholder, such as voting for the election of a director of the company, and that his right is contractual in nature. This contract right was presumably a condition precedent to plaintiff's determination to purchase preferred stock in the defendant company. The redemption provision was a definite undertaking on the part of the defendant corporation to redeem at a given time and on given terms the stock plaintiff agreed to purchase. Assuming, as we fairly may, that in the absence of the redemption provision plaintiff would not have purchased his stock, or that defendant's undertaking to redeem was an inducing cause in consequence of which plaintiff did purchase, the provision for redemption was something more than a mere incident to corporate relationship, it was a definite contractual undertaking, the proposal for which antedated and consummation of which coincided with the purchase of the stock by plaintiff, who prior to that time was not identified with the corporation.'"*

17.    On p. 453 of <u>Weckler v. Valley City,</u> Exh.25

*"the Court of Appeals for the 6th Circuit, in holding that a Michigan corporation could not amend its articles of incorporatation... so as to extend the redemption date of its outstanding preferred stock, without the stockholders' consent, said... "We think this overlooks the true effect of the existing promise to redeem in 1925. This promise was authorized by statute, it was relied upon by the investor, and we see no reason why it is not essentially a contract beyond the power of the corporation to change materially without the consent of the investor.... The power of the corporation to amend its articles... cannot extend to the making of a change which would amount*

-8-

*to a repudiation of a contract which is distinct from, and in addition to, all ordinary matters of internal management, regulation, and control."*

*When §§43, 59, and 192 of the General Corporation Act are considered and construed together, it is clear that the legislature intended that the vested rights of a stockholder,..., be preserved to the stockholder. The court cannot give effect to these statutory provisions and at the same time deny plaintiff the right to recover on her preferred stock. Plaintiff's right to receive the par value of her preferred stock, together with accrued and unpaid dividends on 10/01/1949, was a valuable vested property right, and the power of the old company to amend its articles of incorporatation did not include the power to repudiate its contractual obligation to plaintiff without her consent. The court concludes that the old company could not, and did not, by the amendment of its articles of incorporation in 1936, change or cut off plaintiff's right to receive accrued and unpaid dividends on her preferred stock on 10/01/49.*

18.    On p. 455 of *Weckler v. Valley City,* Exh.25

*Defendants contend that the sale of the old company in 1949 was made in pursuance of §57 of the Michigan GCA, which authorizes a corporation to sell all of its assets to another corporation when authorized by vote of the holders of a majority of shares issued and outstanding, and that under §44 of the act,..., a stockholder who objects to a proposed sale of assets is given a single and exclusive remedy; that is, he must vote against the proposed sale, and within 20 days after the sale is authorized he must object thereto in writing and demand from the corporation the payment of the fair cash value of his shares. In other words, defendants claim that because plaintiff has not resorted to the exclusive remedy provided by §44 of the act, she may not now complain of the sale and the resulting effect upon her rights as a preferred stockholder.*

**The Meaning and Applicability of the Term *"Exclusive Remedy"* Has Been Explained by Judge Starr, on p.455, *Weckler v. Valley City***

19.    *"Objection by any such shareholder to any action of the corporation provided in this section and his rights thereafter under this section shall be his **exclusive remedy."***

*The above-quoted §§ 44 and 57 of the General Corporation Act should be considered and construed in connection with §§ 59 and 192 of the act. When so considered, it would appear that in using the term "exclusive remedy" in § 44 the legislature simply meant that a minority stockholder who "voted against" a proposed good-faith sale of corporate assets could no longer, as he could in the past, prevent or block the sale against the wishes of a majority of stockholders, and that if he voted against the sale, he could only demand that the corporation purchase his stock and pay to him the fair cash value thereof. Such an interpretation of § 44 would appear to be in harmony with the purpose of this and similar statues which where enacted to permit a majority of stockholders to authorize a good-faith sale, lease, or exchange of corporate assets and a fundamental change in the corporate structure without victimizing the minority stockholders, and yet at the same time prevent a minority stockholder from establishing a nuisance value for his shares. **An interpretation of § § 44 and 57 to permit the change or destruction of redemption rights or other vested property rights would certainly be in conflict with § 59 of the act, which provides that "The liability of any corporation * * * shall not in any way be lessened or impaired by the sale of any assets thereof," and in conflict with § 192 of the act, which provides***

-9-

that **"This act shall not impair or affect any * * * right accruing, accrued, or acquired, or liability * * * incurred prior to the time this act takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if this act had not been passed."** It should be noted that § 192 preserves not only accrued rights, but also the remedies for preserving such rights, for it specifically states that they may be asserted, enforced, and prosecuted as if the act had not been passed.

**The New York Case Law of _Breslav v. NY & Queens Electric Light & Power Co._, 291 NYS 932, affirmed 273 NY 593, 7 NE2d 708, Confirms the Same**

20.     _"Statute, if construed as impliedly authorizing making of noncallable stock callable by vote of two-thirds of outstanding shares, would violate Federal Constitution as impairing obligation of contract and as divesting stockholder of vested interest in corporation without due process of law,...Const. art. 8, § 1; Const. U.S. Amend. 14; Const. U.S. art. 1, § 10._

21.     _"Power reserved in state to amend corporation's charter is not unlimited, and its exercise is subject to restrictions imposed by other provisions of State and Federal Constitutions, such as requirement of due process, and vested property rights and obligations of contract must not be destroyed or impaired (Const. art.8, § 1; General Corporation Law, § 5; Const. U.S. Amend.14; Const. U.S. art.1, § 10.)"_

22.     _"Stockholder's interest in corporation as holder of noncallable preferred stock is vested interest which may not be divested without stockholder's assent, and not a mere defeasible interest subject to be extinguished by holders of record of two-thirds (now majority) of outstanding shares."_

23.     _"Statutory remedy of appraisal of dissenting stockholder's stock...does not apply where... vested property right is destroyed by changing noncallable stock into callable stock by vote of two-thirds of stockholders."_

## CONCLUSION

For these additional foregoing reasons, but mainly because per NY BCL §623(h)(1)(2), the 1992-1999 Federal Litigation for Appraisal was barred by the 80 day Statute of Limitations, Plaintiff respectfully requests the Court that the Defendant's Motion to Dismiss be denied.

Dated this February 6, 2008

_J. Czajkowski_

Jerry Czajkowski, Ph.D., in Pro Se

-10-

## EXHIBITS

## TABLE OF CONTENTS

16.  *Hernandez v. City of Pomona (2nd Dist. 4/11/2006) 138 Cal.App.4th, 506, 41 Cal.Rptr. 3d 517)* ...................................................................................    12

17. 4/23/07 Demand Letter from Patricia Lewis to Mr. K. Fitzgerald .............    13

18. 7/20/05 Letter from Mr. K. Fitzgerald to Atkins & Davidson ..................    19

19. 6/23/06 Engagement Offer from Atkins & Davidson to J.Czajkowski ........    20

20. 4/11/07 Letter from Mr. K. Fitzgerald to Patricia Lewis ........................    24

21. 6/12/07 Engagement Offer from Atkins & Davidson to J.Czajkowski ........    26

22. 12/02/91 HBJ NOTICE OF AUTHORIZATION ................................    30

23. p.91-93 FROM THE 1991 HBJ-GCC MERGER PROSPECTUS ............    32

24. NY BCL §623, EXH. D TO THE HBJ-GCC MERGER PROSPECTUS ...    35

25. *Weckler v. Valley City* 93 F.Supp.444. Affirmed, 188 F.2d 36 ...................    39

... [T]he essence of plaintiff's claim is that Shoultz, in his capacity as plaintiff's personal fitness trainer, challenged plaintiff to perform beyond his level of physical ability and fitness. That challenge, however, is the very purpose of fitness training, and is precisely the reason one would pay for the services of a personal trainer.... The trainer's function in the training process is, at bottom, to urge and challenge the participant to work muscles to their limits and to overcome physical and psychological barriers to doing so. Inherent in that process is the risk that the trainer will not accurately assess the participant's ability and the participant will be injured as a result.

... There is no evidence, however, that defendant Shoultz acted with intent to injure plaintiff or acted recklessly and thereby increased the risk inherent in the activity itself. Because the undisputed evidence in this case fails to show that defendant Shoultz breached a duty of care owed to plaintiff, we must affirm the summary judgment entered as to him.

## Civil Rights Actions — Res Judicata

*Hernandez v. City of Pomona* (2nd Dist., Apr. 11, 2006) 138 Cal.App.4th 506, 41 Cal.Rptr.3d 517

A widow and seven minor children of a man who was shot to death while fleeing arrest, filed a federal civil rights action against four police officers and the City of Pomona. The plaintiffs alleged that the defendants had violated the decedent's civil rights under federal law in that, at the time he was shot, he had indicated to the officers that he was unarmed and had turned towards them and raised his empty hands in the air. Following a verdict and judgment in favor of the defendants in federal court, the plaintiffs filed a common law negligence action against the defendants in state court.

The trial court sustained the defendants' demurrer to the complaint, holding that the plaintiffs' cause of action was barred by the previous federal court judgment against the plaintiffs. However, the court of appeal reversed, finding that based upon the procedural circumstances of the case

neither res judicata nor collateral estoppel precluded the plaintiffs' negligence action going forward:

California appellate courts have reached conflicting conclusions as to whether a judgment for defendants in a federal court action under 42 U.S.C. section 1983 alleging excessive force in violation of the Fourth Amendment precludes a state court action for negligence against the same defendants by the same plaintiffs.

....

We hold the doctrine of res judicata does not apply to the case before us. The primary right at issue in the section 198 action was Hernandez's right under the Fourth Amendment to be free from unreasonable seizure of his person. The primary right in the negligence action is Hernandez's right to be free from injury to his person. That some of the same facts are involved in both actions is not determinative; the significant factor is the nature of the harm. The nature of the harm in the former action was the violation of a constitutionally protected right. The nature of the harm in the latter action is the violation of a common law right....

As is apparent from the elements of a section 1983 excessive force action discussed above a general verdict for the defendant police officers does not adjudicate the question of their negligence because negligence was not an issue before the jury in the federal trial. Furthermore, the jury did not necessarily determine the shooting by officers Cooper, Devee and Luna was a reasonable use of force under the circumstances.

The jury could have found, for example, the shooting was an *un*reasonable use of force under the circumstances but officers Cooper, Devee and Luna were entitled to qualified immunity because they had "a mistaken understanding as to whether a particular amount of force is legal in those circumstances." There is no comparable qualified immunity law in California. Thus the jury in the federal civil rights action did not necessarily resolve the issues relevant to the elements of a negligence cause of action in our state court.

## Products Liability — Non-User, Non-Bystander

*Souza v. Squaw Valley Ski Corporation* (3rd Dist., Apr. 5, 2006) 138 Cal.App.4th 262, 41 Cal.Rptr.3d 389

An eight-year-old skier who was injured when she struck a padded and plainly visible snowmaking hydrant on a ski run filed suit against the property owner and the manufacturer of the hydrant. The plaintiff asserted, inter alia, a cause of action for strict liability for a defective product, alleging that the hydrant was defective in that its nozzle was unpadded, and that it was placed with the nozzle pointed uphill.

The trial court granted summary judgment and the court of appeal affirmed, holding that the doctrine of strict products liability was inapplicable, as the plaintiff was neither a user of the product nor a bystander to its use:

Souza's final cause of action alleges that the snowmaking equipment — the hydrant and nozzle — was defective under the strict products liability doctrine because of its defectively designed location, padding and uphill direction.

Under this doctrine, a manufacturer or other relevant entity in the stream of commerce is strictly liable in tort when a product it places on the market, "knowing that [the product] *is to be used* without inspection for defects, proves to have a defect that causes injury to a human being." ... The doctrine of primary assumption of risk does not insulate product suppliers from liability for injury for providing defective products....

The problem for Souza on this cause of action is that she neither used the hydrant and nozzle, nor was she a bystander to its use. [Citation.] Souza simply ran into the product, injuring herself. It is undisputed that the hydrant/nozzle was functioning properly as snowmaking equipment, and was not being used as a product at the time Souza crashed into it. As the trial court aptly put it, a plainly visible and generally avoidable snowmaking hydrant is not made defective simply because a skier runs into it.

... As Squaw Valley persuasively argues, "[t]his scenario does not describe a product defect — it describes an inherent risk of skiing." ■

Exhibit 16

12

# LEWIS LAW FIRM

PATRICIA ANN LEWIS
ATTORNEY AT LAW

1202 KETTNER BOULEVARD, SUITE 6100
SAN DIEGO, CALIFORNIA 92101-3312
TELEPHONE: (619) 225-0747
FACSIMILE: (619) 255-2452
WWW.LAWFIRMPAL.COM
PALEWIS@LAWFIRMPAL.COM

April 23, 2007

## CONTENTS PROTECTED BY
## CALIFORNIA EVIDENCE CODE §§1152, 1154

### VIA FACSIMILE ONLY

Kenneth M. Fitzgerald, Esq.
Latham & Watkins, LLP
600 West Broadway, Suite 1800
San Diego, California   92101-3375
FACSIMILE:   **(619) 696-7419**

*Czajkowski v. Harcourt Brace Jovanovich, Inc.*
*formerly known as Harcourt General, Inc.,*
*now known as Reed Elsevier, Inc.*

Dear Mr. Fitzgerald:

Your 04/11/07 response to Mr. Czajkowski's demand for recovery of his investment is acknowledged.   The characterization of the demand is for settlement, as you must agree, because HBJ has failed to respond to prior settlement offers presented by Mr. Czajkowski or Mr. Davidson, other than by flat denials or rejections.  If the claim was wholly invalid, as you suggest, I would not be presenting any requests to you.

I am troubled with your response in that it fails to provide any specific reference or documentation for the basis of your opposition.  To that end, I make this reply, addressing your opposition in the order of its presentation.

New York Business Corporation Law

You state that Mr. Czajkowski's claims are barred by the New York Business Corporations Law, without further comment and without identifying the specific statutes to support your opposition.   My commentary is, therefore, speculative, without your clarification.

**Exhibit 17**

13

Latham & Watkins, LLP                                          Page Two
Re:   *Czajkowski v. Harcourt Brace Jovanovich, Inc.*         April 23, 2007
      *formerly known as Harcourt General, Inc.,*
      *now known as Reed Elsevier, Inc.*


The choice of law requirements survive a substantial relationship test where, as here, HBJ's principal place of business was in San Diego and the contract was executed in California.   In *Mencor Enterprises v. Hets Equities Corp.* (1987) 190 Cal.App.3d 432, 440, plaintiff was a California corporation, which borrowed from defendant, a Colorado corporation.   A claim of usury under California law, which was legal in Colorado, was denied by the trial court but reversed by the California court of appeals, which found that the contract did not immunize the parties from rights and penalties imposed by California law, on the basis that substantial relations in California supported application of California law.

Mr. Czajkowski is making a common law claim for contractual rights of payment due him which were specifically set forth and identified as mandatory redemption provisions which were the reasons for his purchase of the 12% Preferred.   His common law right to recovery is not a defeasible interest but, rather, is an entitlement to payment according to the terms and provisions of the offering.

I urge you to please identify the specific statutes upon which you rely, so that I may more fully consider your position.

Statute of Limitations

Secondly, you identify the statute of limitations as a preclusion to my client's claim for recovery.   You support your position by the statement that, in 1991, HBJ repudiated its obligation to either pay dividends or redeem the 12% Preferred.

You say, "Events subsequent to the 1991 merger .... reaffirmed to Mr. Czajkowski that he would not receive any dividends, or any redemption of his stock."   Other than the federal litigation, you make no reference to subsequent events.

As you know, the four year statute of limitations period for breach of a written contract accrues at the time of breach.   Here, the redemption provisions begin in an installment of 20% of the outstanding 12% Preferred on 06/30/03, and 20% on each June 30th thereafter until the remaining are redeemed on 06/30/07.   On an installment contract, the limitations period does not accrue until the final payment, or 06/30/07.   *See, Tahoe Pines Co. v. Newman* (1922) 59 Cal.App.186, 188).   Although Mr. Czajkowski wishes to proceed with litigation immediately, the limitations period will not run until 06/29/2011.

**Exhibit 17**

14

Latham & Watkins, LLP                                                    Page Three
Re:    *Czajkowski v. Harcourt Brace Jovanovich, Inc.*                  April 23, 2007
        *formerly known as Harcourt General, Inc.,*
        *now known as Reed Elsevier, Inc.*

Anticipatory Repudiation

        To address your opposition that HBJ has allegedly repudiated its contractual
obligation,  I find no reference in any of the merger prospectus documents, including the
restated merger of 08/24/91, and the amended merger of 10/18/91, or in the Andersen and
Company notes to financial statements of 06/30/91, that HBJ has made a stated
repudiation of its contractual obligation to pay dividends and redeem the 12% Preferred.

        Even assuming there was such a repudiation by HBJ in 1991, as you assert, HBJ's
repudiation of its contractual obligations would be anticipatory to the 06/30/03
redemption.   Because the anticipatory breach has not yet occurred, the injured party may
wait until the time for performance to file his suit.  *Brewer v. Simpson* (1960) 53 Cal.2d
567, 593.

        HBJ's successors have been given the opportunity to redeem, as offered in Mr.
Czajkowski's and Mr. Davidson's prior correspondences.  The limitations period, then,
does not accrue until the time when there is an actual breach, which is now, not in 1991.

        Please provide the documents which support your position that HBJ repudiated
their contractual obligation.

*Res Judicata*

        The 9th Circuit and U.S. District Court cases were decided in 1994 on the basis of
an appraisal remedy for stock, and could not have been decided on the basis of a breach
of a contract which would not accrue until 2003.  *2003*

Debt Security

        You further oppose Mr. Czajkowski's claim by asserting that he purchased
preferred stock, rather than loan money to HBJ.  I beg to differ.

        Mr. Czajkowski paid for a "debt security," meaning,

                "[a]n obligation of an issuer or a share, participation, or other
                interest in an issuer or in property or an enterprise of an issuer
                that is all of the following:

**Exhibit 17**

15

Latham & Watkins, LLP                                           Page Four
Re:   *Czajkowski v. Harcourt Brace Jovanovich, Inc.*          April 23, 2007
      *formerly known as Harcourt General, Inc.,*
      *now known as Reed Elsevier, Inc.*

> (A) It is represented by a security certificate in bearer or registered
> form, or the transfer of it may be registered upon books maintained
> for that purpose by or on behalf of the issuer.
>
> (B) It is one of a class or series or by its terms is divisible into a class
> or series of shares, participations, interests, or obligations.
>
> (C) It is either of the following:
>
> (i) It is, or is of a type, deat in or traded on securities exchanges
> or securities markets.
>
> (ii) It is a medium for investment and by its terms expressly provides
> that it is a security governed by this division."

CA Comm'l Code §8102(15).

I submit to you that Mr. Czajkowski purchased a debt security which was
identified as 12% Preferred, presumably because the Board would declare dividends at
the annual rate of 12% of the liquidation preference ~~of the 12% Preferred, but which
carried with it a liquidation preference~~ of $13.50 per share which "HBJ is required to
redeem ..."   *See,* merger prospectus of 10/25/91 at p. 133.

Had my client not purchased a debt security, clearly there would be no liquidation
preference, there would be no stated redemption payment period, and there would be no
stated amount of redemption.   His purchase is that of a debt security.   His investment is
secured by the liquidation preference of the contractual agreement.

Indeed, the debt security is a contractual obligation which cannot be impaired
without breach thereof.   Mr. Czajkowski's right to redemption at the time and in the
amount stated by HBJ is a contract.   For HBJ to refuse to honor its contractual obligation
is an impairment of Mr. Czajkowski's contract rights and a deprivation of his vested
property interest.

My analysis of Mr. Czajkowski's claim is not "fundamentally flawed" in
identification of HBJ's contractual obligations, as you allege.

**Exhibit 17**

16

Latham & Watkins, LLP                                                      Page Five
Re:    *Czajkowski v. Harcourt Brace Jovanovich, Inc.*          April 23, 2007
       *formerly known as Harcourt General, Inc.,*
       *now known as Reed Elsevier, Inc.*


<u>Sanctions and Malicious Prosecution</u>

I am truly surprised that you have made threats to me *personally*, to wit, that if I pursue an action on my client's behalf, your client will sue me personally for malicious prosecution and seek sanctions personally against me.

My analysis of this case is supported by the same facts and basis which Mr. Clark Davidson used to attempt a settlement in his earlier negotiations with you.   I reiterate here some of his analysis, to which I have also referred you.

> ✓    "The 12% Preferred Stock is mandatorily redeemable and as such is classified outside of shareholders' equity." *See*, Andersen & Company notes to consolidated financial statements, p. F22.

> ✓    Dividends will accrue, even if not paid, just as interest is paid on a loan. *See*, merger prospectus of 10/25/91, p. 133.

> ✓    The 06/30/03 and subsequent installment redemptions are mandatory payments, just as a note would be callable by the holder.

The tenor of your 04/11/07 correspondence to me is not present in your similar correspondences with Mr. Davidson, and I am, therefore, surprised at your vicious commentary ~~to me.~~ *directed to me only.*

<u>Settlement Demand</u>

Although you have failed to make any offer of settlement in your 04/11/07 response, I reiterate, on behalf of Mr. Czajkowski, his demand for $480,000 to settle his claims for breach of contract   This offer will remain open for a limited period.

<u>Documentation</u>

Mr. Davidson and I both have asked that you provide documentation for analysis, which has not been forthcoming.   Please provide, at a minimum, the following:

**Exhibit 17**

17

Latham & Watkins, LLP                                              Page Six
Re:    *Czajkowski v. Harcourt Brace Jovanovich, Inc.*              April 23, 2007
       *formerly known as Harcourt General, Inc.,*
       *now known as Reed Elsevier, Inc.*


✓    Prospectus for the 12% Preferred;
✓    Annual 10K from 1990;
✓    HBJ Articles of Incorporation and Amendments;
✓    All documents to support any assertion that Mr. Czajkowski was paid for
     his loan to HBJ or that his ownership of the 12% Preferred was fully
     redeemed by HBJ;
✓    All documents to support HBJ's opposition to Mr. Czajkowski's demand.

Without documentation, references and citations to support your client's positions,
I remain firm in my belief that Mr. Czajkowski has a valid claim for breach of contract
remedies, supported by the facts and law as I have cited previously, as well as is stated
herein.

I look forward to your considered response, within ten days.

Sincerely,

Lewis Law Firm


Patricia Lewis

PAL:tgs
cc:   Mr. Jerry Czajkowski

**Exhibit 17**
18

Kenneth M. Fitzgerald
Direct Dial: (619) 236-1234
kenneth.fitzgerald@lw.com

6● ●st Broadway, Suite 1800
San Diego, California 92101-3375
Tel: (619) 236-1234  Fax: (619) 696-7419
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Boston | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| | Washington, D.C. |

July 20, 2005

File No. 013384-0006

Clark L. Davidson
Atkins & Davidson
450 B Street, Suite 1430
San Diego, CA  92101

      Re:   <u>Reed Elsevier, Inc.</u>

Dear Mr. Davidson:

      Enclosed are the relevant orders of the District Court and Ninth Circuit, which were entered after the June, 1994 remand referred to in your July 18, 2005 letter.  Apparently, Mr. Czajkowski did not share these orders with you, which should give you considerable pause about acting on his behalf.

      Irrespective of whether your client has been candid with you, the enclosed decisions extinguished your client's claims concerning his HBJ preferred stock, as a matter of law.  In addition, any such claims are now barred by the statute of limitations, in any event.  In sum, neither you nor your client has any probable cause to bring suit over Mr. Czajkowski's HBJ preferred stock, and any effort to do so will be dealt with appropriately.  In pursuing his groundless claims, Mr. Czajkowski has already inflicted significant expense on HBJ and its successors.  Should he renew his vexatious efforts, my client will hold him, and all those assisting him, fully responsible.

                Very truly yours,

                Kenneth M. Fitzgerald
                of LATHAM & WATKINS LLP

Enclosures

**Exhibit 18**

# ATKINS & DAVIDSON

Clark L. Davidson
Attorney & CPA
Direct: 619.255.4730
cdavidson@atkinsdavidson.com

June 23, 2006

Jerry Czajkowski
6370 Streamview Drive
San Diego, California 92115

### Re: *Engagement of Atkins & Davidson*

Dear Mr. Czajkowski:

This engagement letter and the accompanying Appendix serve to confirm for my records and yours that my law firm, Atkins & Davidson ("***Attorney***"), has been engaged to represent you in connection with the claims against Harcourt Brace Jovanich, currently Reed Elsevier, for the breach of contract for loans made by you to HBJ which were labeled preferred stock.

The purpose of this letter and the Appendix is to outline the basic terms of our engagement. While I would prefer to confirm our engagement in a less formal manner, I have found that the attorney-client relationship is enhanced by a mutual understanding of our services and fee arrangements, as described in this letter, and I appreciate your understanding of that fact and your careful review of this letter and the Appendix.

Attorney will perform the following legal services, if necessary, with respect to the matters described above. In the performance of this engagement, Attorney will provide those legal services which, in the exercise of his/her judgment, are reasonably required in order to represent Client's interest in a timely and cost-effective manner. Attorney will take reasonable steps to keep Client informed of progress of the matter, and to respond to Client's inquiries.

June 23, 2006

If a court action is filed, Attorney will represent Client through mediation, arbitration and/or trial, as well as all related court appearances and proceedings, including the following:

     a.     investigation of claims;

     b.     settlement procedures and negotiations;

     c.     preparation and filing of lawsuit; and,

     d.     prosecution of lawsuit to judgment in an appropriate trial court.

In order to secure my representation, we normally request a five thousand dollar ($5,000.00) payment towards our initial fees and costs; however, as we discussed, we will waive this fee under the circumstances of your case. We will accept engagement on your behalf as set forth below, the Contingency Fee.

Contingency Fee:

A contingency fee means that Attorney is only paid a fee if Client wins and collects a judgment or settlement in this matter. In other words, the Attorney's fee is contingent upon Client winning the case. If the Client does not win, Attorney will receive no fee, other than the upfront payment made. Client agrees that the following fee arrangement is fair and reasonable and to pay Attorney as follows:

     1.     Thirty-three and one third percent (33.33%) of any gross amounts recovered if the matter is resolved after the filing of the lawsuit; and,

     2.     Forty percent (40%) of any gross amounts recovered if the matter is resolved within seven days of the first date set for trial, or thereafter.

Costs and expenses paid in connection with Client's claim shall be reimbursed after the contingency fee is computed. (For example, if the claim is settled for $1,000, the gross recovery is $1,000 and attorney's contingency fee shall be based on this amount.) Client's share of the recovery shall be the balance remaining after payment of Attorney's contingency fee and reimbursement of costs advanced and expenses incurred as well as the satisfaction of any third party liens. Any upfront payment by the Client towards fees and costs will be credited against the attorneys' fees and costs reimbursed at the conclusion.

If the recovery consists of payments to be made over a period of time, or other property not entirely cash or cash equivalent, the contingency fee shall be based on the present cash value of the recovery as determined by generally recognized accounting and appraisal standards. (For example, if the recovery consists of $1,000 payable at

450 B STREET, SUITE 1430 • SAN DIEGO, CA • 92101
PHONE: 619.231.4725 • FAX: 619.231.4984

**Exhibit 19**

– 3 –                                                    June 23, 2006

$100 per year over ten years, its present cash value may be approximately $380, depending on prevalent interest rates.)  Unless agreed to otherwise in writing, the contingency fee shall be paid out of the first funds or property received by Client.

The above contingency fee will provide for the attorneys' fees through a trial in court; however, it does not cover additional services after a jury verdict is returned. For example, if any appeal is filed, or any post trial motions, including motions to tax costs and motions for reconsiderations of the verdict, then a new fee arrangement needs to be executed between Attorney and Client.  If a new fee arrangement is not executed, and Attorney performs further work, the Client agrees to pay Attorney at Attorney's standard hourly rates, not to exceed $300 per hour.

You further acknowledge that any payments received with regards to this dispute may be deposited into the Attorney Client Trust Account, the attorneys' fees and costs will be taken directly from the payments deposited, and we will remit the balance to you.  You further agree that Attorney shall have the power to sign for any moneys on your behalf.

Client acknowledges that Attorney may retain additional counsel during the course of the litigation at Attorney's own choosing; based on Attorney's beliefs as to the benefits of additional counsel.  If at any time the Attorney makes an arrangement to share the fees with other counsel, such arrangement will be set forth in writing for your benefit.

Client acknowledges that Attorney has made no guarantee as to the outcome or the amounts recoverable in connection with Client's claims.  Client understands that there is risk associated with all issues arising in the course of litigation, and there may not be a recovery in this case.  Client understands that in the event a lawsuit was brought to court and lost, Client could be liable to the defendants for court costs and under certain circumstances, defendants' attorneys' fees, as well.

Mr. Czajkowski, as we have discussed in the past, there is a significant risk that the state court judge will determine your case very early on in the Defendant's favor based on either a statute of limitations claim or a res judicata claim; because of the former litigation.  I also believe that the Defendant may come after you personally for their fees and costs; and if they choose to do so, we are willing to continue to represent you; however, you will need to pay us on an hourly rate, at a rate of one-half our normal rates.  Presently, rates for paralegals and clerks are between $100 and $150 per hour; and, our attorney rates range from $200 to $300 per hour.

Based on our former correspondence and work for you; I believe you are aware of the risks of a complete and total loss in this matter; but, I want to reiterate in this agreement.

– 4 –                                                                June 23, 2006

Attorney and Client agree to be completely truthful with each other in all matters related in any way to this dispute. Client agrees to cooperate and assist to the fullest extent of Client's ability in the investigation and presentation of Client's claims. Client agrees to keep Attorneys informed of all developments concerning Client's claim, whether favorable or unfavorable, and to perform such further acts and sign such further documents as may become necessary to properly pursue and recover on such claim. Client also hereby agrees to keep Attorney timely informed at all times of Client's whereabouts and current contact information and to keep Attorney apprised well in advance of Client's work, travel, vacation or other plans which might impact Client's availability to assist Attorney in the ongoing preparation and presentation of Client's matter.

You have the right to terminate my representation at any time. I also have the right to withdraw from representation of you for any reason I deem appropriate, including any failure by you, for what I regard as an excessive period of time, to pay my bills.

If this letter and the Appendix accurately state your understanding of our engagement, please sign and return a copy of this letter, to me, keeping a copy for your records.

Please feel free to discuss with me at any time during our relationship any aspect of my representation. I appreciate this opportunity to serve you and look forward to working with you on this engagement.

Very truly yours,


Clark L. Davidson


**AGREED:**

*Jerry Czajkowski*


Signed:_____

Date signed: _____

450 B STREET, SUITE 1430 • SAN DIEGO, CA • 92101
PHONE: 619.231.4725 • FAX: 619.231.4984

**Exhibit 19**

23

Kenneth M. Fitzgerald
Direct Dial: (619) 238-3027
kenneth.fitzgerald@lw.com

600 West Broadway, Suite 1800
San Diego, California 92101-3375
Tel: (619) 236-1234  Fax: (619) 696-7419
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

File No. 013384-0006

April 11, 2007

**VIA FACSIMILE**

Patricia Lewis, Esq.
LEWIS LAW FIRM
1202 Kettner Blvd., Suite 6100
San Diego, CA 92101

Re:    Czajkowski v. Harcourt Brace Jovanovich, Inc.

Dear Ms. Lewis:

I received your letter dated April 2, 2007.  At the outset, I fail to see why it is designated as a settlement communication, since it contains no settlement offer or other settlement content.  Instead, it articulates a claim and demand, which are wholly invalid.  All claims of Mr. Czajkowski, arising from his ownership of HBJ preferred stock, are barred by the New York Business Corporations Law, the statute of limitations, and the doctrine of res judicata.

Mr. Czajkowski bought HBJ preferred stock.  He did not loan HBJ money.  Your analysis mischaracterizes his stock as a promissory note, and is therefore fundamentally flawed.

Moreover, the Ninth Circuit determined that Mr. Czajkowski's exclusive remedy in connection with his stock ownership was an appraisal.  His claim for an appraisal was dismissed on summary judgment, and his subsequent attempt to obtain monetary compensation based on the $13.50 per share maturity value was rejected by the district court, in orders that became final years ago.  The district court's orders and judgment of dismissal fully and finally extinguished any claims to compensation Mr. Czajkowski may have had as an owner of HBJ stock.  Your analysis completely ignores the res judicata effect of the judgment and orders in the prior litigation against Mr. Czajkowski.

Your analysis also fails to recognize that any claim for breach of contract, even if it were theoretically viable, accrued in 1991, when HBJ made it clear that no further dividends would be paid, and that no redemption of the preferred shares would take place.  If, as you contend, Mr. Czajkowski had a contract with HBJ, that contract was repudiated in 1991.  The statute of limitations on any breach of contract claim therefore ran over ten years ago.  Events subsequent to the 1991 merger, including the position taken by HBJ in the litigation, reaffirmed to Mr. Czajkowski that he would not receive any dividends, or any redemption of his stock.  Thus, again, any claim for breach of contract accrued many years ago, and is now clearly barred by the statute of limitations.

**Exhibit 20**

Patricia Lewis, Esq.
April 11, 2007
Page 2

LATHAM&WATKINS LLP

     In sum, there is no probable cause for any claim by Mr. Czajkowski. And while he has demonstrated that he is nothing if not tenacious, his tenacity is not matched by any discernible degree of sense. So while Mr. Czajkowski may feel unconstrained from continuing to harass our client, I would hope that you would exercise greater restraint. Because of Mr. Czajkowski's vexatiousness, and his seemingly incessant demands and frivolous arguments, our client has determined to hold his attorneys responsible for any additional costs inflicted on his behalf. Therefore, be advised that if you proceed to assert any such claim on behalf of Mr. or Mrs. Czajkowski, our client will seek sanctions against you personally, and/or sue you personally for malicious prosecution, in addition to pursuing any and all remedies against Mr. Czajkowski.

Very truly yours,

Kenneth M. Fitzgerald
of LATHAM & WATKINS LLP

cc:  William Bayers, Esq.

**Exhibit 20**

# ATKINS & DAVIDSON

Clark L. Davidson
Attorney & CPA
Direct: 619.255.4730
cdavidson@atkinsdavidson.com

June 12, 2007

Jerry Czajkowski
6370 Streamview Drive
San Diego, California 92115

       *Re:  Engagement of Atkins & Davidson, APC*

Dear Mr. Czajkowski:

    This engagement letter and the accompanying Appendix serve to confirm for my records and yours that my law firm, Atkins & Davidson (*"Attorney"*), has been engaged to represent you in connection with the claims against Harcourt Brace Jovanich, currently Reed Elsevier, for the breach of contract for loans made by you to HBJ which were labeled preferred stock.

    The purpose of this letter and the Appendix is to outline the basic terms of our engagement.  While I would prefer to confirm our engagement in a less formal manner, I have found that the attorney-client relationship is enhanced by a mutual understanding of our services and fee arrangements, as described in this letter, and I appreciate your understanding of that fact and your careful review of this letter and the Appendix.

    Attorney will perform the following legal services, if necessary, with respect to the matters described above.  In the performance of this engagement, Attorney will provide those legal services which, in the exercise of his/her judgment, are reasonably required in order to represent Client's interest in a timely and cost-effective manner. Attorney will take reasonable steps to keep Client informed of progress of the matter, and to respond to Client's inquiries.

June 12, 2007

If a court action is filed, Attorney will represent Client through mediation, arbitration and/or trial, as well as all related court appearances and proceedings, including the following:

    a.    investigation of claims;

    b.    settlement procedures and negotiations;

    c.    preparation and filing of lawsuit; and,

    d.    prosecution of lawsuit to judgment in an appropriate trial court.

In order to secure my representation, we normally request a five thousand dollar ($5,000.00) payment towards our initial fees and costs; however, as we discussed, we will waive this fee under the circumstances of your case. However, you will be required to pay the initial $300 complaint filing fee, and to also pay for any experts that may be retained during the course of the litigation. We will accept engagement on your behalf as set forth below, the Contingency Fee.

Contingency Fee:

A contingency fee means that Attorney is only paid a fee if Client wins and collects a judgment or settlement in this matter. In other words, the Attorney's fee is contingent upon Client winning the case. If the Client does not win, Attorney will receive no fee, other than the upfront payment made. Client agrees that the following fee arrangement is fair and reasonable and to pay Attorney as follows:

1.    Thirty-three and one third percent (33.33%) of any gross amounts recovered if the matter is resolved after the filing of the lawsuit; and,

2.    Forty percent (40%) of any gross amounts recovered if the matter is resolved within seven days of the first date set for trial (this date is usually within one (1) year of the complaint filing date, or thereafter.

Costs and expenses paid in connection with Client's claim shall be reimbursed after the contingency fee is computed. (For example, if the claim is settled for $1,000, the gross recovery is $1,000 and attorney's contingency fee shall be based on this amount.) Client's share of the recovery shall be the balance remaining after payment of Attorney's contingency fee and reimbursement of costs advanced and expenses incurred as well as the satisfaction of any third party liens. Any upfront payment by the Client towards fees and costs will be credited against the attorneys' fees and costs reimbursed at the conclusion. Attorney is NOT obligated, nor does Attorney agree, to front any costs in this lawsuit.

– 3 –                                     June 12, 2007

If the recovery consists of payments to be made over a period of time, or other property not entirely cash or cash equivalent, the contingency fee shall be based on the present cash value of the recovery as determined by generally recognized accounting and appraisal standards. (For example, if the recovery consists of $1,000 payable at $100 per year over ten years, its present cash value may be approximately $380, depending on prevalent interest rates.) Unless agreed to otherwise in writing, the contingency fee shall be paid out of the first funds or property received by Client.

The above contingency fee will provide for the attorneys' fees through the last day of trial, including any days of jury deliberation; however, it does not cover additional services after a jury verdict is returned. For example, if any appeal is filed, or any post trial motions, including motions to tax costs and motions for reconsiderations of the verdict, then a new fee arrangement needs to be executed between Attorney and Client. If a new fee arrangement is not executed, and Attorney performs further work, the Client agrees to pay Attorney at Attorney's standard hourly rates, not to exceed $300 per hour.

You further acknowledge that any payments received with regards to this dispute may be deposited into the Attorney Client Trust Account, the attorneys' fees and costs will be taken directly from the payments deposited, and we will remit the balance to you. You further agree that Attorney shall have the power to sign for any moneys on your behalf for deposit into the Attorney Client Trust Account.

Client acknowledges that Attorney may retain additional counsel during the course of the litigation at Attorney's own choosing; based on Attorney's beliefs as to the benefits of additional counsel. If at any time the Attorney makes an arrangement to share the fees with other counsel, such arrangement will be set forth in writing for your benefit.

Client acknowledges that Attorney has made no guarantee as to the outcome or the amounts recoverable in connection with Client's claims. Client understands that there is risk associated with all issues arising in the course of litigation, and there may not be a recovery in this case. Client understands that in the event a lawsuit was brought to court and lost, Client could be liable to the defendants for court costs and under certain circumstances, defendants' attorneys' fees, as well.

Mr. Czajkowski, as we have discussed in the past, there is a significant risk that the state court judge will determine your case very early on in the Defendant's favor based on either a statute of limitations claim or a res judicata claim; because of the former litigation. I also believe that the Defendant may come after you personally for their fees and costs; and if they choose to do so, we are willing to continue to represent you; however, you will need to pay us on an hourly rate, at our standard rates.

450 B STREET, SUITE 1430 • SAN DIEGO, CA • 92101
PHONE: 619.231.4725 • FAX: 619.231.4984

**Exhibit 21**

28

– 4 –                                                  June 12, 2007

Presently, rates for paralegals and clerks are between $100 and $150 per hour; and, our attorney rates range from $200 to $300 per hour.

Based on our former correspondence and work for you; I believe you are aware of the risks of a complete and total loss in this matter; but, I want to reiterate the fact in this agreement.

Attorney and Client agree to be completely truthful with each other in all matters related in any way to this dispute. Client agrees to cooperate and assist to the fullest extent of Client's ability in the investigation and presentation of Client's claims. Client agrees to keep Attorneys informed of all developments concerning Client's claim, whether favorable or unfavorable, and to perform such further acts and sign such further documents as may become necessary to properly pursue and recover on such claim. Client also hereby agrees to keep Attorney timely informed at all times of Client's whereabouts and current contact information and to keep Attorney apprised well in advance of Client's work, travel, vacation or other plans which might impact Client's availability to assist Attorney in the ongoing preparation and presentation of Client's matter.

You have the right to terminate my representation at any time. I also have the right to withdraw from representation of you for any reason I deem appropriate, including any failure by you, for what I regard as an excessive period of time, to pay my bills.

If this letter and the Appendix accurately state your understanding of our engagement, please sign and return a copy of this letter, to me, keeping a copy for your records.

Please feel free to discuss with me at any time during our relationship any aspect of my representation. I appreciate this opportunity to serve you and look forward to working with you on this engagement.

Very truly yours,

Clark L. Davidson

AGREED:

Signed:_____

Date signed: _____

Harcourt Brace Jovanovich, Inc.
6277 Sea Harbor Drive
Orlando, FL  32887


NOTICE OF AUTHORIZATION


To:  Jerry and Lonia Czajkowski
7944 La Jolla Shores Drive
La Jolla, CA  92037

        Notice is hereby given, pursuant to Section 623 of the
Business Corporation Law of the State of New York, that
authorization for the following corporate action was obtained
from the shareholders of Harcourt Brace Jovanovich, Inc., a New
York corporation ("HBJ"), by holders of 69% of the outstanding
shares of the Common Stock, par value $1.00 per share of HBJ
("HBJ Common Stock") and holders of 61% of the outstanding shares
of Preferred Stock, par value $1.00 per share of HBJ ("HBJ
Preferred Stock"), each voting separately as a class, at a
meeting of shareholders of HBJ held at the RIHGA Royal Hotel, 151
West 54th Street, City of New York, County of New York, State of
New York, on the 23rd day of November, 1991:

        The shareholders of HBJ approved the merger (the
        "Merger") of HBJ with a wholly owned subsidiary of
        General Cinema Corporation ("GCC"), pursuant to which
        each outstanding share of HBJ Common Stock and each
        outstanding share of HBJ Preferred Stock (other than,
        in each case, dissenting shares and shares owned by
        HBJ, GCC, or any of their respective subsidiaries)
        would be converted into the right to receive the
        fraction of a share of Class B Stock, par value $1.00
        per share of GCC ("GCC Class B Stock"), and Common
        Stock, par value $1.00 per share of GCC ("GCC Common
        Stock"), respectively, determined as follows:

                (A) if the average closing price of GCC
                Common Stock, as reported on the New York Stock
                Exchange, Inc. Composite Tape for the fifteen
                consecutive trading days ending three business
                days prior to the effective date of the Merger
                (the "Average Price") were not less than $19.00
                and not more than $25.00, (I) each share of HBJ
                Common Stock would be converted into the right to
                receive the fraction of a share of GCC Class B
                Stock determined by dividing $0.75 by the Average
                Price and (II) each share of HBJ Preferred Stock
                would be converted into the right to receive the
                fraction of a share of GCC Common Stock determined
                by dividing $0.75 by the Average Price;

                (B) if the Average Price were greater than
                $25.00 and less than or equal to $29.00, (I) each
                share of HBJ Common Stock would be converted into

**Exhibit 22**

the right to receive .0300 shares of GCC Class B
Stock and (II) each share of HBJ Preferred Stock
would be converted into the right to receive .0300
shares of GCC Common Stock, which is the fraction
of a share of GCC Class B Stock and GCC Common
Stock, respectively, into which HBJ Common Stock
and HBJ Preferred Stock would be converted if the
Average Price were $25.00;

    (C) if the Average Price were greater than or
equal to $15.00 but less than $19.00, (I) each
share of HBJ Common Stock would be converted into
the right to receive .0395 shares of GCC Class B
Stock and (II) each share of HBJ Preferred Stock
would be converted into the right to receive .0395
shares of GCC Common Stock, which is the fraction
of a share of GCC Class B Stock and GCC Common
Stock, respectively, into which HBJ Common Stock
and HBJ Preferred Stock would be converted if the
Average Price were $19.00; and

    (D) if the Average Price were less than
$15.00, GCC would have the right to elect to have
each share of HBJ Common Stock and HBJ Preferred
Stock converted into the right to receive the
fraction of a share of GCC Class B Stock and GCC
Common Stock, respectively, determined by dividing
$0.5925 (which is the trading price, based on an
Average Price of $15.00, of .0395 shares of GCC
Common Stock) by the Average Price; and if the
Average Price were greater than $29.00, HBJ would
have the right to elect to have each share of HBJ
Common Stock and HBJ Preferred Stock converted
into the right to receive the fraction of a share
of GCC Class B Stock and GCC Common Stock,
respectively, determined by dividing $0.87 (which
is the trading price, based on an Average Price of
$29.00, of .0300 shares of GCC Common Stock) by
the Average Price.  If GCC or HBJ, as the case may
be, failed to make its respective election when
available, the other would have the right to
terminate the agreement.

    The Merger was consummated on November 25, 1991.  Each share
of HBJ Common Stock was converted into the right to receive
0.0395 of a share of GCC Class B Stock, and each share of HBJ
Preferred Stock was converted into the right to receive 0.0395 of
a share of GCC Common Stock.  As a result of the Merger, HBJ
became a wholly owned subsidiary of GCC.

Dated, December 2, 1991

                         HARCOURT BRACE JOVANOVICH, INC.

**Exhibit 22**

**THIS DISCUSSION AND EXHIBIT D SHOULD BE REVIEWED CAREFULLY BY ANY SHAREHOLDER OF HBJ WHO WISHES TO EXERCISE STATUTORY APPRAISAL RIGHTS OR WHO WISHES TO PRESERVE THE RIGHT TO DO SO BECAUSE FAILURE TO STRICTLY COMPLY WITH ANY OF THE PROCEDURAL REQUIREMENTS OF SECTION 623 MAY RESULT IN A TERMINATION OR WAIVER OF APPRAISAL RIGHTS UNDER SECTION 623.**

A holder of HBJ Shares as of the Record Date who elects to dissent from the approval and adoption of the Merger Agreement and who has not voted in favor thereof is entitled under the provisions of Sections 623 and 910 of the New York BCL, as an alternative to receiving the applicable Merger Consideration for such holder's HBJ Shares, to a judicial determination of the fair value in cash of such holder's HBJ Shares.

Any holder of HBJ Shares who elects to exercise such holder's dissenter's rights with respect to the Merger Agreement must file a written objection to the HBJ Merger Proposal with HBJ before the HBJ Special Meeting, or at the HBJ Special Meeting but before the vote on the HBJ Merger Proposal is taken, which objection includes (i) a notice of such holder's election to dissent, (ii) such holder's name and residence address, (iii) the number and classes of HBJ Shares as to which such holder dissents, and (iv) a demand for payment of the fair value of such holder's HBJ Shares. Such objection is not required for any holder of HBJ Shares to whom HBJ did not give notice of the HBJ Special Meeting. For purposes of perfecting dissenters' rights pursuant to Section 623, the written objection of a holder of HBJ Shares shall be deemed filed with HBJ upon receipt of such objection by HBJ. Neither voting against nor failure to vote for the Merger Agreement will constitute the written objection required to be filed by an objecting shareholder. Failure to vote against the Merger Agreement, however, will not constitute a waiver of rights under Sections 623 and 910 of the New York BCL, provided that a written objection has been properly filed. A shareholder voting to approve the HBJ Merger Proposal will be deemed to have waived such shareholder's dissenter's rights. Any proxy may be revoked before it is voted by filing with the Assistant Secretary of HBJ a written notice of revocation or a duly executed proxy bearing a later date or by attending the HBJ Special Meeting and voting in person. The return of a signed proxy without instructions as to the Merger will be deemed a vote in favor of the Merger Agreement. See "VOTING AND PROXY INFORMATION."

A shareholder may not dissent as to less than all HBJ Shares held of record that such holder beneficially owns. A nominee or fiduciary may not dissent on behalf of any beneficial owner as to less than all the HBJ Shares of such beneficial owner, as to which such nominee or fiduciary has a right to dissent, held of record by such nominee or fiduciary. Furthermore, if the HBJ Shares are owned of record in a fiduciary capacity, such as by a trustee, guardian, or custodian, the demand should be made in that capacity, and if the HBJ Shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand should be made by or for all owners of record. An authorized agent, including one of two or more joint owners, may execute the demand for appraisal for a holder of record; however, such agent must identify the record owner or owners and expressly state, in such demand, that the agent is acting as agent for the record owner or owners of such HBJ Shares.

A record holder, such as a broker or an agent, who holds HBJ Shares as a nominee for beneficial owners, some of whom desire to demand appraisal, must exercise appraisal rights on behalf of such beneficial owners who desire to demand appraisal with respect to the HBJ Shares held for such beneficial owners.

All notices of election to dissent should be addressed to HBJ at Orlando, Florida 32887, Attention: Assistant Secretary.

Within ten days after the date of the shareholders' vote approving the HBJ Merger Proposal, HBJ, as the Surviving Corporation, will give written notice of such approval by registered mail to each holder of HBJ Shares who timely filed a written objection to the HBJ Merger Proposal, or from whom written objection was not required, and who did not vote in favor of the HBJ Merger Proposal.

At the time of filing a notice of election to dissent or within one month thereafter, a dissenting holder of HBJ Shares must submit the certificate or certificates representing such holder's HBJ Shares to HBJ or its transfer agent, for conspicuous notation thereon of the election to dissent, after which such certificates will be returned to such holder or other person who submitted them on behalf of the holder. Sun Bank, N.A. serves

91
**Exhibit 23**

as the transfer agent for the HBJ Shares, and its address is c/o Trust Company Bank, 58 Edgewood Avenue, Room 225 Annex, Atlanta, Georgia 30303. Any such holder who fails to submit such certificates for notation will, at the election of HBJ or the Surviving Corporation, exercised by written notice to such holder within 45 days from the date of filing of the notice to dissent, lose such holder's dissenter's rights unless a court, for good cause shown, otherwise directs.

Within 15 days after the expiration of the period within which holders of HBJ Shares may file their notices of election to dissent, or within 15 days after the Effective Time, whichever is later (but in no case later than 90 days after the shareholders' vote approving the HBJ Merger Proposal), HBJ or the Surviving Corporation, as the case may be, is required to make a written offer by registered mail to each shareholder who has filed a notice of election to dissent to pay for such holder's HBJ Shares at a specified price which HBJ or the Surviving Corporation, as the case may be, considers to be their fair value. Such offer will be accompanied by a statement setting forth the aggregate number of HBJ Shares with respect to which notices of election to dissent from approval and adoption of the Merger Agreement have been received and the aggregate number of holders of such HBJ Shares. If the Merger has been consummated at the time such offer is made, such offer will also be accompanied by (i) advance payment to each dissenting holder who has submitted such holder's certificates to HBJ for notation thereon of such holder's election to dissent of an amount equal to 80% of the amount of such offer, or (ii) as to each dissenting holder who has not yet submitted such certificates for such notation, a statement that advance payment to such holder of an amount equal to 80% of the amount of such offer will be made by the Surviving Corporation promptly upon submission of such certificates. If the Merger has not been consummated at the time of such offer, such advance payment or statement as to advance payment will be sent to each holder entitled thereto forthwith upon consummation of the Merger. Every advance payment or statement as to advance payment will include advice to such holder that acceptance of such advance payment by a dissenting holder will not constitute a waiver of such holder's dissenter's rights. If the Merger has not been consummated by the expiration of the above-mentioned 90-day period, HBJ's offer may be conditioned upon the consummation of the Merger. If within 30 days after the making of a written offer by HBJ or the Surviving Corporation, as the case may be, HBJ or the Surviving Corporation, as the case may be, and any dissenting holder agree upon the price to be paid for such shareholder's HBJ Shares, payment therefor will be made within 60 days after the making of such offer or the Effective Time, whichever is later, upon the surrender of the certificates representing such HBJ Shares.

From and after the Effective Time, any payments with respect to any demands for appraisal or in settlement of any such demands will be made by HBJ (as the Surviving Corporation) in all circumstances, but only to the extent not prohibited by Section 623(j) of the New York BCL, which is described below. GCC has no obligation to make such payments to the holders of Dissenting Shares.

If HBJ or the Surviving Corporation, as the case may be, fails to make such an offer within the 15-day period described in the preceding paragraph, or if it makes an offer but HBJ or the Surviving Corporation, as the case may be, and a dissenting holder do not agree within 30 days of the making of the offer upon the price to be paid for such holder's HBJ Shares, HBJ or the Surviving Corporation, as the case may be, must, within twenty days of such 15- or 30-day period, as the case may be, institute a special proceeding in the New York Supreme Court, New York County (the "Court"), to determine the rights of dissenting holders and fix the fair value of their HBJ Shares. It is the current intention of HBJ to institute any such proceeding within the 20-day period; however, if HBJ does not institute such proceeding within the 20-day period, any dissenting holder may, within 30 days after such 20-day period, institute a proceeding for the same purposes. If such proceeding is not instituted within such 30-day period, dissenting holders who have not agreed with HBJ as to the price to be paid for their HBJ Shares will lose their dissenters' rights, unless the Court, for good cause shown, otherwise directs.

All dissenting holders, other than those who shall have agreed with HBJ or the Surviving Corporation, as the case may be, as to the price to be paid for their HBJ Shares, will be made parties to such appraisal proceeding. The Court will determine whether each dissenting holder, as to whom HBJ or the Surviving Corporation, as the case may be, requests the Court to make such determination, is entitled to receive payment for such holder's HBJ Shares. If HBJ or the Surviving Corporation, as the case may be, does not request any such determination or if the Court finds that such dissenting shareholder is so entitled, the Court

92

**Exhibit 23**

33

will then determine the fair value of such holder's HBJ Shares as of the close of business on the day prior to the date the Merger Agreement was approved by the shareholders of HBJ. In fixing the fair value of the HBJ Shares, the Court will consider the nature of the transaction giving rise to the holder's right to receive payment for such holder's HBJ Shares under the New York BCL, the effects of such transaction on HBJ and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining the fair value of the shares of a corporation engaging in a similar transaction under comparable circumstances, and all other relevant factors. Within sixty days after the completion of any such Court proceeding, HBJ or the Surviving Corporation, as the case may be, will be required to pay to each dissenting holder the amount found to be due, with interest thereon at such rate as the Court finds to be equitable, from the date the Merger is consummated to the date of payment, upon surrender to HBJ or the Surviving Corporation, as the case may be, by such holder of the certificates representing such HBJ Shares. If the Court finds that the refusal of any dissenting holder to accept the offer of HBJ was arbitrary, vexatious, or otherwise not in good faith, no interest will be allowed to such holder. From and after the Effective Time, any amount found to be due to dissenting shareholders, and any interest allowed, will be paid by HBJ (as the Surviving Corporation) to the extent not prohibited by Section 623(j) of the New York BCL.

The parties to such appraisal proceeding will bear their own costs and expenses, including the fees and expenses of their counsel and any experts employed by them, except that the Court, in its discretion, (i) may apportion and assess all or any part of the costs, expenses, and fees incurred by dissenting holders against HBJ or the Surviving Corporation, as the case may be, if, among other things, the Court finds that the fair value of the HBJ Shares materially exceeds the offer by HBJ or the Surviving Corporation, as the case may be, or (ii) may apportion and assess all or any part of the costs, expenses, and fees incurred by HBJ or the Surviving Corporation, as the case may be, against all of the dissenting holders, including any dissenting holders who have withdrawn their notices of election to dissent from the Merger, who the Court finds were arbitrary, vexatious, or otherwise not acting in good faith in refusing any offer of payment HBJ or the Surviving Corporation, as the case may be, may have made.

Any shareholder who has filed a notice of election to dissent will not, after the Effective Time, have any of the rights of a shareholder with respect to such holder's HBJ Shares, other than the right to be paid the fair value of such HBJ Shares under the New York BCL and any other right provided under the New York BCL for shareholders who have filed such a notice. Any notice of election to dissent may be withdrawn by a dissenting shareholder at any time prior to such shareholder's acceptance in writing of an offer made by HBJ or the Surviving Corporation, as the case may be, as described above, but in no case later than 60 days after the Effective Time (or if HBJ or the Surviving Corporation, as the case may be, fails to make a timely offer to pay such shareholder the fair value of such holder's HBJ Shares as described above, at any time within 60 days after any date such an offer is made), or thereafter with the written consent of the Surviving Corporation. In order to be effective, withdrawal of a notice of election to dissent must be accompanied by the return to the Surviving Corporation of any advance payment to the shareholder made by the Surviving Corporation, as described above. Any dissenting shareholder who withdraws such holder's notice of election to dissent or otherwise loses such holder's dissenter's rights will thereupon have only the right to receive the Merger Consideration for each of such holder's HBJ Shares.

Under Section 623(j) of the New York BCL, no payment of the fair value of their HBJ Shares may be made to dissenting shareholders by HBJ as the Surviving Corporation if the Surviving Corporation were to be insolvent or if such payment would render the Surviving Corporation insolvent. In that event, each dissenting shareholder would be required to either (i) withdraw such holder's notice of election to dissent or (ii) retain such holder's status as a claimant against the Surviving Corporation. If a dissenting shareholder were to elect to remain a claimant against the Surviving Corporation, such dissenting shareholder's rights would be subordinated to the rights of the Surviving Corporation's creditors but would be superior to those of non-dissenting shareholders, should HBJ (as the Surviving Corporation) be liquidated. If HBJ (as the Surviving Corporation) were not liquidated, the dissenting shareholder would retain such holder's right to payment for such holder's HBJ Shares, which obligation the Surviving Corporation would be required to meet once it was no longer insolvent or if such payment would not render the Surviving Corporation insolvent. If a dissenting shareholder fails to exercise either such option within 30 days after the Surviving Corporation has given such

EXHIBIT D

## New York Business Corporation Law § 623

**§ 623. Procedure to enforce shareholder's right to receive payment for shares. — (a)** A shareholder intending to enforce his right under a section of this chapter to receive payment for his shares if the proposed corporate action referred to therein is taken shall file with the corporation, before the meeting of shareholders at which the action is submitted to a vote, or at such meeting but before the vote, written objection to the action. The objection shall include a notice of his election to dissent, his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares if the action is taken. Such objection is not required from any shareholder to whom the corporation did not give notice of such meeting in accordance with this chapter or where the proposed action is authorized by written consent of shareholders without a meeting.

(b) Within ten days after the shareholders' authorization date, which term as used in this section means the date on which the shareholders' vote authorizing such action was taken, or the date on which such consent without a meeting was obtained from the requisite shareholders, the corporation shall give written notice of such authorization or consent by registered mail to each shareholder who filed written objection or from whom written objection was not required, excepting any shareholder who voted for or consented in writing to the proposed action and who thereby is deemed to have elected not to enforce his right to receive payment for his shares.

(c) Within twenty days after the giving of notice to him, any shareholder from whom written objection was not required and who elects to dissent shall file with the corporation a written notice of such election, stating his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares. Any shareholder who elects to dissent from a merger under section 905 (Merger of subsidiary corporation) or paragraph (c) of section 907 (Merger or consolidation of domestic and foreign corporations) or from a share exchange under paragraph (g) of Section 913 (Share exchanges) shall file a written notice of such election to dissent within twenty days after the giving to him of a copy of the plan of merger or exchange or an outline of the material features thereof under section 905 or 913.

(d) A shareholder may not dissent as to less than all of the shares, as to which he has a right to dissent, held by him of record, that he owns beneficially. A nominee or fiduciary may not dissent on behalf of any beneficial owner as to less than all of the shares of such owner, as to which such nominee or fiduciary has a right to dissent, held of record by such nominee or fiduciary.

(e) Upon consummation of the corporate action, the shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights under this section. A notice of election may be withdrawn by the shareholder at any time prior to his acceptance in writing of an offer made by the corporation, as provided in paragraph (g), but in no case later than sixty days from the date of consummation of the corporate action except that if the corporation fails to make a timely offer, as provided in paragraph (g), the time for withdrawing a notice of election shall be extended until sixty days from the date an offer is made. Upon expiration of such time, withdrawal of a notice of election shall require the written consent of the corporation. In order to be effective, withdrawal of a notice of election must be accompanied by the return to the corporation of any advance payment made to the shareholder as provided in paragraph (g). If a notice of election is withdrawn, or the corporate action is rescinded, or a court shall determine that the shareholder is not entitled to receive payment for his shares, or the shareholder shall otherwise lose his dissenters' rights, he shall not have the right to receive payment for his shares and he shall be reinstated to all his rights as a shareholder as of the consummation of the corporate action, including any intervening premptive rights and the right to payment of any intervening dividend or other distribution or, if any such rights have expired or any such dividend or distribution other than in cash has been completed, in lieu thereof, at the election of the corporation, the fair value thereof in cash as determined by the board as of the time of such expiration or completion, but without prejudice otherwise to any corporate proceedings that may have been taken in the interim.

D-1

**Exhibit 24**

35

(f) At the time of filing the notice of election to dissent or within one month thereafter the shareholder of shares represented by certificates shall submit the certificates representing his shares to the corporation, or to its transfer agent, which shall forthwith note conspicuously thereon that a notice of election has been filed and shall return the certificates to the shareholder or other person who submitted them on his behalf. Any shareholder of shares represented by certificates who fails to submit his certificates for such notation as herein specified shall, at the option of the corporation exercised by written notice to him within forty-five days from the date of filing of such notice of election to dissent, lose his dissenter's rights unless a court, for good cause shown, shall otherwise direct. Upon transfer of a certificate bearing such notation, each new certificate issued therefor shall bear a similar notation together with the name of the original dissenting holder of the shares and a transferee shall acquire no rights in the corporation except those which the original dissenting shareholder had at the time of transfer.

(g) Within fifteen days after the expiration of the period within which shareholders may file their notices of election to dissent, or within fifteen days after the proposed corporate action is consummated, whichever is later (but in no case later than ninety days from the shareholders' authorization date), the corporation or, in the case of a merger or consolidation, the surviving or new corporation, shall make a written offer by registered mail to each shareholder who has filed such notice of election to pay for his shares at a specified price which the corporation considers to be their fair value. Such offer shall be accompanied by a statement setting forth the aggregate number of shares with respect to which notices of election to dissent have been received and the aggregate number of holders of such shares. If the corporate action has been consummated, such offer shall also be accompanied by (1) advance payment to each such shareholder who has submitted the certificates representing his shares to the corporation, as provided in paragraph (f), of an amount equal to eighty percent of the amount of such offer, or (2) as to each shareholder who has not yet submitted his certificates a statement that advance payment to him of an amount equal to eighty percent of the amount of such offer will be made by the corporation promptly upon submission of his certificates. If the corporate action has not been consummated at the time of the making of the offer, such advance payment or statement as to advance payment shall be sent to each shareholder entitled thereto forthwith upon consummation of the corporate action. Every advance payment or statement as to advance payment shall include advice to the shareholder to the effect that acceptance of such payment does not constitute a waiver of any dissenters' rights. If the corporate action has not been consummated upon the expiration of the ninety day period after the shareholders' authorization date, the offer may be conditioned upon the consummation of such action. Such offer shall be made at the same price per share to all dissenting shareholders of the same class, or if divided into series, of the same series and shall be accompanied by a balance sheet of the corporation whose shares the dissenting shareholder holds as of the latest available date, which shall not be earlier than twelve months before the making of such offer, and a profit and loss statement or statements for not less than a twelve-month period ended on the date of such balance sheet or, if the corporation was not in existence throughout such twelve month period, for the portion thereof during which it was in existence. Notwithstanding the foregoing, the corporation shall not be required to furnish a balance sheet or profit and loss statement or statements to any shareholder to whom such balance sheet or profit and loss statement or statements were previously furnished, nor if in connection with obtaining the shareholders' authorization for or consent to the proposed corporate action the shareholders were furnished with a proxy or information statement, which included financial statements, pursuant to Regulation 14A or Regulation 14C of the United States Securities and Exchange Commission. If within thirty days after the making of such offer, the corporation making the offer and any shareholder agree upon the price to be paid for his shares, payment therefor shall be made within sixty days after the making of such offer or the consummation of the proposed corporate action, whichever is later, upon the surrender of the certificates for any such shares represented by certificates.

(h) The following procedure shall apply if the corporation fails to make such offer within such period of fifteen days, or if it makes the offer and any dissenting shareholder or shareholders fail to agree with it within the period of thirty days thereafter upon the price to be paid for their shares:

(1) The corporation shall, within twenty days after the expiration of whichever is applicable of the two periods last mentioned, institute a special proceeding in the supreme court in the judicial district in which the office of the corporation is located to determine the rights of dissenting shareholders and to fix

D-2

**Exhibit 24**

the fair value of their shares. If, in the case of merger or consolidation, the surviving or new corporation is a foreign corporation without an office in this state, such proceeding shall be brought in the county where the office of the domestic corporation, whose shares are to be valued, was located.

(2) If the corporation fails to institute such proceeding within such period of twenty days, any dissenting shareholder may institute such proceeding for the same purpose not later than thirty days after the expiration of such twenty day period. If such proceeding is not instituted within such thirty day period, all dissenter's rights shall be lost unless the supreme court, for good cause shown, shall otherwise direct.

(3) All dissenting shareholders, excepting those who, as provided in paragraph (g), have agreed with the corporation upon the price to be paid for their shares, shall be made parties to such proceeding, which shall have the effect of an action quasi in rem against their shares. The corporation shall serve a copy of the petition in such proceeding upon each dissenting shareholder who is a resident of this state in the manner provided by law for the service of a summons, and upon each nonresident dissenting shareholder either by registered mail and publication, or in such other manner as is permitted by law. The jurisdiction of the court shall be plenary and exclusive.

(4) The court shall determine whether each dissenting shareholder, as to whom the corporation requests the court to make such determination, is entitled to receive payment for his shares. If the corporation does not request any such determination or if the court finds that any dissenting shareholder is so entitled, it shall proceed to fix the value of the shares, which, for the purposes of this section, shall be the fair value as of the close of business on the day prior to the shareholders' authorization date. In fixing the fair value of the shares, the court shall consider the nature of the transaction giving rise to the shareholder's right to receive payment for shares and its effects on the corporation and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining fair value of shares of a corporation engaging in a similar transaction under comparable circumstances and all other relevant factors. The court shall determine the fair value of the shares without a jury and without referral to an appraiser or referee. Upon application by the corporation or by any shareholder who is a party to the proceeding, the court may, in its discretion, permit pretrial disclosure, including, but not limited to, disclosure of any expert's reports relating to the fair value of the shares whether or not intended for use at the trial in the proceeding and notwithstanding subdivision (d) of section 3101 of the civil practice laws and rules.

(5) The final order in the proceeding shall be entered against the corporation in favor of each dissenting shareholder who is a party to the proceeding and is entitled thereto for the value of his shares so determined.

(6) The final order shall include an allowance for interest at such rate as the court finds to be equitable, from the date the corporate action was consummated to the date of payment. In determining the rate of interest, the court shall consider all relevant factors, including the rate of interest which the corporation would have had to pay to borrow money during the pendency of the proceeding. If the court finds that the refusal of any shareholder to accept the corporate offer of payment for his shares was arbitrary, vexatious or otherwise not in good faith, no interest shall be allowed to him.

(7) Each party to such proceeding shall bear its own costs and expenses, including the fees and expenses of its counsel and of any experts employed by it. Notwithstanding the foregoing, the court may, in its discretion, apportion and assess all or any part of the costs, expenses and fees incurred by the corporation against any or all of the dissenting shareholders who are parties to the proceeding, including any who have withdrawn their notices of election as provided in paragraph (e), if the court finds that their refusal to accept the corporate offer was arbitrary, vexatious or otherwise not in good faith. The court may, in its discretion, apportion and assess all or any part of the costs, expenses and fees incurred by any or all of the dissenting shareholders who are parties to the proceeding against the corporation if the court finds any of the following: (A) that the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay; (B) that no offer or required advance payment was made by the corporation; (C) that the corporation failed to institute the special proceeding within the period

D-3

**Exhibit 24**

specified therefor; or (D) that the action of the corporation in complying with its obligations as provided in this section was arbitrary, vexatious or otherwise not in good faith. In making any determination as provided in clause (A), the court may consider the dollar amount or the percentage, or both, by which the fair value of the shares as determined exceeds the corporate offer.

(8) Within sixty days after final determination of the proceeding, the corporation shall pay to each dissenting shareholder the amount found to be due him, upon surrender of the certificates for any such shares represented by certificates.

(i) Shares acquired by the corporation upon the payment of the agreed value therefor or of the amount due under the final order, as provided in this section, shall become treasury shares or be cancelled as provided in section 515 (Reacquired shares), except that, in the case of a merger or consolidation, they may be held and disposed of as the plan of merger or consolidation may otherwise provide.

(j) No payment shall be made to a dissenting shareholder under this section at a time when the corporation is insolvent or when such payment would make it insolvent. In such event, the dissenting shareholder shall, at his option:

(1) Withdraw his notice of election, which shall in such event be deemed withdrawn with the written consent of the corporation; or

(2) Retain his status as a claimant against the corporation and, if it is liquidated, be subordinated to the rights of creditors of the corporation, but have rights superior to the non-dissenting shareholders, and if it is not liquidated, retain his right to be paid for his shares, which right the corporation shall be obliged to satisfy when the restrictions of this paragraph do not apply.

(3) The dissenting shareholder shall exercise such option under subparagraph (1) or (2) by written notice filed with the corporation within thirty days after the corporation has given him written notice that payment for his shares cannot be made because of the restrictions of this paragraph. If the dissenting shareholder fails to exercise such option as provided, the corporation shall exercise the option by written notice given to him within twenty days after the expiration of such period of thirty days.

(k) The enforcement by a shareholder of his right to receive payment for his shares in the manner provided herein shall exclude the enforcement by such shareholder of any other right to which he might otherwise be entitled by virtue of share ownership, except as provided in paragraph (e); and except that this section shall not exclude the right of such shareholder to bring or maintain an appropriate action to obtain relief on the ground that such corporate action will be or is unlawful or fraudulent as to him.

(l) Except as otherwise expressly provided in this section, any notice to be given by a corporation to a shareholder under this section shall be given in the manner provided in section 605 (Notice of meetings of shareholders).

(m) This section shall not apply to foreign corporations except as provided in subparagraph (e)(2) of section 907 (Merger or consolidation of domestic and foreign corporations). (Amended by L. 1962, Ch. 834, § 40; L. 1963, Ch. 746, § 15; L. 1965, Ch. 803, §§ 20-22; L. 1982, Ch. 202, §§ 3-9; L. 1982, Ch. 928, §§ 38-40; L. 1986, Ch. 117, § 3.)

D-4

**Exhibit 24**

38

**WECKLER v. VALLEY CITY MILL. CO.**
Cite as 93 F.Supp. 444

**451**

corporation. However, it should be kept in mind that the plaintiff did not attend the stockholders' meeting on December 22, 1936, at which time the proposed amendment of the articles was authorized, never consented to the amendment, and never surrendered her cumulative preferred stock in exchange for new noncumulative preferred.

[2] Whatever the law of other jurisdictions may be as to the power of majority stockholders to materially change the contract rights of minority stockholders, the law of Michigan is well established that a Michigan corporation may not, through action by a majority of its stockholders, take away from its minority stockholders vested or accruing property rights without the consent of the minority. Sutton v. Globe Knitting Works, 276 Mich. 200, 267 N.W. 815, 105 A.L.R. 1447; Vanden Bosch v. Michigan Trust Co., 6 Cir., 35 F.2d 643. Section 43 of the Michigan General Corporation Act, quoted above, which permits a corporation to amend its articles so as to change the rights, privileges or preferences of the holders of shares of any class of stock, if the amendment is approved by the vote of the holders of a majority of the shares of each class entitled to vote and a majority of shares of each class whose rights, privileges, or preferences are so changed, must be read and construed in connection with §§ 59 and 192 of the Act. Sutton v. Globe Knitting Works, supra, 276 Mich. 200, 267 N.W. 815, 105 A.L.R. 1447; acquired his preferred stock, but prior to the specified redemption date. In holding that plaintiff was entitled to recover, the court, after quoting §§ 43, 59, and 192 of the General Corporation Act, said, 276 Mich. at pages 206-208, 267 N.W. at page 816:

"In determining whether the Legislature by passing Act No. 327, Pub.Acts 1931 (the Michigan General Corporation Act), intended to empower corporations to alter, in the manner herein asserted by defendant, the rights of those holding corporate stock issued prior thereto, we should read the statute as a whole and make reasonable application of each of its separate sections.

"'No rule is better settled than, in construing a statute, effect must be given to

every part of it. One part must be so construed as to render another part nugatory or of no effect.'" People v. Burns, 5 Mich. 114;' City of Grand Rapids v. Crocker, 219 Mich. 178, 189 N.W. 221, 222."

"When read entirely by itself section 43 of Act No. 327 [Pub.Acts 1931] seems at first blush, perhaps, to contain provisions which are extremely broad. It is not necessary to decision here, in to determine to what extent the rights of minority stockholders are subject to action by majority stockholders in cases where the rights of such minority stockholders were not vested prior to the statute becoming effective. But reading the whole act together and giving effect to each section makes it clear that the legislature had no intention of attempting to give to then-existing corporations the power through action of a majority of its stockholders to take from the minority stockholders vested or accruing property rights. By virtue of the quoted provision contained in the certificate of stock held by plaintiff, he certainly had, immediately upon receiving it from defendant, a vested or accruing right to have it redeemed at par on the 25th day of January, 1932. This was a liability that the corporation assumed incident to issuing this stock. Section 59 of the act expressly provides that 'The liability of any corporation, or of * * * shall not in any way be lessened or impaired by * * * any change or amendment in the articles of any such corporation.' It is not possible to give effect to this provision of the statute and at the same time deny plaintiff the quite unnecessary;' but apparently so that there might be no doubt of the purpose of the Legislature to preserve vested and accruing rights, practically at the close of the act (which covers more than 30 pages of the Public Acts), in section 192 it is again provided:

"'This act shall not impair or affect any * * * right, accruing, accrued, or incurred * * * liability or * * * incurred prior * * * and * * * same may be * * * enforced * * *.'"

**452**

**93 FEDERAL SUPPLEMENT**

as fully and to the same extent as if this act had not been passed.'

"The inescapable conclusion is that notwithstanding the broad terms in which section 43 of the act is expressed, the Legislature clearly and conclusively intended to preserve vested rights of the character here asserted by plaintiff. This necessarily appears from reading and giving reasonable effect to each and all of the provisions of the enactment."

The Supreme Court further stated, 276 Mich. at pages 209-211, 267 N.W. at page 818:

"It seems clear that the redemption right of plaintiff as a preferred stockholder is something more and different in character than an ordinary incidental right of a stockholder, such as voting for the election of a director of the company, and that his contract right was presumably a condition precedent to plaintiff's determination to purchase preferred stock in the defendant company. The redemption provision was a definite undertaking on the part of the defendant corporation to redeem at a given time and on given terms the stock plaintiff agreed to purchase. Assuming, as it fairly may, that in the absence of the redemption provision plaintiff would not have purchased his stock, or that defendant's undertaking to redeem was an inducing cause of the purchase of which plaintiff did purchase, the provision for redemption was something more than a mere incident to corporate relationship, it was a definite contractual undertaking, the proposal for which antedated and consummation of which coincided with the purchase of the stock by plaintiff, who prior to that time was not identified with the corporation.

* * * While it is quoted from a case wherein the plaintiff was a creditor of, and not a stockholder in, the defendant corporation, we think the following statement of the United States Supreme Court is applicable to the instant case:

"'The authority of a' state under the so-called reserved power '(of the California constitution which provision effects the same as in the Michigan constitution)

## WECKLER v. VALLEY CITY MILL CO.
Cite as 83 F.Supp. 444

**453**

is valid; but it is not unlimited. The corporate charter may be repealed or amended, and, within limits not now necessary to define, the interrelations of state, corporation, and stockholders may be changed; but neither vested property rights nor the obligation of contracts of third persons may be destroyed or impaired. Coombes v. Getz, 285 U.S. 434, 52 S.Ct. 435, 436, 76 L.Ed. 866.

* * *

" 'The power of alteration or amendment is not without limit and does not invest the legislature with unrestricted control over the charter of the corporation created by it.

* * *

" 'The reserved right of amendment, alteration or repeal, whether contained in a statute or constitutional provision, must be exercised in subjection to the various other constitutional commands and restrictions. Due process of law must be observed, and there must be no denial of the equal protection of the laws, nor impairment of the obligation of contract.' Fletcher's Encyclopedia of Corporations (Rev.Ed.) vol. 7, §§ 3680, 3681."

In Vanden Bosch v. Michigan Trust Co., supra, 35 F.2d 643, the Court of Appeals for the Sixth Circuit, in holding that a Michigan corporation could not amend its articles of incorporation or by-laws so as to extend the redemption date of its outstanding preferred stock, without the stockholders' consent, said at pages 645, 646: "We think this overlooks the true effect of the obligation as authorized by statute, it was relied upon by the investor and we see no reason why it is not essentially a contract beyond the power of the corporation to change materially without the consent of the investor. It follows that the statutory promise was authorized by statute, it was relied upon by the investor and we see no reason why it is not essentially a contract beyond the power of the corporation to change materially without the consent of the investor. * * *"

[3] The present case, as regards the effect of the amendment of the articles of incorporation of the old company in 1936, falls squarely within the holding in the Sutton and Vanden Bosch Cases. When the old company issued its certificate to plaintiff April 20, 1923, for 250 shares of the 7% cumulative preferred stock, it by contracted to redeem the stock represented by the certificate, with accrued dividends, on October 1, 1949. Under this contract the plaintiff had a vested right to have her stock redeemed, with accrued dividends, on that date. Section 59 of the General Corporation Act hereinbefore quoted expressly provides that the liability of any corporation shall not in any way be lessened or impaired by any change of amendment in its articles of incorporation. Section 192 of the act expressly provides that the act shall not impair or affect any right or liability incurred prior to the time the act took effect, and that any such right or liability may be enforced as fully and to the same extent as if the act had not been passed. When §§ 43, 59, and 192 of the General Corporation Act are considered and construed together, it is clear that the legislature intended that the vested rights of a stockholder, such as are asserted by the plaintiff in the present case, be preserved to the stockholder. The court cannot give any effect to those statutory provisions and at the same time deny plaintiff the power to recover on her preferred stock. Plaintiff's right to receive the par value of her preferred stock, together with accrued and unpaid dividends, on October 1, 1949, was a valuable vested property right, and the power of the old company could not be taken from plaintiff without her consent. The court concludes that the statutory obligation to plaintiff did not include the power to repudiate its contractual obligation to amend its articles of incorporation in 1936, change or cut off plaintiff's right to receive accrued and unpaid dividends on her preferred stock on October 1, 1949.

The next question presented is, what effect, if any, did the purported sale of the assets of the old company to the new company in 1949 have on plaintiff's rights as a

**454     93 FEDERAL SUPPLEMENT**

preferred stockholder? As hereinbefore stated, the old company on February 7, 1949, pursuant to a so-called reorganization plan formulated by its directors, transferred all of its assets to Rowena Mills, Inc., a new corporation organized by or at the instance of the directors of the old company and in exchange for its assets the old company received preferred and common stock of the new company. This transfer of assets was immediately followed by a formal dissolution of the old company and a simultaneous change of the name of Rowena Mills, Inc., to Valley City Milling Company (the name of the old company). Preferred and common stockholders of the old company were requested to exchange their shares of stock for stock of the new company on a share-for-share basis. The preferred stock of the new company, which was to be exchanged for preferred stock of the old company, was made redeemable on October 1, 1969, viz., 20 years later than the specified redemption date of the old preferred. This purported sale of assets was made in pursuance of § 57 of the Michigan General Corporation Act, Comp. Laws 1948, § 450.57, Stat.Ann. § 21.57, which provides: "Every corporation formed or existing under this act may sell, lease or exchange all or substantially all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or corporations domestic or foreign, as its board of directors shall deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the shares issued and outstanding: Provided, That the articles may require the vote or written consent of the holders of a larger proportion of the shares issued and outstanding"

It is clear that the intended purpose of the 1949 reorganization of the old company by the purported sale of its assets to the new company, so far as preferred stockholders were concerned, was to postpone the redemption date of both the old 7% cumulative preferred stock owned by plaintiff and her relatives, and the noncumulative preferred stock authorized in 1936 from October 1, 1949, to October 1, 1969. The right of a Michigan corporation to postpone the redemption rights of its preferred stock was considered and determined in the Sutton and Vanden Bosch cases, supra. In both of these cases it was definitely held that under Michigan law the right of a preferred stockholder to have his stock redeemed on the certain date specified in the stock certificate was a vested property right of a contractual nature, and that a corporation could not, through action by a majority of its stockholders, deprive a minority preferred stockholder of his redemption right. In those cases the postponement of redemption rights was attempted by an amendment of the articles of incorporation, whereas in the present case and the Sutton and Vanden Bosch cases; that is, in those cases the postponement of redemption rights was attempted by an amendment of the articles of incorporation, whereas in the present case the postponement of redemption in 1969 was attempted by a reorganization based on a purported

the meeting of the stockholders of the old company on February 7, 1949. Prior to the meeting plaintiff's attorney and her relatives company that plaintiff and her relatives owned a total of 850 shares of the cumulative preferred stock of the old company receive their preferred stock of the old company redeemable at par with accrued dividends on October 1, 1949. This letter, to which the company did not reply, further stated: "This letter is sent to you as a matter of record only in order that you may be aware of the situation at the time of the forthcoming stockholders' meeting." Plaintiff did not attend this meeting, either in person or by proxy, did not in any way participate in or approve the action taken, and has not exchanged her preferred stock of the old company, redeemable October 1, 1949, for the preferred stock of the new company, redeemable October 1, 1969.

The purported sale of assets to the new company was approved by the required majority of shares issued and outstanding at by a reorganization based on a purported

**Exhibit 25**

40

WINKLER v. VALLEY CITY MILL. CO.   455
Cite as 93 F.Supp. 444

sale of the assets of the old company to the new company. Defendants contend that the sale of the assets of the old company in 1949 was made in pursuance of § 57 of the Michigan General Corporation Act, which authorizes a corporation to sell all of its assets to another corporation when authorized by vote of the holders of a majority of shares issued and outstanding, and that under § 44 of the act, Comp. Laws 1948, § 450.44, Stat.Ann. § 21.44, a stockholder who objects to a proposed sale of assets is given a single and exclusive remedy; that is, he must vote against the proposed sale, and within 20 days after the sale is authorized he must object thereto in writing and demand from the corporation the payment of the fair cash value of his shares. In other words, defendants claim that because plaintiff has not resorted to the exclusive remedy provided by § 44 of the act, she may not now complain of the sale and the resulting effect upon her rights as a preferred stockholder. This section, upon which defendants rely, provides as follows:

"If a corporation has authorized the sale, lease or exchange of all or substantially all of its assets a shareholder who was a stockholder, at the time such action was authorized and who voted against such action may, within 20 days after the date upon which such action was authorized but not thereafter, object thereto in writing and demand from the corporation the payment of the fair cash value of his shares as of the day preceding the day such action was authorized by the shareholders, excluding from such fair cash value any appreciation or depreciation in consequence of the action authorized, and surrender at such time to the corporation the certificate or certificates for his shares as to which he is demanding payment. * * *"

The above-quoted §§ 44 and 57 of the General Corporation Act should be considered and construed in connection with §§ 59 and 192 of the act. When so considered, it would appear that in using the term "exclusive remedy" in § 44 the legislature simply meant that a minority stockholder who "voted against" a proposed sale of corporate assets could no longer, as he could in the past, prevent or block the sale against the wishes of a majority of stockholders, and that if he voted against the sale, he could only demand that the corporation purchase his stock and pay to him the fair cash value thereof. Such an interpretation of § 44 would appear to be in harmony with the purpose of this and similar statutes which were enacted to permit a majority of stockholders to authorize a good-faith sale, lease, or exchange of corporate assets without victimizing the minority stockholders, and yet at the same time prevent a minority stockholder from establishing a nuisance value for his shares.[4] An interpretation of §§ 44 and 57 to permit the change or destruction of redemption rights or other vested property rights of any corporation * * * would certainly be in conflict with § 59 of the act, which provides that "The liability of any corporation * * * shall not in any way be lessened or affected * * *"; and in conflict with § 192 of the act, which provides that "This act shall not impair or affect any * * * right, accruing, accrued or acquired, or liability * * * incurred prior to the time this act takes ef-

4. The purpose of such statutes was stated in Voeller v. Neilston Warehouse Co., 311 U.S. 531, 535, 61 S.Ct. 376, 377, 85 L.Ed. 322, as follows: "At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by

refusal to cooperate. To meet the situation, legislatures modified the common law rules by providing for corporate action upon a majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted."

456   93 FEDERAL SUPPLEMENT

fect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if this act had not been passed." It should be noted that § 192 preserves not only accrued rights, but also the remedies for preserving such rights, for it specifically states that they may be asserted, enforced, and prosecuted as if the act had not been passed. However, the court concludes that it is not necessary to determine these questions, because the purported sale of the assets of the old company in 1949 was not a good-faith sale as contemplated by §§ 44 and 57 of the act.

[4] The word "sale" as used in §§ 44 and 57 could refer only to a good-faith sale. The court will not ascribe to the legislature, in its use of the word "sale," an intention to include a sham sale or legal subterfuge, the primary and obvious purpose of which is to cut off or impair vested property rights of minority preferred stockholders. This is not to say that a corporation may not, under appropriate circumstances and in good faith, sell its assets to another corporation which has been formed at the instigation of the former. However, where a sale is made in the manner and under the facts and circumstances existing in the present case, it is far short of the type of good-faith sale contemplated by the statute. It is significant that this purported sale of the assets of the old company to Rowena Mills, Inc., was initiated by the members of the board of directors of the old company, in pursuance of a reorganization plan; that this purported sale of the assets of the old company to Rowena Mills, Inc., was initiated by the members of the board of directors of the old company; that the name "Rowena" had been a trade mark and trade name, owned and used by the old company for many years; that the only subscriber to the stock of Rowena Mills, Inc., was the old company; that no stock certificates were issued by Rowena Mills, Inc.; that the primary purpose of the incorporation of Rowena Mills, Inc., was the purpose of the same five persons who were directors of the old company; that the individual defendants in this case were directors of the old company and immediate-

ly became directors of the new company at the time of its organization; that the preferred and common stock of the old company was to be exchanged for stock of the new company on a share-for-share basis; that the business of the old company was in every particular continued without interruption or change in any form or manner; and that in reality the new company became the old company. It is also significant that the notice of the February 7, 1949, meeting of stockholders of the old company, and the accompanying letter from the president, did not disclose or even intimate that the intended purpose of the meeting was to extend the redemption date of the outstanding preferred stock to October 1, 1969; or that action would be taken at the meeting compelling plaintiff and other preferred stockholders either to accept the new preferred redeemable October 1, 1969, or sell their stock to the company for its fair value. It may be noted that the directors of the old company received in exchange for their shares the same number and class of shares in the new company; that certain of these directors, who were also officers of the company, held large amounts of common stock and had long been in active management of the company at substantial salaries. The old company was apparently in financial condition to redeem its outstanding preferred stock as agreed on October 1, 1949, and it was obviously to the great advantage of these directors to avoid liquidation and continue the company by deferring the redemption of its preferred stock for another 20 years.

The corporate term of the old company was to expire September 4, 1950, and although the purported reorganization and sale of its assets on February 7, 1949, served to extend its corporate life, it is obvious that the primary and motivating purpose of the sale was to postpone the redemption rights of preferred stockholders. If a mere extension of the corporate term had been the primary purpose, that could easily have been accomplished by the simple procedure provided in § 40 of the act, Comp.Laws 1948, § 450.40, Stat.Ann. § 21.60. This statutory procedure for extension of the

Exhibit 25

41

**WECKLER v. VALLEY CITY MILL. CO.**
Cite as 93 F.Supp. 444

457

corporate term would have involved no sale of assets, no expense for recording deeds, provision for stamp taxes, for new stock certificates, and so forth. Furthermore, this procedure would not have deprived the holders of the preferred stock of the old company of their redemption rights, which was clearly the motivating purpose in resorting to the purported sale of assets. In making the sale special attention was given to insuring that the new company did not assume the obligation of the old preferred stock, by providing that the purchasing company assumed all debts and liabilities of the old company *except capital-stock liabilities*. When the purported sale had been accomplished, the name of the purchasing corporation was immediately changed to the name of the old company, and the business of the old company went on as usual. The new company was, in reality, the old company except for one important difference, viz., the redemption rights of preferred stockholders of the old company had been postponed for a 20-year period.

Under all the facts and circumstances shown the court concludes that the purported sale of assets by the old company to the new company in 1949 was not a good-faith sale, but was a sham and an attempted legal subterfuge, the primary and motivating purpose of which was to permit the old company to escape its obligation to redeem its preferred stock on October 1, 1949, and did not divest plaintiff of her vested right to the redemption of her 250 shares of 7% cumulative preferred stock and accrued dividends on October 1, 1949. To hold against the plaintiff in this case would, in effect, mean that a Michigan corporation could, by the legal subterfuge of a fictitious sale of its assets to itself, cut off the vested rights of preferred stockholders and violate its contractual obligation to redeem its preferred stock by deferring the redemption date for successive periods.

[6, 7] Defendants further contend that plaintiff should be denied relief because she is guilty of laches. Their argument would appear to be that plaintiff, through her actions, has lulled the defendants into a feeling of security so that they took actions they would not otherwise have taken. Laches is an equitable defense employed in equitable proceedings, whereas the plaintiff in the present case is asserting a legal claim in the nature of assumpsit. Apart from this, the defendants' contention as to laches is not supported by the facts. Plaintiff's stock, by its terms, did not mature until October 1, 1949. She brought suit on October 4, 1949, four days after her redemption rights matured. When she was requested to exchange her cumulative preferred stock in 1936 for new noncumulative preferred, she refused to make the exchange. When she was informed of the proposed sale of assets in 1949, her attorney notified defendants by letter that she was entitled to her redemption rights on October 1, 1949. When, after the purported sale and reorganization, she was asked to exchange her stock for stock of the new company, she did not send in her stock certificate and did not make the exchange. In short, she consented to none of the corporate actions in question but, on the contrary, indicated by her every action that she had no intention of waiving or sacrificing her redemption rights. Under these circumstances it cannot be said that plaintiff lulled defendants into a feeling of security, thereby inducing them to take actions they would not otherwise have taken. No facts are shown which would justify the application of the theory of estoppel against plaintiff. The court concludes that plaintiff has not been guilty of laches.

93 FEDERAL SUPPLEMENT

458

[5] Upon consideration of the contract is whether or not the complaint should be dismissed as to the individual defendants, and that the court would dispose of the motion to dismiss in its final opinion. The individual defendants contend that the complaint shows on its face that the corporate actions of which plaintiff complains were taken by authority of and with the approval of the stockholders and not by authority of the directors. The court is of the opinion that this contention is well taken. Under § 43 of the Michigan General Corporation Act, Comp.Laws 1948, § 450.43, Stat.Ann. § 21.43, an amendment of the articles of incorporation may be accomplished only by action of the requisite majority of stockholders and not by the directors. Likewise, under § 57 of the act a sale of assets may be authorized only by the requisite majority of stockholders. The amendment of the articles of incorporation of the old company in 1936 was made in pursuance of § 43 of the General Corporation Act, and the purported sale of assets in 1949 was made in pursuance of § 57 of the act, and such amendment and sale were authorized by the requisite number of stockholders. The complaint specifically alleges that "plaintiff never consented to the action taken by the stockholders on February 7, 1949." Although the preliminary procedural steps in accomplishing these corporate actions were initiated and carried out by the directors, this is usually true of any corporate action. The directors could not and did not authorize the amendment of the articles of incorporation in 1936 or the purported sale of assets in 1949. The corporate actions taken could be authorized only by the requisite majority of stockholders, and were so authorized.

[8] The final question to be determined is whether or not the complaint should be dismissed as to the individual defendants, who were the directors of both the old and new companies. This question was raised by the individual defendants by a motion to dismiss on the ground that the complaint failed to state a claim as to them upon which relief could be granted. At the trial the court ruled that the individual defendants would have the full benefit of the answers filed by the defendant corporations and that the court would dispose of the motion to dismiss in its final opinion. The individual defendants contend that the complaint concludes that the motion of the individual defendants to dismiss the complaint as to them should be granted.

For the reasons stated herein the court further concludes that plaintiff is legally entitled to recover from the defendant corporations the sum of $7,309.44. This amount is computed as follows:

Par value of plaintiff's 250 shares of 7% cumulative preferred stock issued April 20, 1923.....  $2,500.00

Accrued dividends on said stock from October 1, 1923, to the specified redemption date of October 1, 1949.....  $4,550.00

Dividends paid for two quarters in 1927 and three quarters in 1928   218.75
                                                          _____
                                                           $4,331.25

Total due plaintiff on October 1, 1949   $6,831.25

Interest at 7% from October 1, 1949, to September 30, 1950   478.19
                                                          _____
Amount due plaintiff on the date hereof   $7,309.44

Judgment will be forthwith entered in favor of the plaintiff and against the two defendant corporations, jointly and severally, for the sum of $7,309.44.

The motion of the individual defendants to dismiss the complaint as to them is granted.

As the material facts are stipulated and the court's findings of fact and conclusions of law are fully set forth in this opinion, it is unnecessary to make separate findings of fact and conclusions of law.

**Exhibit 25**