Jerry Czajkowski, Ph.D., in Pro Se
6370 Streamview Dr
San Diego, CA 92115
619-287-2944



# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY CZAJKOWSKI, Ph.D., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>REED ELSEVIER, INC., a Massachusetts Corporation,<br><br>Defendant | Case No.: 07 CV 2383 JM (LSP)<br><br>**Oral Argument**<br><br>Date: March 19, 2008<br>Time: 13:30<br>Courtroom: 16, 5th Floor<br><br>Honorable Jeffrey T. Miller |

Your Honor, my name is Jerry Czajkowski, I represent myself and the memory of my mother Lonia. I am here today to oppose Defendant's three Motions and the Request of Judicial Notice.

## I

### Opposition To The Judicial Notice Request

Defendant's previous, an almost identical, request of Judicial Notice was denied by the 9th Circuit Court of Appeals, and so I suggest that the District Court should do the same based on the doctrine of Res Judicata.

There were numerous factual errors in the prior proceedings, like the Court's statements that Defendant bought Plaintiff's shares for $2,800, and Defendant's two concealments which led to the issuance of the incorrect Stock Certificate, and to the futile appraisal amendment. Our Stock Certificate was "future dated", for at the time of the merger, we possessed about 83,000 shares, instead of the disclosed 5,000.

Therefore, granting of the Judicial Notice would legitimize these factual errors and Defendant's two concealments, of future dating the Certificate, and one other leading to the futile appraisal amendment.

## II

**Defendant's Prior Two Concealments: First of the 83,000 Share Certificate, Second That the Appraisal Claim Was Barred By the 80 Day Statute Of Limitations**

In response to the remaining 3 Motions, I would like the Court to consider all my Opposition Memoranda, which are based on numerous exceptions to the Doctrines of Res Judicata and Collateral Estoppel found in the Second Restatement of Judgments.

Defendant's 3 Motions, should be denied because Plaintiff's prior appraisal claim, if it wasn't for Defendant's concealment of the applicability of the NY BCL Section 623(h) (1)(2), would have been barred by the *condition precedent* of the 80 day statute of limitations.

In the *Second Restatement of Judgments, Section 26.* **Exceptions To The General Rule Concerning Claim Splitting,** "*Mistake or fraud, concealment, or mis-representation by the Defendant*",

**Exception (j),** states that, "*the result is the same when the Defendant was not fraudulent, but by an <u>innocent mis-representation</u> prevented the Plaintiff from including the entire claim in the original action.*"

Even though the Plaintiff now is not engaged in splitting the prior appraisal claim, Defendant's *mis-representation* informing the District Court that his Exclusive Remedy was an appraisal, when that right was already lost, and then two years later on appeal advocating the same *mis-representation*, which has led to the erred remand and a "*futile appraisal amendment*", this *mis-representation* should <u>not</u> bar the current action for the breach of *mandatory redemption*. In other words, the bar, if any, according to the *Exception (j)*, should <u>not</u> be based on the "*mistake or fraud, concealment, or mis-representation by the Defendant*".

The same "*bar, if any*", exception can be applied to the Defendant's second "*mistake or concealment*" of the 83,000 share Certificate, or *mis-representation* consisting of future dating the 5,000 share Certificate, which *prevented the Plaintiff from including the entire 83,000 share claim in the original action*, and led to 78,000 shares being unaccounted for.

## III

**There Were Two Transactional Nucleuses And The Exclusive Remedy Of Appraisal Is Not Exclusive When It Affects Vested Property Rights**

In his Consolidated Reply, Defendant wrongly asserts that the ***"Plaintiff had one Exclusive Remedy arising from one transactional nucleus of facts"***. Actually the Plaintiff did not have any Exclusive Remedy, but two Transactional Nucleuses, one stemming from the 1991 merger triggering for 80 days the right to appraisal, and the other stemming from the 1987 mandatory redemption promise to redeem the Certificate fully in 2007.

Fifty eight years ago, Judge Raymond Starr of the United States District Court, in <u>Weckler v. Valley City</u> declared *mandatory redemption* to be the *vested property right*:

> *"The right of a preferred stockholder to have his stock redeemed on the certain date specified in the stock certificate was a vested property right of a contractual nature, and that a corporation could not, through action by a majority of its stockholders, deprive a minority preferred stockholder of this redemption right without his consent."*

In <u>Weckler</u> Judge Starr also explained why the Exclusive Remedy of appraisal is not Exclusive to securities which possess *vested property rights*, such as the mandatory redemption. His explanation was that the appraisal's exclusivity if true, would be in conflict with other Sections of the Michigan Corporation Law which protect *vested property rights*:

> *"An interpretation of Sections 44 and 57 to permit the change or destruction of redemption rights or other vested property rights would certainly be in conflict with Section 59 of the act, which provides that "The liability of any corporation… shall not in any way be lessened or impaired by the sale of any assets thereof," and in conflict with Section 192 of the act, which provides that "This act shall not impair or affect any … right accruing, accrued, or acquired, or liability…*

It should be noted that other States have similar Statues which protect *vested property rights*. In New York there is the Business Corporation Law, Sections 514 and 906, and in California the Corporations Code Section 1107, and across the United States there is the Federal Constitution, Article I, Section 10, and Amendment 14th, which under the Obligations of Contracts, also protect *vested property rights*.

McKinney's Consolidated Laws of New York, comments about BCL Section 514, ***"Agreements for purchase by a corporation of its own shares"***,

> *that this Section is designed to remove doubts cast by certain cases in New York and other jurisdictions having similar corporation laws upon the validity and enforceability of a corporation's contracts for the reacquisition of its own shares.*

In the case of <u>Breslav v. New York and Queens Electric Light and Power Co</u>, constitutional protections of *vested property rights* were reaffirmed in 1936:

> "Statute, if construed as <u>impliedly</u> authorizing making of noncallable stock callable by vote of two-thirds of outstanding shares, would violate Federal Constitution as impairing obligation of contract and as divesting stockholder of vested interest in corporation without due process of law", and

> "Statutory remedy of appraisal of dissenting stockholder's stock...does not apply where... vested property right is destroyed..."

### IV

### Shareholder's *Vested Property Rights* Are Not Subject To Defeasance

In his Consolidated Reply, Defendant misleadingly asserts that all "*shareholder's preferential rights are subject to defeasance*", when in fact *vested property rights,* possessed by some but not all preferred stocks, are not subject to defeasance.

Defendant relies in his argument on inapplicable cases of <u>Rauch</u> and <u>Rothschild</u>, whose preferred stocks did not possess any *vested property rights,* but indicated that,

> "Preferential rights ... are contractual in nature and therefore are governed by express provisions of a company's certificate of incorporation."

In <u>Rothschild</u>, "The certificate also provided that its ...Preferred stock could not be redeemed.", and in <u>Rauch</u>, "Preferred Stock ... may be redeemed by the Corporation,... <u>at its election</u>..."

Again, fifty eight years ago District Judge Raymond Starr in <u>Weckler</u>, indicated that most preferential rights are subject to defeasance but not *vested property rights* –

> "It seems clear that the redemption right of Plaintiff as a preferred stockholder is something more and different in character than an ordinary incidental right of a stockholder, such as voting for the election of a director…, and that his right is <u>contractual in nature</u>. This contract right was presumably a <u>condition precedent</u> to Plaintiff's determination to purchase preferred stock in the Defendant company. The redemption provision was a definite undertaking on the part of the Defendant corporation to redeem at a given time and on given terms the stock Plaintiff agreed to purchase".

### V

### The Merger Did Not Destroy Plaintiff's *Vested Property Right* of

## The Mandatory Redemption

In his Consolidated Reply, Defendant wrongly alleges that the *"1991 merger destroyed Plaintiff's redemption right"* and that the NY case of <u>Rehberger v MRW</u> is inapplicable because the stock redemption agreement there was created after the merger. This conclusion is not correct per California Corporations Code Section 1107 as applied in <u>Mauldin v. PDSC,</u> and per NY BCL Section 906 which states that,

> *"No liability or obligation due or to become due... shall be released or impaired by such merger or consolidation".*

In <u>Mauldin</u>, the Appellate Court concluded that the stock redemption agreement, could not be void after the merger because, the surviving corporation had to inherit all the debts and liabilities. Citing Corporations Code Section 1107, the Court concluded:

> *"Upon merger ... the surviving corporation ... shall be subject to all the debts and liabilities ... as if the surviving corporation had itself incurred them." In short, PDSC, a Delaware corporation, has the same obligation as does PDSC, a California corporation, as if the Delaware corporation had itself incurred the obligation. If PDSC, a California corporation, would have been liable to <u>Maudlin</u>, so too would PDSC, a Delaware corporation."*, and,

> *"under California law governing the rights and obligations of surviving corporations in mergers, PDSC has the same obligation to <u>Maudlin</u> as it did before the merger. Since the transaction was enforceable by <u>Maudlin</u> before the merger, it is likewise enforceable against PDSC after the merger"*, and

> *"Surviving corporation in a merger does not enjoy a status like a bona fide purchaser for value without notice; rather, surviving corporation... is subject to all of its debts and liabilities in the same manner as if the surviving corporation had itself incurred them."*

In <u>Treadaway v. Camellia</u>, cited in <u>Maudlin</u>, it was also indicated that the,

> *"surviving corporation in a statutory merger is subject to reformation of one of its assumed contracts as if it had been the original party to the contract".*

## VI

## Right To Compensation Is Not An Issue That Was Or Is To Be Litigated

In <u>Rehberger,</u> using Defendant's present argument that the *"right to compensation"* was already adjudicated in the prior court action, the District Court in NY should have dismissed his complaint based on the Opposition's arguments of Res Judicata and Collateral Estoppel as to the is-

sue of the *"right to compensation"*. However, the Court did not see the *"right to compensation"* as an issue already litigated, but instead identified as an issue to be litigated the right to a *"buy-out"*, and denied the Opposition's Motion to Dismiss, stating –

> *"In this case, the issue (the right to a "buy-out) was not raised in the previous litigation, nor could it have been litigated in the previous proceeding for the reasons mentioned above (as it was premature). The ("buy-out") issue could not have been litigated at the time the state court action was pending and therefore should not be barred. Thus, Defendant's Motion to Dismiss ... must be denied."*

Similarly, in this case, Plaintiff has pointed out that his redemption right was premature at the time of the first action, and that based on the facts of this case, showing two different claims and two different issues, it would be in contradiction of existing policies restricting <u>unyielding</u> and <u>indiscriminate</u> application of the doctrines of Res Judicata and Collateral Estoppel, to grant any of Defendant's Motions based on these doctrines.

### VII
### *Exceptions to the General Rule of Issue Preclusion*

In <u>Mauldin</u>, it was stated that to invalidate the stock redemption agreement by *"applying the rule 'in pari delicto', it would be to permit the Defendant to be unjustly enriched at the expense of the Plaintiff, and so the rule should not be applied"*.

Similarly, in this case it can be inferred, that by applying the rules of Res Judicata or Collateral Estoppel, the Defendant would be permitted to be unjustly enriched at the expense of the Plaintiff, and so these rules also should not be applied.

In the Second Restatement of Judgments on page 249, similar conclusions as in <u>Mauldin</u> were reached about the <u>unyielding</u> application of these restrictive rules:

> *"There are a number of instances in which the policies against relitigation of an issue may be overcome. For example, when the two actions involve different claims and the claims are totally unrelated, or when the amount in controversy in the subsequent action far exceeds that involved in the initial action, <u>unyielding</u> application of estoppel doctrine may operate unfairly against the party which is precluded from relitigating an issue. Courts have therefore recognized the need for flexibility in the operative principles, and this recognition has served as the basis for the exceptions to the rule of issue preclusion set forth in Section 28.*

*Section 28, **Exception b. Issues of law**.*

<u>*A rule of law declared in an action between two parties should not be binding on them for all time*</u>*, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected.* <u>*Such preclusion might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position.*</u>

In this case, Plaintiff's prior litigation for appraisal, leading to the resolution of the single issue that the *"fair value"* in 1991 was $0.69/share, should have no bearing on the final determination in this breach of *mandatory redemption* action based on the new issue of whether the Defendant *"became obligated to buy-out the Plaintiff"* per NY BCL Sections 514 and 906, because any ruling for the Defendant based on the past issue of the *"fair value"*, would only affect the Plaintiff and not the remaining debtholders, who would not be precluded from obtaining a *"buy-out"* in effect of Defendant's assertion of Collateral Estoppel or Res Judicata in this action.

*Section 28, **Exception j. Lack of fair opportunity to litigate in the initial action.***

*In an action in which an issue is litigated and determined, one party may conceal from the other information that would materially affect the outcome of the case. Such concealment may be of particular concern if there is a fiduciary relationship between the parties....*

In this case, there was a strong fiduciary relationship between the parties, and because the Plaintiff trusted Defendant's accountants, and they had "future-dated" his Stock Certificate, and thereby concealed 78,000 shares, Plaintiff had no *"fair opportunity to litigate in the initial action"*, whether or not this action was barred by the 80 day statute of limitations. Due to the summary judgment no accounting was ever performed. Had there been an actual appraisal proceeding and the necessary accounting, the total 83,000 shares even at the *"fair value"* of $0.69/share would have amounted to $57,000, instead of the offered by *concealment* $3,500, and this certainly *would have materially affected the outcome of this case.*

## VIII

### Final Exception To The Applicability Of The Issue Preclusion

Plaintiff in his last two Oppositions, based on the Second Restatement of Judgments and the NY case of <u>Rehberger</u> showed that the doctrines of Res Judicata and Collateral Estoppel should not bar his second non-identical claim and non-identical issue of the mandatory redemption per NY

BCL Sections 514 and 906.

In the application of the final exception,

*"the amount in controversy in the first action may have been so small in relation to the amount in controversy in the second that preclusion would be plainly unfair"*

Plaintiff indicated that in the original Breach of Contract action, he sought $13.50/share *"liquidation preference"* totaling $66,000. Due to the *concealment* of the 78,000 shares, the Defendant offered only $3,500 for 5,000 shares. Plaintiff rejected this offer.

In the present action for the Breach of Contract of the *mandatory redemption*, Plaintiff seeks $13.50/share maturity value, plus the cumulative dividends in arrears, all worth about $7 million.

Therefore, the amount in controversy in the first action was so small, in relation to the amount in controversy in the second, *that preclusion would be plainly unfair*.

As was already stated, application of the two doctrines definitely would permit the Defendant to be unjustly enriched at the expense of the Plaintiff, and for Defendant's *concealments,* and *misrepresentations*, discussed above, to prevail.

## CONCLUSION

For all the foregoing reasons, based on the NY BCL Sections 514 and 906, the *Second Restatement of Judgments,* the NY case of <u>Rehberger,</u> the California case of <u>Mauldin</u> and others, Plaintiff respectfully requests the Court that the *Motion for Pre-Filing Order Against Vexatious Litigant, the Motion for Sanctions,* and the *Motion to Dismiss* <u>all be denied</u>, as well as the Judicial Notice Request, and per Rule 11, that Plaintiff be awarded the reasonable expenses incurred in opposing these Motions.

Dated this 19 March 2008

*/s/ J. Czajkowski*
Jerry Czajkowski, Ph.D., in Pro Se

# Westlaw.

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 1

**H** Maudlin v. Pacific Decision Sciences Corp.
Cal.App. 4 Dist.,2006.

Court of Appeal, Fourth District, Division 3, California.
Melvin J. MAUDLIN, Plaintiff and Appellant,
v.
PACIFIC DECISION SCIENCES CORPORATION et al., Defendants and Respondents.
No. G035060.

March 21, 2006.
Review Denied July 12, 2006.

**Background:** Company retiree filed suit against corporation that acquired company in a merger, after it stopped paying him the monthly deferred compensation from a stock redemption agreed to when he retired. The Superior Court of Orange County, No. 03CC12835, John M. Watson, entered judgment for the corporation, based on finding contract was structured to avoid taxes and retiree was in pari delicto. Retiree appealed.

**Holding:** The Court of Appeal, Ikola, J., held that retiree was not barred from enforcing contract under doctrine of in pari delicto.

Reversed and remanded.

West Headnotes

**[1] Corporations 101 ⟨key⟩ 68**

101 Corporations
    101VIII Capital and Stock
        101VIII(A) Nature and Amount of Capital and Shares
            101k68 k. Retirement of Stock. Most Cited Cases
Corporations Code no longer prohibits the redemption of stock from a shareholder unless, at the time the contract is executed, the corporation has retained earnings which are greater than the total contract price payable over the entire life of the contract; now, the retained earnings test no longer needs to be met at the time the contract is executed, but only when the payments are made. West's Ann.Cal.Corp.Code § 500.

**[2] Corporations 101 ⟨key⟩ 152**

101 Corporations
    101VIII Capital and Stock
        101VIII(F) Division of Profits and Dividends
            101k152 k. Declaration of Dividends. Most Cited Cases
A corporate distribution to a shareholder is prohibited only if cash is paid at a time when the retained earnings of the corporation are insufficient to cover the distribution; making the particular distribution is the potentially prohibited act, not the execution of a contract for distribution which may or may not be impaired by future events. West's Ann.Cal.Corp.Code §§ 500, 166.

**[3] Contracts 95 ⟨key⟩ 139**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k135 Effect of Illegality
                95k139 k. Parties Not in Pari Delicto. Most Cited Cases
Company retiree was not precluded from enforcing a stock redemption contract with the company under doctrine of in pari delicto regarding the contract's tax evading structure; the company structured the contract with no input from retiree, company derived the tax advantage from the contract, while retiree paid taxes on all income he received at ordinary income rate, refusal to enforce the agreement would result in a forfeiture having a present value of $1,696,002, and unjust enrichment to company in that amount.
See 1 Witkin, Summary of Cal. Law (9th ed. 1988)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 10 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 2

*Contracts, § 453.*

[4] Action 13  4

13 Action
 13I Grounds and Conditions Precedent
  13k4 k. Illegal or Immoral Transactions. Most Cited Cases

The pari delicto rule should not be applied where the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where applying the rule will permit the defendant to be unjustly enriched at the expense of the plaintiff.

[5] Contracts 95  139

95 Contracts
 95I Requisites and Validity
  95I(F) Legality of Object and of Consideration
   95k135 Effect of Illegality
    95k139 k. Parties Not in Pari Delicto. Most Cited Cases

Mere knowledge by one party to a contract that the transaction is structured in a manner designed to achieve the unlawful purpose of the other party is not the beginning and the end of the inquiry as to whether the contract is enforceable.

[6] Corporations 101  589

101 Corporations
 101XIV Consolidation
  101k589 k. Succession to Rights of Original Corporations. Most Cited Cases

Corporations 101 590(1)

101 Corporations
 101XIV Consolidation
  101k590 Liabilities for Debts and Acts of Original Corporations
   101k590(1) k. In General. Most Cited Cases

Surviving corporation in a merger does not enjoy a status like a bona fide purchaser for value without notice; rather, surviving corporation succeeds to all the rights and property of the disappearing corporation and is subject to all of its debts and liabilities in the same manner as if the surviving corporation had itself incurred them. West's Ann.Cal.Corp.Code § 1107(a).

[7] Contracts 95  309(1)

95 Contracts
 95V Performance or Breach
  95k309 Discharge by Impossibility of Performance
   95k309(1) k. In General. Most Cited Cases

The obligation to perform a contract is not excused or discharged by a temporary impossibility, but is merely suspended, unless the delayed performance becomes materially more burdensome or the temporary impossibility becomes permanent.
See *1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 833*.

[8] Contracts 95 313(1)

95 Contracts
 95V Performance or Breach
  95k313 Renunciation
   95k313(1) k. In General. Most Cited Cases

In the absence of an acceleration clause, a contract made unilateral by one party's complete performance renders the doctrine of anticipatory breach inapt.

**725 Meisenheimer Herron & Steele, Matthew V. Herron and Robert M. Steele, San Diego, for Plaintiff and Appellant.
Jeffer, Mangels, Butler & Marmaro, Melvin N.A. Avanzado and Matthew D. Hinks, Los Angeles, for Defendants and Respondents.

*1004 OPINION

IKOLA, J.
When plaintiff Melvin J. Maudlin retired from his full-time employment with Pacific Decision Sciences Corporation (PDSC), he negotiated a deal with his long-time business partner, Hark Vasa, by which PDSC would pay him $2.9 million over a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 3

period of nearly 23 years. Their agreement allocated $150,000 for the redemption of Maudlin's 300,000 shares of stock (about 30 percent of the outstanding shares), with the balance of $2.75 million, designated by the transaction's documents as "deferred compensation," to be paid at the rate of $10,000 per month. The monies were paid as agreed for nearly five and one-half years. Payment stopped, however, when PDSC's new management expressed concerns about the legitimacy of the "deferred compensation" arrangement. Maudlin sued, inter alia, to recover *1005 the balance of the payments he claimed he was owed. **726 The court denied Maudlin any relief, concluding the contract was a disguised stock redemption that violated the California Corporations Code and evaded taxes. The court further found Maudlin was in pari delicto with Vasa and PDSC.

We reverse the judgment. By comparing the total payments under the contract with the amount of PDSC's retained earnings when the contract was executed, the court relied upon California corporate law that was superseded by statute effective in 1977. The court should have compared each individual payment with PDSC's retained earnings as of the date each payment was due. With respect to the tax evasion issue, we are unable to distinguish this case from a 40-year-old California Supreme Court precedent that compels us to conclude on this record that Maudlin was not in pari delicto. Therefore Maudlin is entitled to enforce the contract.

FACTS

Maudlin and Vasa formed PDSC as a California corporation in 1983. PDSC was in the business of developing and licensing custom computer software to meet particularized needs of its client companies. Vasa served as the president and chief executive officer of PDSC and Maudlin was its corporate secretary. At the time of its formation, Vasa owned or controlled 54 percent of the stock and Maudlin owned 36 percent. The remaining 10 percent was owned by the person from whom PDSC had acquired its original business assets.

From the time of its formation in 1983 until 1997, Maudlin and Vasa both worked full time for PDSC. According to Vasa, he and Maudlin were both underpaid during the formative years, and they had made an informal agreement that "if some day the company makes a lot of money and the company has money available, we'll pay [Maudlin]." But no amounts were set. In 1997, Maudlin decided to retire when he suffered some serious health problems that made it difficult for him to continue providing full-time services to the corporation. Maudlin and Vasa discussed the means by which Maudlin could divest his interest in the company. Maudlin wanted to sell his shares of stock and PDSC wanted to buy them. Maudlin also wanted to be paid at the rate of $10,000 per month for a period longer than his life expectancy. The record is virtually silent as to any discussions held between Maudlin and Vasa when they derived $2.9 million as the total amount to be paid to Maudlin. Maudlin testified Vasa came up with the "total number" of $2.9 million paid at the rate of $10,000 per month for 275 months as "deferred compensation," and $150,000 for his shares of stock, but Maudlin *1006 had "no idea" what the number was based upon. The evidence also disclosed, however, that shortly before Maudlin and Vasa struck their deal, PDSC had sold stock to a new investor for $10 per share, from which the inference is easily drawn that the $2.9 million to be paid to Maudlin was the approximate value of his 300,000 shares.

What is clear from the evidence, however, is that Vasa retained Anne Tahim, PDSC's accountant, to assist with the documentation for the transaction. Vasa told Tahim that "Maudlin was retiring, and he wanted to sell his stock, which the company wanted to buy. And also since [Maudlin] was retiring, [Vasa] wanted to provide him the retirement benefits...." Vasa also "wanted a document that would be tax advantageous to the company," and that would require monthly $10,000 payments to Maudlin for 275 months.

Tahim recommended the use of a "secular trust" by which PDSC would pay $10,000 per month to the trust, and the trust would pay $10,000 each month to Maudlin. The document that was eventually **727 signed on September 3, 1997, by Vasa as president of PDSC and as trustee of the "Pacific Decision Sciences Corporation Secular Trust" (Secular Trust), did just that and recited that Maudlin had rendered services to PDSC for which he had not been compensated in the amount of $2,750,000. By separate agreement of September 3, 1997, PDSC agreed to purchase Maudlin's 300,000 shares of PDSC stock for $150,000, payable in three annual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 12 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 4

installments, with the first payment due in the first quarter of 1998. The shareholder resolution authorizing the purchase required the corporation to buy the shares on November 10, 1997, while the board of directors' September 3, 1997 resolution provided that "effective immediately" Maudlin's shares would become PDSC treasury shares.

Following execution of the Secular Trust, PDSC began making the $10,000 monthly payments for the benefit of Maudlin, and continued making the payments until October 2000 when PDSC was acquired in a statutory merger by PDS Acquisition Corporation, a Delaware corporation that was a wholly owned subsidiary of Applied Digital Solutions, Inc. (ADS).[FN1] After the merger, PDSC continued making the monthly payments through May 2003. Maudlin also received payment of $145,000 for his stock, accepting the reduction in price in exchange for an accelerated payment.

> FN1. Sometime after the merger, PDS Acquisition Corporation changed its name back to Pacific Decision Sciences Corporation. As we discuss *post,* the rights and obligations of PDS Acquisition Corporation are identical to those of PDSC. Accordingly, we will refer to each as "PDSC" without further distinction.

*1007 The Secular Trust was established as a separate tax-paying entity, filing separate tax returns, reporting the distributions to Maudlin to the taxing authorities, and providing Maudlin with a Schedule K-1 reflecting the payments he received. PDSC deducted the payments to the Secular Trust on its own tax returns, and Maudlin reported and paid taxes on his distributions as ordinary income.

In the course of the merger negotiations, ADS conducted a review of the books and records of PDSC with its own team of accountants, and the Secular Trust obligation was fully disclosed, both on the financial statements and on a formal disclosure schedule as part of the merger documents.

Under an employment agreement negotiated as part of the merger, Vasa continued as an employee of PDSC until he was replaced in January 2003. New management reviewed the books and records and made an inquiry of Maudlin about the Secular Trust.

Maudlin asked Tahim to respond to the letter of inquiry, which she did. Not satisfied with the response, PDSC made its last $10,000 Secular Trust payment in May 2003, prompting Maudlin to bring this action against PDSC, ADS, and Vasa. For convenience, we will sometimes refer to PDSC and ADS collectively as the "PDSC defendants."

Maudlin's operative complaint alleged: (1) breach of contract against all defendants (first cause of action); (2) breach of fiduciary duty against Vasa (second cause of action); (3) negligence against Vasa (third cause of action); (4) a creditor's action against ADS pursuant to Code of Civil Procedure section 491.310 (fourth cause of action); (5) fraudulent conveyances against the PDSC defendants (fifth and sixth causes of action); (6) improper corporate distribution against Vasa (seventh cause of action); and (7) alter ego against the PDSC defendants (eighth "cause of action"). Vasa cross-complained against the PDSC defendants alleging **728 causes of action for equitable indemnity, contribution, and declaratory relief.

Following a bench trial, the court ruled the Secular Trust was "void on the grounds that it was illegal, fraudulent, contrary to public policy and in violation of provisions of the California Corporations Code and the Federal Internal Revenue Code," and that the Secular Trust "was a subterfuge to disguise a stock repurchase as deferred compensation pay." The court further found the "conduct of the parties to the Trust-Maudlin and Vasa-were of substantially the same moral turpitude, although each was acting in his own self-interest while cooperating in the creation of the [Secular] Trust." The court concluded, "Maudlin and Vasa should be left as they were when they came to Court. Any other action would reward their wrongdoing at the *1008 expense of the innocent parties PDSC and [ADS]." Accordingly, the court entered judgment in favor of the PDSC defendants on all of Maudlin's causes of action, and in favor of the PDSC defendants on all of Vasa's causes of action in his cross-complaint. As to Maudlin's complaint against Vasa, the court dismissed it without prejudice. Maudlin timely appealed the judgment. No other party filed a notice of appeal.

DISCUSSION

*Introduction*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 13 of 20

137 Cal.App.4th 1001                                                                                            Page 5
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

The court's judgment was based on the underlying premise that the Secular Trust "was a subterfuge to disguise a stock repurchase as deferred compensation pay." PDSC hoped it could successfully deduct the $10,000 monthly payments to Maudlin as an ordinary business expense on its tax returns, thereby cheating the taxing authorities of tax otherwise owed on some $120,000 per year. The court concluded the Secular Trust arrangement could not be enforced as a stock repurchase agreement because it violated "provisions of the California Corporations Code." Another premise of the court's judgment was the "innocence" of the PDSC defendants. Thus, the court found that "PDSC [and ADS] had no part in the preparation of the [Secular] Trust nor joined in any improper purposes" and that "Maudlin and Vasa should be left as they were when they came to Court. Any other action would reward their wrongdoing at the expense of the innocent parties PDSC and [ADS]."

On appeal, Maudlin does not challenge the court's finding that the Secular Trust arrangement was, in reality, a redemption of his stock. No doubt he recognizes substantial evidence supports that conclusion. Instead, he argues (1) the stock repurchase was not illegal under California corporate law, (2) contrary to the court's conclusion, Maudlin was *not* in pari delicto with Vasa and PDSC with regard to the contract's tax evading structure, and (3) the PDSC defendants were "legally bound by the understanding of the predecessor corporation."

Assuming the transaction was a stock repurchase, as found by the trial court, we conclude the transaction was *not* illegal under California's corporate law. The holdings of the cases relied upon by the PDSC defendants have *not* constituted correct statements of California law for some 29 years, having been decided long before the Legislature enacted Corporations Code sections 166 and 500 in their current form, effective in 1977. With regard to the tax evasion issue, and the court's conclusion that Maudlin was in pari delicto with Vasa and PDSC, we are unable to distinguish the material facts established by *1009 the record in this case from the facts relied upon by the Supreme Court in deciding *Tri-Q, Inc. v. Sta-Hi Corp.* (1965) 63 Cal.2d 199, 45 Cal.Rptr. 878, 404 P.2d 486(*Tri-Q* ), wherein the **729 Supreme Court concluded a litigant in the same position as Maudlin was *not* in pari delicto. Because *Tri-Q* is indistinguishable, we are bound by its result. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.) Finally, under California law governing the rights and obligations of surviving corporations in mergers, PDSC has the same obligation to Maudlin as it did before the merger. Since the transaction was enforceable by Maudlin before the merger, it is likewise enforceable against PDSC after the merger. Any complaint the PDSC defendants have with respect to the completeness of the disclosures made during the merger transaction cannot be used as a defense against Maudlin, who, according to the evidence, played absolutely no part in the merger transaction.

*The Transaction Was Not Illegal Under California Corporate Law*

[1] The PDSC defendants argued in the trial court, as they argue on appeal, that Corporations Code section 500 (section 500) prohibits the redemption of stock from a shareholder unless, at the time the contract is executed, the corporation has retained earnings which are greater than the total contract price payable over the entire life of the contract.[FN2]

> FN2. The court found that PDSC had $357,864 in retained earnings at the time the Secular Trust was created. Actually, this was the amount of retained earnings shown on PDSC's balance sheet as of June 30, 1998, after some eight monthly payments had already been made, and $95,000 had already been paid on the agreement admittedly designated as the stock purchase agreement.

That was once the law, but has not been since 1977. Counsel's continued citation of cases that are no longer apt because the relevant statutes were changed some 29 years ago is puzzling, particularly when one of the cases the PDSC defendants rely upon expressly notes, inter alia, that the retained earnings test no longer needs to be met at the time the contract is executed, but only when the payments are made. (See *Kupetz v. Wolf* (9th Cir.1988) 845 F.2d 842, 850 ["distributions to shareholders ... must be scrutinized at the time they are made and not at the time the parties contracted that they would be made

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP    Document 26    Filed 03/19/2008    Page 14 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 6

in the future"].)

Section 500, subdivision (a) states in pertinent part: "Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) except as follows: [¶] The distribution may be made if the amount of the retained earnings of the corporation immediately *1010 prior thereto equals or exceeds the amount of the proposed distribution." [FN3] The key to understanding section 500 is to note precisely what it restricts-a distribution to shareholders. Thus, unless a contract to pay a shareholder in the future is a "distribution" to the shareholder, the contract is not restricted or impaired by section 500.

> FN3. Section 500 also sets forth an alternative test. But the retained earnings test of subdivision (a) is the only test addressed by the parties.

Corporations Code section 166, which is embedded in the text of section 500 to ensure the reader does not miss its significance, defines the term "distribution to its shareholders." As relevant to the matter at hand: " 'Distribution to its shareholders' means ... the purchase or redemption of its shares for cash. [T]he time of any distribution by purchase or redemption of shares shall be the date cash ... is transferred by the corporation, whether or not pursuant to a contract of an earlier date." (Corp.Code, § 166, italics added.) The meaning of section 166 is plain. A "distribution"**730 occurs only when the cash is transferred, not when the contract is signed. And since section 500 applies *only* to "distributions," its restrictions must be measured when the distribution is made, i.e., when cash is transferred.

A leading treatise on California corporate law describes the purpose of the current law on corporate redemptions. "The present General Corporation Law was designed to eliminate the requirement that a corporation be able to purchase shares covered by a contract of purchase at the time the contract is entered into and to require such ability only as of the date of performance by the corporation. This is effected through the interplay of Corp.Code § 166 and the provisions of Chapter 5 of the General Corporation Law. Corp.Code § 166, the definition of 'distribution to its shareholders,' provides that the time of any distribution by purchase or redemption of shares shall be the date cash or property is transferred by the corporation, whether or not pursuant to a contract of an earlier date, provided that when a debt obligation that is a security (as defined in Com.Code § 8102) is issued in exchange for shares, the time of the distribution is the date when the corporation acquires the shares in that exchange. In turn, Corp.Code § 500 provides that a corporation shall not make any distribution unless the tests already described are met either (as to the 'retained earnings' test) immediately prior to the distribution or (as to the 'remaining assets' test) immediately after giving effect to the distribution.... Thus, the statutory scheme is to permit a distribution, whether or not by virtue of a contract entered into prior thereto, if the corporation meets the applicable tests at the time the distribution is made." (2 Ballantine & Sterling, Cal. Corporation Laws (4th ed.1998) § 143.03, p. 8-60 (rel.87-5/04).)

*1011 The cases relied upon by the PDSC defendants were either decided before the Legislature enacted Corporations Code sections 166 and 500 in their present form, or do not support their argument for other reasons. (See *McConnell v. Estate of Butler* (9th Cir.1968) 402 F.2d 362 [predates 1977]; *Mindenberg v. Carmel Film Productions* (1955) 132 Cal.App.2d 598, 282 P.2d 1024 [same]; *Matter of National Tile & Terrazzo Co., Inc.* (9th Cir.1976) 537 F.2d 329 [same]; *In re Qintex Entertainment, Inc.* (9th Cir.1993) 8 F.3d 1353, 1355-1356 [interpreting Delaware law which "prohibits a corporation from purchasing shares of its own stock 'when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation ....' " and noting " 'the older cases required legally available funds both at the time the agreement was made and at the time of performance. The modern trend is to uphold such agreements as valid, regardless of the situation at the time of the making of the agreement, and to enforce them, ...*to the extent that the corporation has legally available funds at the time of repurchase* ' "]; *In re Reliable Mfg. Corp.* (7th Cir.1983) 703 F.2d 996 [interpreting same Delaware statute and concluding it did not prohibit guarantee by corporation of third party's obligation to seller of the corporation's stock where corporation had sufficient surplus at time of the guarantee].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 15 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 7

The cases cited by the PDSC defendants interpreting Delaware law involved the question whether the repurchase of stock "impaired" the capital of the corporation, an issue not contested in this action. And California law has a bright-line test. If the retained earnings are sufficient to pay the cash at the time it is transferred in satisfaction of an earlier obligation to do so, the distribution is not prohibited. Delaware law helps not one whit on this issue.

**731[2] Here, substantial evidence would support a finding that PDSC had sufficient retained earnings, both before and after the merger, to make the distributions to Maudlin through his last payment in May 2003.[FN4] But that is not really the issue. The PDSC defendants did not claim entitlement to reimbursement of payments already made. Instead, the PDSC defendants asserted no obligation to make any further payments. And they did so on the *1012 basis of their assertion that the contract was an illegal contract for the repurchase of Maudlin's stock. At least insofar as the source of the alleged illegality is the restriction imposed by section 500, we have seen that the contract itself is not illegal. A distribution is prohibited only if cash is paid at a time when the retained earnings of the corporation are insufficient to cover the distribution. Making the particular distribution is the potentially prohibited act, not the execution of a contract which may or may not be impaired by future events. Thus, unless Maudlin is barred from enforcing the contract by reason of his participation in a tax evasion scheme, he is, as a matter of corporate law, entitled to enforce the Secular Trust arrangement as a stock redemption agreement. Whether he is entitled to payment of each installment when due depends upon the measure of retained earnings at the time each payment is to be made.

> FN4. Not all of the trial exhibits were made a part of the record on appeal. From those available to us, we note evidence of retained earnings of $357,864 as of June 30, 1998, apparently later restated in the amount of $835,439. (Although the record is uncertain, the difference may be that one statement was prepared on a cash basis and the other on an accrual basis, or perhaps one statement was consolidated with a European and Asian subsidiary and the other was not.) Other evidence of retained earnings showed $2,471,777 as of June 30, 1999; $1,592,697 as of June 30, 2000; $48,320 as of December 31, 2000; $2,707,985 as of December 31, 2001; $1,533,491 as of December 31, 2002; $1,656,219 as of December 31, 2003; and $227,277 as of May 31, 2004.

*Pursuant to Binding Supreme Court Precedent, Maudlin Is Not in Pari Delicto*

[3] We turn to the court's conclusion Maudlin was in pari delicto regarding the contract's tax evading structure. In *Tri-Q, supra,* 63 Cal.2d 199, 45 Cal.Rptr. 878, 404 P.2d 486, the California Supreme Court considered a set of facts virtually indistinguishable from those in this case. Leland Satre was an employee, officer, and shareholder of the Sta-Hi Corporation. Upon termination of his employment, Satre negotiated an agreement by which the corporation would repurchase one-half of his stock for $45,000. But the corporation insisted the contract be written to reflect a cash payment of $25,000 for the stock, with the remaining $20,000 to be paid in 10 semiannual installments of $2,000 each, pursuant to a separate "Severance Benefit Agreement," which recited the payments were being made in consideration of the assignment of certain nonexistent patent rights. (*Id.* at pp. 216-217, 45 Cal.Rptr. 878, 404 P.2d 486.) "Both Sta-Hi and Satre understood that the recited consideration was not the true consideration, and that the [Severance Benefit Agreement] was actually intended to provide for the payment of the remaining $20,000 of the agreed purchase price of the stock." (*Id.* at p. 217, 45 Cal.Rptr. 878, 404 P.2d 486.) Further, "the evidence indicated that the 'Severance Benefit Agreement' was intended by both parties to provide the balance of the consideration for the stock, and that Sta-Hi had insisted on the subterfuge to give it an improper income tax advantage." (*Id.* at pp. 217-218, 45 Cal.Rptr. 878, 404 P.2d 486.) Satre was aware of Sta-Hi's purpose, but Satre's sole purpose was to obtain the agreed-upon purchase price. **732 (*Id.* at p. 218, 45 Cal.Rptr. 878, 404 P.2d 486.)

With the above evidence, the trial court in *Tri-Q* made findings nearly identical to the trial court findings in this case. "[I]t found that the agreement afforded a means by which both parties could have taken improper tax advantage of the federal and state

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 16 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 8

governments, was entered into by both parties for tax purposes, was against public policy and should be treated as illegal.... It then concluded ... the parties were *in pari delicto,* and that neither party was entitled to relief." (*Tri-Q, supra,* 63 Cal.2d. at p. 218, 45 Cal.Rptr. 878, 404 P.2d 486.)

[4]*1013 The Supreme Court disagreed and reversed. The court noted, "There is no doubt that the general rule requires the courts to withhold relief under the terms of an illegal contract or agreement which is violative of public policy." (*Tri-Q, supra,* 63 Cal.2d at p. 218, 45 Cal.Rptr. 878, 404 P.2d 486.) But the court added, "These rules are intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract. They do not necessarily apply to both parties to the agreement unless both are truly *in pari delicto.*" (*Ibid.*) The high court then adopted a formulation of the in pari delicto doctrine articulated in *Norwood v. Judd* (1949) 93 Cal.App.2d 276, 209 P.2d 24. " '[T]he courts should not be so enamored with the Latin phrase "*in pari delicto*" that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.' " (*Tri-Q, supra,* 63 Cal.2d at pp. 218-219, 45 Cal.Rptr. 878, 404 P.2d 486.) The *Tri-Q* court also relied upon its earlier statement of an exception to the general rule in *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 151, 308 P.2d 713 where the court said: " 'In some cases, ... effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.' " (*Tri-Q, supra,* 63 Cal.2d at p. 220, 45 Cal.Rptr. 878, 404 P.2d 486.)

Applying this rationale to the case before it, the Supreme Court concluded: "No reason appears why Satre should be denied the aid of the courts in obtaining the agreed consideration for the assets which he has delivered to Sta-Hi. Except for payment of that consideration, 'the transaction has been completed,' and the public requires no further protection. Sta-Hi is clearly guilty of the greater moral fault, and Satre's conduct involved little, if any, serious moral turpitude. Certainly, refusal of the courts to enforce the agreement would 'permit defendant [Sta-Hi] to be unjustly enriched at the expense of plaintiff.' Such a course would result in a forfeiture 'disproportionately harsh considering the nature of the illegality,' and the respective conduct of the parties. Finally, 'effective deterrence ... [will be] best realized by enforcing plaintiff's [Satre's] claim rather than by leaving the defendant [Sta-Hi] in possession of the benefit.' " **733 (*Tri-Q, supra,* 63 Cal.2d at p. 220, 45 Cal.Rptr. 878, 404 P.2d 486, fns. omitted.)

*1014 The instant case cannot be distinguished from *Tri-Q* on any material basis. Yet the trial court ruled that "none of [the *Tri-Q* ] exceptions appear before the Court in this case. Using the analysis contained in *Tri-Q Inc.,* Maudlin and Vasa were in *pari delicto.*" The court below made a further finding "that at the time Vasa, Maudlin and the accountant, Anne Tahim, conceived and drafted the Trust, the goals and hoped for benefits differed between Maudlin and Vasa, but both were fully and intimately aware of the illegality, immorality and resultant benefits to themselves, respectively. Any other ... finding would grant relief to the wrongdoer or wrongdoers."

[5] As *Tri-Q* makes clear, however, mere knowledge by one party to a contract that the transaction is structured in a manner designed to achieve the unlawful purpose of the other party is not the beginning and the end of the inquiry. And with regard to the finding that Maudlin "conceived and drafted the Trust," we have searched the record for evidence to support the finding and are unable to find any. The PDSC defendants likewise have not directed us to any evidence in the record that would distinguish this case from *Tri-Q.* They point to the court's findings, but not to supporting evidence. The evidence PDSC does cite is the same type of evidence considered by the *Tri-Q* court, or, in some

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 17 of 20

137 Cal.App.4th 1001                                                                                                 Page 9
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

cases, is simply not germane to the asserted illegality.

For example the PDSC defendants point out that Maudlin testified it was his desire that "the payout ... be over a period of time longer than my lifetime." But there is nothing immoral, illegal, or against public policy with respect to that request. And the PDSC defendants make much of Maudlin's deposition testimony wherein he was asked how much he was paid for his stock, and he answered, "I guess you'd say I was paid $2.9 million." Of course, that testimony is highly probative of the real purpose of the Secular Trust-to redeem Maudlin's stock. But the disguised stock redemption is the same type of conduct considered by the *Tri-Q* court. And, of course, the stock redemption itself is not illegal, immoral, or against public policy.[FN5] The PDSC defendants also rely on evidence that Maudlin and Vasa negotiated the price over a period of several months, but so did Satre in the *Tri-Q* case. Finally, *1015 the PDSC defendants argue that Maudlin's "participation in this fraudulent scheme was exemplified by his attempt to obscure the truth about the Secular Trust in this litigation." But the *evidence* cited in support of this argument was *Vasa's* testimony, and the opening statement and closing argument of Maudlin's counsel in which he attempted to persuade the court the Secular Trust obligations were enforceable. But counsel's arguments are not evidence. And presenting an argument to achieve a result in litigation has **734 nothing whatsoever to do with Maudlin's conduct at the time of the transaction some seven and one-half years earlier.

> FN5. "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."(Civ.Code, § 1599.) The disguised stock redemption had at least one lawful object, the redemption of Maudlin's stock. That the transaction was documented in a manner to facilitate false tax reporting suggests that PDSC's appropriate remedy is to correct the unlawful object of the contract by filing amended tax returns eliminating the false deduction, while honoring the lawful object of the contract by paying Maudlin for the stock he delivered. (See, e.g., *Homami v. Iranzadi* (1989) 211 Cal.App.3d 1104, 260 Cal.Rptr. 6 [oral agreement to pay interest on loan, contrary to written agreement stating loan was interest free, was tax evasion scheme and thus unenforceable, but payments were applied to principal of loan, the legal object of the contract].)

Maudlin's *actual* testimony is instructive. "Q. What was the extent of your involvement in determining the form of the secular trust? [¶] A. Very little. [¶] Q. What was your involvement, if any? [¶] A. I really don't recall. I just don't recall. [¶] Q. Was the-did you say to Mr. Vasa that you wanted a secular trust as opposed to some other form of compensation? [¶] A. No, I'm sure I didn't. [¶] Q. Did you know what a secular trust was at that time? [¶] A. No. [¶] Q. Did you rely on the company and its professionals to come up with the appropriate form for this agreement? [¶] A. Pretty much, to the best of my knowledge, that's true. [¶] Q. Were you represented by counsel in that matter? [¶] A. No, I was not. [¶] Q. Did you have any professionals representing you of any type? [¶] A. No, I did not." On cross-examination, Maudlin confirmed this testimony. "Q. Whose idea was it-well, let me ask it this way: It was Hark Vasa's idea to buy back your stock; correct? [¶] A. Yes. [¶] Q. And it was his idea to enter into this secular trust agreement; correct? [¶] A. It was his suggestion. [¶] Q. That wasn't something that you came up with. [¶] A. No."

Vasa and Tahmin also confirmed Maudlin's lack of involvement. Essentially, Vasa went to Tahmin and asked for advice on how the payments to Maudlin could be structured in a tax-advantaged manner, and Tahmin recommended and drafted the Secular Trust.

Maudlin also testified he had paid taxes on all his payments from 1997 to 2003 as ordinary income. Of course, his tax burden would have been significantly lower had he reported the stock redemption as an installment sale at capital gain tax rates. (See 26 U.S.C. § 453.) On the other side of the transaction, PDSC had the tax advantage of deducting the payments on its tax return. It paid too little tax-Maudlin paid too much.

On this record, we cannot distinguish *Tri-Q*. As in *Tri-Q*, Maudlin has fully performed his side of the transaction and the public requires no further

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 18 of 20

137 Cal.App.4th 1001
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

Page 10

protection. PDSC was clearly guilty of the greater moral fault. Maudlin's *1016 conduct involved little, if any, serious moral turpitude. And importantly, a refusal to enforce the agreement would result in a forfeiture, according to the evidence, having a present value of $1,696,002 as of September 1, 2004. Meanwhile, the PDSC defendants have received *all* of Maudlin's stock, which their own expert valued at approximately $2.9 million. The magnitude of the forfeiture on Maudlin's side of the transaction and the unjust enrichment on the PDSC defendants' side is staggering.

We conclude Maudlin is not in pari delicto with PDSC and Vasa, and could have enforced the Secular Trust obligations against PDSC, a California corporation. The remaining issue is whether he may enforce these obligations against PDSC, a Delaware corporation, a subject to which we now turn.

*PDSC, a Delaware Corporation, is Liable as the Successor by Merger to PDSC, a California Corporation*

[6] The PDSC defendants assert they are "innocent" parties, enjoying a status like a bona fide purchaser for value without notice, a characterization the court implicitly adopted. But there is no authority for this proposition. The effect of a statutory merger is set forth in Corporations Code section 1107, subdivision (a): "Upon merger pursuant to this chapter the separate existence of the disappearing corporations ceases and the surviving corporation shall succeed, without other transfer, to *all* **735 the rights and property of each of the disappearing corporations and shall be subject to *all the debts and liabilities of each in the same manner as if the surviving corporation had itself incurred them.*"(Italics added.) In short, PDSC, a Delaware corporation, has the same obligation as does PDSC, a California corporation, "as if [the Delaware corporation] had itself incurred" the obligation. If PDSC, a California corporation, would have been liable to Maudlin, so too would PDSC, a Delaware corporation. (See, e.g., *Treadaway v. Camellia Convalescent Hospitals, Inc.* (1974) 43 Cal.App.3d 189, 118 Cal.Rptr. 341 [surviving corporation in statutory merger is subject to reformation of one of its assumed contracts as if it had been the original party to the contract].) Cases cited by the PDSC defendants suggesting the contrary are all inapt as they do not involve a statutory merger, but instead discuss the rights of a bankruptcy trustee or the transferee of a fraudulent conveyance. If there was any fraud or concealment in connection with the merger, the PDSC defendants' remedy, if any, is against those who participated in the merger. Maudlin did not.

*1017*Remedy on Remand*

[7] As we have explained, neither the consideration for, nor the primary object of, the (disguised) stock redemption agreement is unlawful. But the law nevertheless restricts the conditions under which each payment may be made. Maudlin's entitlement to each payment of cash as it becomes due is dependent upon PDSC's having sufficient retained earnings at the time of payment. Thus, any deficiency in the amount of PDSC's retained earnings would make its performance at least temporarily impossible. But a "[t]emporary impossibility usually *suspends* the obligation to perform during the time it exists." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 833, p. 921.) The obligation to perform is not excused or discharged by a temporary impossibility-it is merely suspended-unless the delayed performance becomes materially more burdensome or the temporary impossibility becomes permanent. (*G.W. Andersen Construction Co. v. Mars Sales* (1985) 164 Cal.App.3d 326, 334-337, 210 Cal.Rptr. 409 [governmentally imposed construction moratorium did not discharge obligation of general contractor affected by moratorium, but merely suspended its duty where delayed performance would not have been materially more burdensome].)

California law on temporary impossibility mirrors the Restatement Second of Contracts, section 269, which provides: "Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform while the impracticability or frustration exists but does not discharge his duty or prevent it from arising unless his performance after the cessation of the impracticability or frustration would be materially more burdensome than had there been no impracticability or frustration." [FN6] On the other hand, "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 19 of 20

137 Cal.App.4th 1001                                                                                           Page 11
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
(Cite as: 137 Cal.App.4th 1001)

was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." (Rest.2d Contracts, § 261.)

> FN6. "The Second Restatement consolidates the subjects of impracticability and frustration of purpose, substituting the term 'impracticability' for 'impossibility' as better expressing the extent of the increased burden required." (1 Witkin, *supra*, Contracts, § 829, p. 917.)

Thus, on remand, the court must determine whether PDSC had sufficient retained **736 earnings to meet the section 500 test at the time each $10,000 payment became due, beginning with the missed payment in June 2003 through the month of the new trial, and, if the test is not met when a payment became due, determine whether the deficiency was temporary, thereby merely *1018 suspending the duty to pay, or whether, without fault of PDSC, the deficiency has become sufficiently permanent to excuse further payments. The court may consider the evidence already in the record, together with such additional evidence as it may deem necessary or advisable to receive.FN7

> FN7. As described in footnote 4, *ante*, we are aware of evidence in the record that would circumstantially support a finding that PDSC had sufficient retained earnings to make all payments to Maudlin through at least May 2004. But, as noted, the appellate record does not contain all of the evidence from the original trial, and the required factual findings are properly made by the trial court in the first instance. Moreover, a proper determination of the amount of retained earnings will likely require a restatement of PDSC's financial statements to account for the effect on its retained earnings of treating the payments to Maudlin as a stock redemption, thereby eliminating their deduction as an ordinary business expense, and accounting for the additional tax burden on PDSC.

[8] Judgment, however, may be entered only for the accrued, unpaid installments not suspended by the operation of section 500-not for the present value of the future income stream. Maudlin's theory of anticipatory breach of contract argued at the first trial is inapplicable to the installment obligation created by this stock redemption agreement. It is well established in California law that, in the absence of an acceleration clause, a contract made unilateral by one party's complete performance renders the doctrine of anticipatory breach inapt. (See *Cobb v. Pacific Mutual Life Ins. Co.* (1935) 4 Cal.2d 565, 571, 51 P.2d 84(*Cobb* );*Minor v. Minor* (1960) 184 Cal.App.2d 118, 122, 7 Cal.Rptr. 455;*Diamond v. University of So. California* (1970) 11 Cal.App.3d 49, 53-54, 89 Cal.Rptr. 302;*Harris v. Time, Inc.* (1987) 191 Cal.App.3d 449, 457-458, 237 Cal.Rptr. 584.) While this rule has been criticized (see, e.g., *Harris v. Time, Inc., supra*, 191 Cal.App.3d at pp. 457-458, 237 Cal.Rptr. 584), we are bound by our Supreme Court's holding in *Cobb*.(*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455, 20 Cal.Rptr. 321, 369 P.2d 937.) Maudlin may recover all payments that are owed through the time of trial, but must await default on the future installments before bringing an action for nonpayment. (*Minor v. Minor, supra*, 184 Cal.App.2d at p. 126, 7 Cal.Rptr. 455.)

Finally, because the court found the transaction unenforceable by Maudlin, it made no other findings on his other causes of action. Accordingly, on remand, the court must also make findings on Maudlin's remaining causes of action against PDSC and ADS.FN8

> FN8. Maudlin made no argument on appeal with regard to his claims against Vasa, and Vasa did not appear in this appellate proceeding. Because no error has been affirmatively shown, the judgment as to Vasa is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, 86 Cal.Rptr. 65, 468 P.2d 193.)

*1019 DISPOSITION

The judgment is reversed and remanded with directions to the trial court to determine the amount owing to Maudlin under the Secular Trust through the date of the new trial, in a manner consistent with the views expressed in this opinion. Further, the trial court must make a new decision on Maudlin's remaining causes of action against PDSC and ADS. In making its determinations, the trial court may

Case 3:07-cv-02383-JM-LSP   Document 26   Filed 03/19/2008   Page 20 of 20

137 Cal.App.4th 1001 Page 12
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391
**(Cite as: 137 Cal.App.4th 1001)**

utilize **737 the evidence presented at the original trial, together with such additional evidence as the court may deem necessary and proper to receive. Maudlin shall recover his costs on appeal.

WE CONCUR: RYLAARSDAM, Acting P.J., and BEDSWORTH, J.
Cal.App. 4 Dist.,2006.
Maudlin v. Pacific Decision Sciences Corp.
137 Cal.App.4th 1001, 40 Cal.Rptr.3d 724, 06 Cal. Daily Op. Serv. 2384, 2006 Daily Journal D.A.R. 3391

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.